```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             WESTERN DIVISION

 3      LDGP, LLC, et al.,          )        Docket No. 15 C 50148
                                    )
 4                    Plaintiffs,   )        Rockford, Illinois
                                    )        Tuesday, August 2, 2016
 5             v.                   )        10:15 o'clock a.m.
                                    )
 6      CYNOSURE, INC.,             )
                                    )
 7                    Defendant.    )

 8                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE IAIN D. JOHNSTON
 9
        APPEARANCES:
10
        For the Plaintiffs:         POWERS, ROGERS & SMITH
11                                  (70 W. Madison Street,
                                     Suite 5500
12                                   Chicago, IL  60602) by
                                    MR. DEVON C. BRUCE
13
                                    WILLIAMS McCARTHY
14                                  (120 W. State Sreet,
                                     P.O. Box 219,
15                                   Rockford, IL  61105-0219) by
                                    MR. MARC C. GRAVINO
16
        For the Defendant:          SMITH AMUNDSEN LLC
17                                  (150 N. Michigan Avenue,
                                     Suite 3300,
18                                   Chicago, IL  60601) by
                                    MR. ERIC L. SAMORE
19                                  MR. RONALD D. BALFOUR

20      Court Reporter:             Mary T. Lindbloom
                                    327 S. Church Street
21                                  Rockford, Illinois  61101
                                    (779) 772-8309
22

23

24

25
```

1          (The following is from a tape-recording of proceedings:)

2              THE CLERK:  Calling 15 CV 50148, LDGP v. Cynosure, Inc.

3              THE COURT:  All right.  Let's get appearances.

4              MR. BRUCE:  Devon, D-e-v-o-n, Bruce on behalf of the

5     plaintiffs, your Honor.

6              MR. GRAVINO:  Marc Gravino on behalf of the plaintiffs,

7     your Honor.

8              MR. SAMORE:  Good morning, your Honor.  Eric Samore on

9     behalf of defendant Cynosure.

10             MR. BALFOUR:  Good morning, your Honor.  Ronald Balfour

11    for Cynosure.

12             THE COURT:  Good morning.

13             All right.  I've got multiple motions in front of me.

14    Essentially they're just the cross-motions.  It's all over the

15    same types of issues.  I've read the -- I've read this.  I've

16    read the pleadings.

17             MR. SAMORE:  Your Honor, may I make a preliminary

18    request?  And that is I'd like to supplement the record with the

19    product brochure that was given to customers in 2013, which was

20    the approximate time that the plaintiffs made their purchases.

21    And I've provided them with a copy of this with the tabs earlier

22    this morning.

23             THE COURT:  Have you seen a copy?

24             MR. BRUCE:  Yeah, he e-mailed me yesterday.  I couldn't

25    download it.  He showed me this morning.  Mr. Samore.  I don't

1    have a copy of them.

2            I guess as a general proposition -- I'm easy going,

3    Judge.  If he wants to refer to it -- he's representing to the

4    court that was given to all of the plaintiffs.  I don't know

5    that that's the case.  We haven't -- I mean, just -- but no, I

6    don't have a problem with it, and things come up.  So, that's

7    fine, Judge.

8            THE COURT:  Sure.  If Mr. Ferguson is allowed to handle

9    it.

10           MR. SAMORE:  Your Honor, I'm not representing that it

11   was handed to all of the plaintiffs.  What I'm saying is that

12   that was the product brochure that was the first version in 2013

13   that it was the custom and practice to provide to customers.

14   The exact version that was given to these plaintiffs --

15           THE COURT:  And so, let's get our nomenclature clear.

16           MR. SAMORE:  Yes.

17           THE COURT:  When you're saying customers, you're saying

18   purchasers of the product.

19           MR. SAMORE:  Purchasers of the product, right.  We

20   don't have any testimony from any customers, including the

21   plaintiffs, with respect to exactly what was provided before the

22   sale, which is one of the reasons why the record is so garbled

23   in this matter.  But what we do know is that the --

24           THE COURT:  Can we back up to what I was talking about?

25           MR. SAMORE:  Oh, absolutely.  Sorry.

```
1                THE COURT:  Just for fun.

2                MR. SAMORE:  Sure.

3                THE COURT:  All right.  If you want this to be part of

4    the record, you're going to have to file it on CM/ECF.  Okay?

5    And I have it.  They've got a copy.  Plaintiff has a copy.  And

6    I'll take a look at it.

7                MR. SAMORE:  Okay.  Thank you.  Thank you.

8                THE COURT:  But if you want it going in the record and

9    you want it to be part of the record, make sure you take it down

10   to the second floor and file it on CM/ECF --

11               MR. SAMORE:  Sure.

12               THE COURT:  -- with the Clerk's Office.

13               I also, because I'm a glutton for punishment, went

14   through the Manual of Complex Litigation again, just because

15   it's so much fun.  The -- let me put this all in context.

16               When we initially set the schedule for the case, I did

17   it in phases.  Some people might say bifurcated.  So, we were

18   focused on the class cert issue, not the merits issue, with the

19   idea being that it would simplify discovery.  And I'm pretty

20   confident I said at that time that oftentimes when you try to

21   simplify discovery by bifurcating, it comes back and bites you,

22   and it doesn't really simplify things.

23               And so, the Manual for Complex Litigation is very

24   helpful in that regard, and it says you should try to simplify

25   unless it causes more problems.  This appears it might be one of
```

 1    those cases that maybe we just opened a whole issue up for full

 2    blown merits discovery, discovery on everything, and we can

 3    proceed, and then once everything's set for class cert, we can

 4    have a class cert motion.  I can brief that while we continue

 5    on.

 6              So, that's my opening on what I've got.  So, I've read

 7    the materials.  I got a sense of where things are going.

 8    Defendant filed the initial motion.  So, first in the door.  So,

 9    tell me -- I've got lots of questions.

10              MR. SAMORE:  Sure.

11              THE COURT:  But tell me what you want to tell me.

12              MR. SAMORE:  Sure.

13              THE COURT:  And then I'll hear from Mr. Gravino, and

14    then you tell me again, and we'll keep talking.

15              MR. SAMORE:  Yes, your Honor.  Thank you very much.

16              Just to -- I'd like to comment upon the brochure that

17    was actually provided to customers in 2013.  Because if you read

18    the material that was actually provided to customers, it clearly

19    represents on Pages 438, Bates stamp 438 and 440, better

20    clearance with fewer treatments.

21              THE COURT:  Okay.

22              MR. SAMORE:  Clearance is a percentage.  Better

23    clearance with fewer treatments.  It's not promising perfect,

24    invisible to the naked eye.  On Page 440, better results.

25    Again, not promising it will be invisible to the naked eye.  The

1     product brochure that was handed to customers also included

2     photographs of the actual tattoos showing that they were -- some

3     were partially removed, but not completely removed.

4          The photographs that plaintiff has been basing his

5     entire brief on are post-sale documents, and those -- we

6     question and it will be a subject of discovery whether those

7     were seen by any of the plaintiffs because they were not part of

8     the product brochure, and those photographs were available for

9     doctors to use --

10          THE COURT:  Which photographs?

11          MR. SAMORE:  -- if they wanted to market to their

12     customers, to their patients.

13          THE COURT:  Which photographs?  The ones that I'm

14     looking at now --

15          MR. SAMORE:  No, no, no, no, no.

16          THE COURT:  -- that you just handed me or the other

17     ones?

18          MR. SAMORE:  The photographs that the plaintiff has --

19          THE COURT:  The butterfly.  Butterflies on models.

20          MR. SAMORE:  The butterfly.

21          THE COURT:  Okay.

22          MR. SAMORE:  And so, at a minimum, I mean, what I can

23     safely say on this record is that we believe that the evidence

24     will show that prior to the sale the defendant expressly

25     represented that the product would provide better clearances

1    with fewer treatments.  It's not promising a hundred percent.

2    And that's significant.

3              In addition, the understanding of the plaintiffs is

4    very important for all of the issues in the case, issues

5    pertaining to reliance, whether they were deceived by those --

6    even if they saw those photographs before the sale, whether they

7    were deceived by them, whether they relied on them, whether

8    there was a proximate cause of their alleged injury.

9              THE COURT:  If you saw the photographs, how would you

10   not rely upon them?

11             MR. SAMORE:  Well, if they -- well, because they have

12   to be viewed in context of all of the representations that were

13   made, and in context it was represented that the product would

14   not remove -- necessarily remove 100 percent of each and every

15   tattoo.

16             I think that if you saw some photographs showing that

17   there was complete removal and some that were not, you would

18   conclude that sometimes -- you might conclude that sometimes

19   there was -- it was invisible, and sometimes it was not.

20             In addition, the visibility depends upon the distance.

21   I mean, what is invisible at six feet is not maybe visible at

22   three feet or two feet.  And the -- I mean, I'll go right down

23   the various things, but --

24             THE COURT:  I don't want to head down too far on this

25   rabbit hole, but what's the purpose of this picture with a

1    totally clear back?

2            MR. SAMORE:  That's to draw attention to the product.

3            THE COURT:  Where is the product?  Unless it's a

4    massage parlor and we're in Vegas, I'm not sure what the product

5    is here.

6        (Laughter.)

7            THE COURT:  Okay.  It's going to draw attention.

8            MR. SAMORE:  Right.

9            THE COURT:  Okay.

10           MR. SAMORE:  All right.  Now, I can go through -- I

11   don't know if you want me to go through each of the requests in

12   broad categories.

13           THE COURT:  Tell me whatever you -- look.  I've got my

14   own views.  I've thought about it.

15           MR. SAMORE:  Okay.

16           THE COURT:  I've got some ideas, but --

17           MR. SAMORE:  Okay.

18           THE COURT:  -- you've briefed it.

19           MR. SAMORE:  Okay.

20           THE COURT:  You know I've read the briefs.

21           MR. SAMORE:  All right.

22           THE COURT:  If there's something you want to highlight,

23   if there's something new that came up, like, you know, you want

24   to show this, you tell me what you want to tell me, and I'll

25   hear what they have to say.

1      MR. SAMORE:  Right.  Okay.  Thank you, your Honor.

2      Okay.  Now, with respect to the discovery pertaining to

3 the number of procedures performed and revenues, that evidence

4 is relevant to the PicoSure at the time of purchase.  One way to

5 value an asset is by the revenue that can be generated by the

6 asset.

7      With respect to our motion concerning customer

8 complaints and satisfaction, those documents are clearly

9 relevant to the key issue.  Did the product perform as

10 represented.  Okay.  Did they achieve better clearances with

11 fewer treatments.

12      In addition, I mean, without those -- I mean, what

13 they're saying to us is the product didn't work as represented,

14 but they're denying us the evidence that would show whether the

15 product worked or not.  The evidence of the patients'

16 complaints, their satisfactions, their comments is directly

17 relevant to the key issue in the case.

18      Request number 25 concerns documents pertaining to the

19 plaintiffs' complaints or compliments.

20      In addition, interrogatory number 15 asks for all

21 individuals who declined to use the product because of the

22 alleged deficiency.

23      Another category is the use of other tattoo removal

24 products.  This product was geared to doctors or medical

25 professionals who were working under their supervision.  That's

1    required by law to be operated either by a doctor or under their

2    supervision.

3              Their prior experience with tattoo removal products is

4    relevant to their understanding, and their understanding is

5    relevant to the issue of whether they were actually deceived,

6    whether they relied, and whether there was a proximate cause of

7    their damages.

8              Requests 27 through 29 requests a consent form and

9    other informational documents, and this is very important to me.

10   I think that what we'll see there is that the doctors disclosed

11   to their patients.  They may have disclosed to their patients

12   what type of results to expect from the -- by the PicoSure

13   product, which would indicate -- which would be strong evidence

14   with respect to what their understanding was with respect to its

15   efficacy.  Their disclosures to their own patients is directly

16   relevant to the key issues in the case.

17             We also ask --

18             THE COURT:  The key issues in the case or as to class

19   cert?

20             MR. SAMORE:  I think it's directly --

21             THE COURT:  Because that's why I tried to frame the

22   issue.  We were here for class cert.

23             MR. SAMORE:  That's a great -- and I honestly believe

24   it is relevant to both.  It's relevant to the certification

25   because for multiple reasons.  One is if discovery reveals, as

1    we believe it will, that there's a variance of understanding

2    between different purchasers, before they make this $300,000

3    purchase, they're going to do some research on it.  They're very

4    likely going to be reviewing authoritative articles.  They're

5    going to have their prior experience with other tattoo removal

6    products.  All that evidence may vary from plaintiff to

7    plaintiff, which may render it unsuitable for class

8    certification.  The claims may not be typical.  They may not be

9    adequate.  There may be a predominance of individualized input.

10         It's also relevant to the merits, whether these claims

11   even have a cause of action.  Again, plaintiffs' advertisements,

12   how they advertise, is directly relevant to what their

13   understanding was.  They basically have blocked us from seeing

14   any of their advertisements prior to their purchase of the

15   PicoSure.  But what we know is that -- from our own independent

16   research is that they understood tattoo removal not to mean

17   100 percent invisible to the naked eye.

18         THE COURT:  Let me pause you right there because I did

19   not follow that.  So, you did your own research.  You've gone

20   online.  You've found some things.  And you said that the

21   exhibits supported the position that they knew it wouldn't

22   remove, as --

23         MR. SAMORE:  Yes.

24         THE COURT:  -- in eliminate, the tattoos.  And then one

25   is Exhibit C on docket entry 71.  It's the same exhibit -- I

1    want to say they're D, E, and F.  Hold on one second here.  Yes.

2    D, E, and F in docket entry 69.  I'm not seeing it.

3              MR. BALFOUR:  I'm sorry.  In which part?  Okay.

4              THE COURT:  It is docket entry 71.

5              MR. BALFOUR:  Right.

6              THE COURT:  And it's Exhibit C.

7              MR. BALFOUR:  Right.  It's the same --

8              MR. SAMORE:  Oh, exhibit.

9              THE COURT:  It's the same document that's in 69, and

10   then there's two others.

11             MR. BALFOUR:  But Exhibit C or D.  Sorry.

12             THE COURT:  C, as in cat.

13             MR. SAMORE:  Exhibit C what we have is an article on

14   laser tattoo removal.

15             THE COURT:  Right.

16             MR. SAMORE:  Okay.  And Exhibit D is --

17             THE COURT:  No.  Okay.  Let's do this really simply.

18   Pick up Exhibit 71.

19             MR. SAMORE:  Okay.  We have Exhibit 71.

20             THE COURT:  Okay.  There's only --

21             MR. SAMORE:  Oh, 71.

22             THE COURT:  It only goes up to Exhibit C, as in cat.

23             MR. SAMORE:  Oh.  What 71 is -- let's see.  I've got --

24   our motion was document 69.

25             THE COURT:  Right.

1          MR. SAMORE:  Okay.  And then where's 71?  71.  Is that

2     the plaintiffs' filing or -- I'm sorry.

3          THE COURT:  Nope.  Signed by you.

4          MR. SAMORE:  Okay.  It's Exhibit 71.

5          THE COURT:  Yes.  All right.  Let's try to make it

6     easier.  The same documents are in Exhibit 69.

7          MR. SAMORE:  Okay.  Oh, wait a second.  I think I see.

8     71.

9          THE COURT:  Exhibit D.  D, as in dog, in Exhibit --

10         MR. BALFOUR:  D, as in dog, yes.

11         MR. SAMORE:  Okay.  We have that.  Yes.  Thank you.

12         THE COURT:  (Continuing) -- in filing 69 is the same as

13    Exhibit C, as in cat, in 71, and Exhibit E is attached to that.

14    These are all documents that the defendant was able to obtain, I

15    assume online, and the point that the defendant was trying to

16    make or I was told in the pleadings or in the briefs, that these

17    exhibits showed that the plaintiff understood that removal meant

18    not eliminate, but to lessen.

19         MR. BALFOUR:  Right.

20         THE COURT:  That's the pitch that was made.  I looked

21    at the exhibits, and I'm not seeing that at all.

22         MR. BALFOUR:  So, your Honor, these documents are from

23    before this plaintiff bought the PicoSure machine.

24         THE COURT:  Okay.

25         MR. BALFOUR:  They are talking about tattoo removal.

1    They specifically say our RevLite lasers on the first page

2    remove tattoos.  Now, that is the same RevLite laser that the

3    studies show is less effective at removing tattoos than the

4    PicoSure, the point being that the plaintiffs have represented

5    to their own customers that tattoo removal does not mean what

6    counsel now says they think it means.

7              THE COURT:  You lost me.

8              MR. BALFOUR:  Sorry.  So, they're talking about tattoo

9    removal, right?

10             THE COURT:  All right.  We're looking at Exhibit D.

11   Got it?  D, as in dog.  Got it.  All right.  It's in front of

12   me.

13             MR. BALFOUR:  And under the tattoo removal heading, it

14   says, quote, our RevLite lasers safely penetrate the skin and

15   target get each tattoo ink color with specific wavelengths,

16   causing tattoos to gradually fade during the course of 5 to 15

17   treatments.  Now, that, based on the heading, is what plaintiffs

18   describe as tattoo removal to their own customers.

19             THE COURT:  Are we looking at the same document?

20             MR. SAMORE:  I think that --

21             THE COURT:  D, as in dog.

22             MR. BALFOUR:  Yes, that's the same -- I'm looking at --

23             THE COURT:  Where is the our RevLite removals?  It says

24   tattoo removals.

25             MR. SAMORE:  Oh, I see.

```
1              THE COURT:  Then there's a box that says safe and
2    effective --
3              MR. BALFOUR:  Right.
4              THE COURT:  -- tattoo removal.
5              MR. BALFOUR:  So, four lines down from that.
6              THE COURT:  Okay.  Our staff is trained?
7              MR. BALFOUR:  No.  Right above that.  The last sentence
8    of the first paragraph there.
9              THE COURT:  Our RevLite.
10             MR. BALFOUR:  Lite TM lasers.
11             THE COURT:  Okay.  Our RevLite lasers safely penetrate
12   the skin and target each tattoo ink color with specific
13   wavelengths, causing tattoos to gradually fade during the course
14   of 5 to 15 treatments.  Okay?
15             MR. BALFOUR:  So, according to plaintiffs, that's what
16   tattoo removal means.
17             THE COURT:  Is there anything on the next page of
18   Exhibit D, as in dog?
19             MR. BALFOUR:  The next page again they're talking about
20   tattoo removal on the bottom.
21             THE COURT:  Right.  I'm there.
22             MR. BALFOUR:  The laser emits short zaps of light,
23   targets and stimulates the body's immune system to remove the
24   pigment.
25             THE COURT:  Exactly.
```

1          MR. BALFOUR:  Right.  So, the point being that

2    plaintiffs' position that removal means complete elimination is

3    not the position they've taken with their own customers.

4          THE COURT:  It says remove the pigment.  Isn't that

5    remove?

6          MR. BALFOUR:  It does not, and the studies we've

7    provided show that because our machine is three times more

8    effective than the RevLite.

9          THE COURT:  Slow, slow, slow down.

10         MR. SAMORE:  It's important --

11         THE COURT:  My point being --

12         MR. SAMORE:  Yes.

13         THE COURT:  It's a really simple point is the documents

14    were provided in an attempt to show that the plaintiffs'

15    understanding of removal meant reduce, not eliminate, and I'm

16    just not seeing it in these documents.  I mean, it says remove,

17    right?  They use the same word.  Remove.

18         MR. BALFOUR:  Well, that's exactly right, but they

19    don't -- when they say that, they do not mean complete

20    elimination, unless -- counsel has pointed out repeatedly that

21    not all tattoos can be completely eliminated.  That's the whole

22    point of their entire motion.

23         THE COURT:  All right.  How about in E, as in Edward?

24         MR. SAMORE:  And, your Honor, did you see on Exhibit D

25    that it's a RevLite?  RevLite is referred to in one of the

1    studies as being the precursor.  It's not nearly as effective,

2    according to the medical study, as the PicoSure because the

3    wavelength of the PicoSure is much shorter.

4            THE COURT:  Okay.  How about E?  Tell me in E where it

5    would support the proposition that plaintiffs understood remove

6    means lessened, not eliminated?

7            MR. BALFOUR:  It's Page 3.

8            THE COURT:  Okay.  Hold on one second.  Two of four,

9    three of four.  Yeah.  It says can lighten or remove, right?

10           MR. BALFOUR:  It does say that.  But counsel is saying

11   that tattoos cannot be removed, which is contrary to what this

12   says.  Basically I think plaintiffs are taking a position that

13   doesn't jive with what they're telling their customers.

14           THE COURT:  I'm not seeing it.  Okay.  How about E --

15   or F.  Show me in F.

16           MR. BALFOUR:  F is the best one.

17           THE COURT:  Tell me in F.

18           MR. BALFOUR:  So, here's F.  F is great because it

19   specifically says on Page -- which --

20           THE COURT:  It says on Page 2 we guarantee tattoo

21   removal.

22           MR. BALFOUR:  Right.  So, the third page of this

23   towards the bottom, I have had 15 to 20 treatments.  Do you see

24   that in bold?

25           THE COURT:  Which part of it?  Page 3?

1          MR. BALFOUR:  Yeah.

2          THE COURT:  Three of eight?

3          MR. BALFOUR:  Yes.  Or three of seven.

4          THE COURT:  At the top it will say Page --

5          MR. BALFOUR:  Right.  4 of 8 at the top.

6          THE COURT:  4 of 8.  Okay.  I'm there.

7          MR. BALFOUR:  Towards the bottom.  I've had 15 to 20

8    treatments on my tattoo, and it's still there?

9          THE COURT:  Yes, I see that.

10         MR. BALFOUR:  Unlike traditional lasers, PicoSure is

11   great at removing previously treated tattoos.  That's our

12   product they're talking about.  That's the product they're

13   telling the court cannot remove tattoos, and they're telling

14   their customers the exact opposite.  In fact, I have a printout

15   from yesterday that their website still says that, despite what

16   they're saying in court now.

17         THE COURT:  All right.  So, now I understand.  What

18   you're telling me here is something different that's in the

19   brief.

20         MR. BALFOUR:  My apologies, your Honor.

21         THE COURT:  Or maybe my interpretation is wrong.

22         Okay.  So, I paused you there.  You were telling about

23   what you found online.  I obviously saw what you found online

24   where they're talking about -- it says complete removal.  Okay.

25         All right.  Go ahead.

1           MR. SAMORE:  So, their advertisements we believe are

2     relevant and should be produced because we believe that

3     plaintiffs understood the phrase tattoo removal consistent as

4     it's stated and used by the FDA consistent as it is used by

5     authoritative articles in their medical field.  We also request

6     records pertaining to --

7           THE COURT:  Is there any evidence that they knew about

8     these authoritative articles?

9           MR. BALFOUR:  No, because they refused to provide the

10    evidence.

11          MR. SAMORE:  They've (inaudible) to block us --

12          THE COURT:  I'm just asking questions.

13          MR. SAMORE:  One of the 30(b)(6) topics that they've

14    objected to is what research they did before making this

15    $300,000 purchase.  We believe that some people before they make

16    a $300,000 purchase are not just relying on the salesperson's

17    representations, that especially doctors may have done their own

18    independent research of this product, and our website has

19    consistently cited all of the authoritative peer-reviewed

20    articles praising the PicoSure product as a significant

21    improvement over any prior similar product.

22          THE COURT:  So that you look like this woman, with

23    nothing on her back.  Okay.

24          MR. SAMORE:  The tattoo removal training is important

25    because if they were not obtaining the good results that were

1   reported in the medical literature by -- you know, including

2   doctors at Harvard and Massachusetts General, who was one of the

3   authors of a couple of the peer-reviewed pieces.  If they were

4   not obtaining better clearances with fewer treatments, then

5   maybe they weren't using the product properly.  It's a

6   complicated product.  There has to be settings, training.  The

7   product has to be used by a doctor under a doctor's supervision

8   by a medical professional that has been authorized by the state,

9   and that varies from state to state.

10          Unless you've got further questions, that's pretty much

11   it.  I reserve the right to comment after hearing plaintiffs'

12   argument.

13          THE COURT:  Everybody will have -- you don't have to

14   reserve anything here.  We'll talk.

15          Is there any insurance coverage currently on this?  Is

16   there a DEC action pending?

17          MR. SAMORE:  There is -- I'm not involved in the

18   insurance coverage, but there is a defense and a reservation of

19   rights.  I don't believe there's an insurance declaration

20   coverage, any coverage litigation.

21          THE COURT:  I know it's kind of early to be talking

22   about this, but are we going to -- does anybody anticipate

23   bringing in third-parties in this case?  And if so, would there

24   be like insurance coverage for an advertising policy?

25          MR. SAMORE:  I don't believe that there's any

1     third-parties that are contemplated to be brought into this

2     case.  We do not -- at this point in time, we believe that --

3     you know, that the product worked as represented.

4          In addition, we should note that with respect to --

5     there's a pending motion for judgment on the pleadings that

6     would eliminate several of the counts that would narrow the

7     issues further if that's granted.

8          THE COURT:  And that's pending before the district

9     judge --

10         MR. SAMORE:  Yes.

11         THE COURT:  -- once it gets fully briefed.

12         MR. SAMORE:  Right.

13         THE COURT:  Okay.  Because here's why I ask that.  You

14     know, I see the photos, you know, with the before and after,

15     which is it disputed that it was photo-shopped?  Is there any

16     dispute about that?

17         MR. SAMORE:  With respect to one of them, there's no

18     dispute.  With respect to two, I first saw those in conjunction

19     with this, but there's been no -- I'd have to verify with the

20     company.  What is disputed is whether those were seen by

21     customers before the purchase because those were marketing

22     materials that doctors could use after they made their purchase

23     to market to their customer.

24         THE COURT:  So, the people who have the tattoos get

25     shown this of a before and after that's been photo-shopped,

1    which is -- look.  I'm a simple guy.  So, I'm thinking, well,

2    that seems like an advertising pitch to me with a photo-shop,

3    and that's really a bad fact for somebody.  You know, it doesn't

4    take a lot to figure out.

5              MR. SAMORE:  Right, right.

6              THE COURT:  That's a bad fact for some entity in this

7    process that sold the product.

8              MR. SAMORE:  And it has been changed.  The photos

9    clearly state that they're a model, so that there's no

10   misunderstanding.  As soon as that photograph was brought, you

11   know, to our -- I learned about this, they changed the one, and

12   I believe all of them have changed.  If you go to the website,

13   it's been changed.  And so, your point is well --

14             THE COURT:  All right.  Okay.  All right.  Anything

15   else?

16             MR. SAMORE:  No.  Thank you, your Honor.

17             THE COURT:  Okay.  All right.

18             MR. BRUCE:  Judge, Devon Bruce on behalf of the

19   plaintiff.  Thank you.  Just a couple preliminary matters.  I

20   don't want to run afoul of your order, Judge.  I don't see

21   anybody else in the courtroom.  Cynosure's counsel hasn't made

22   an issue of it, but they were very particular about getting a

23   confidentiality, and I'm going to talk, refer to, and show the

24   court, and I just don't want to -- I didn't want to run afoul of

25   your order.

```
 1              THE COURT:  That's fine.  Not a problem.
 2              MR. BRUCE:  Okay.  I think you made a prefatory
 3    comment, your Honor, about how you had ordered this discovery to
 4    proceed, and that is part and parcel of what brings us here
 5    today, which is you had phased it.  We embrace that and agree
 6    with it.  And we're here today on class action discovery.  I'm
 7    going to let Mr. Gravino address that more towards the end.
 8              But you make an excellent point, Judge.  We're not --
 9    as I understood your order and what I've been conducting
10    ourselves is we're not at the merits phase discovery.  I have
11    that same book you do, and that's my bible in terms of this
12    discovery, as well.
13              In any event, so let me just respond to some of the
14    things that Mr. Samore said.  First of all, I don't mind him
15    giving us these documents this morning.  I don't have a copy of
16    what he gave to the court, but we'll get one from him.  But,
17    Judge, that is not in their briefs.  I mean, I just -- I think
18    it's important to kind of put this whole case and what we're
19    saying and what they're saying in context for looking at this
20    discovery and especially looking at it for the class action
21    discovery.
22              What we're saying in this case, and it is clearly set
23    forth in our pleadings, the first thing we're saying is they
24    advertised that this product would remove tattoos.  And I think
25    it's very important.  They want to -- at least in the briefs,
```

1    not so much today, they want to draw the court into this

2    semantical argument about what does that mean and the

3    interpretation and all of that, Judge.

4            I attached to our amended complaint and the original

5    complaint -- and I want to make it very clear.  We're not just

6    using the word remove as a basis of our argument.  We're saying

7    that they advertised that it would remove, using that verbiage,

8    and we also attached this woman's before and after where they

9    used the word remove, and that's very important in our argument.

10    I'm not just relying on the word remove.  I'm relying on the

11    word remove in the context that they -- and this isn't after

12    lawyers and lawsuits and what Devon Bruce decides to use.  This

13    is what their marketing people did.

14            Judge, and just as an aside, this is the first time I'm

15    hearing all of this argument about, you know, we didn't use that

16    to sell the product, and, well, we don't know if it's

17    photo-shopped.  Judge, this came from the plaintiffs.  Okay?

18    He's getting way off the record here.  I attached this to the

19    complaint.  They admitted that.  They used these products to

20    advertise the sale to the plaintiffs.  Period, full stop, end of

21    story.  These aren't my plaintiffs' documents.  All these

22    PicoSure documents with the picture -- and not just one.

23    There's replete.  There's woman after woman where it says before

24    and after.  It's PicoSure's documents, and they gave them to our

25    clients to get them to buy this product.  I mean, I'm hearing

1    this for the first time forever where they're saying, well, we

2    don't know if they relied on it, and that wasn't our intent, and

3    that sounds like what Mr. Samore is saying.

4            THE COURT:  Can I pause you right there, Mr. Bruce?

5            MR. BRUCE:  Yes.

6            THE COURT:  That's the allegation in the complaint --

7            MR. BRUCE:  Yes.

8            THE COURT:  -- the amended complaint, which is taken as

9    true for purposes of class cert.

10            MR. BRUCE:  Paragraph 13, your Honor, they admit it.

11            THE COURT:  Right.  I just pulled up the document.

12            MR. BRUCE:  And I think I cited it in my brief.  I

13    think it was Page 13.  They've admitted that they advertised

14    that this machine would remove tattoos.  They have further

15    admitted -- you know, I can answer the question that you asked

16    to Mr. Samore much more readily than he did.  Mr. Holevas and I

17    were arguing, if you recall, about who's going to take that

18    first woman's deposition, and I asked them in the answers to

19    interrogatories, you know, name, address, all that stuff, and

20    they specifically and emphatically said that that was

21    photo-shopped on there.

22            Now, Judge, we -- you know, the only thing that we

23    don't know -- and I think that Mr. Samore said two of these

24    they're acknowledging.  All of these are, you know, different

25    women, but they all have the before and after, and they're all

1    PicoSure, and they all use the word remove, and they're all used

2    to advertise this product.  This is a bunch of malarkey, this

3    idea that, oh, we didn't use it to get the purchasers to buy

4    this product.  And I think that's important.

5            And also they want to go down this road of, well, what

6    did the plaintiff purchasers understand.  Judge, they chose to

7    advertise this, and it's all over the discovery in this case.

8    New technology.  Groundbreaking technology.  Brand new PicoSure

9    technology, whatever that means.  It's a made up word that they

10   use.  But they're using this to say look, we got this brand new

11   product.  Don't buy the $50,000 one that lightens.  We want you

12   to buy the 300,000, 275,000, and here's what it does.  And

13   that's where their -- that's where their problem.  I didn't see

14   in any of Mr. Samore's response -- I made a big deal about this

15   in the complaint and in each of our motions.  They have no

16   response to this.  They have no response that brochure after

17   brochure that they gave to the plaintiff purchasers, that it's

18   before and after, and it's photo-shopped.  They have no response

19   for that.  Absolutely no response.

20           And the reason why, Judge, is it's consistent with the

21   formal representation they made to the FDA.  Formal

22   representation.  And we've pointed -- I didn't know about this

23   area of law, but if you're a company and you're applying for FDA

24   approval and you misrepresent something, that's subject to

25   criminal sanctions.  I put a footnote in there.  I learned this.

1    But they represented the truth, which is it doesn't remove the

2    tattoos.  Okay?

3            So, the point of the whole allegation in this complaint

4    is this, Judge.  We're saying they advertised that it would

5    remove tattoos using that photograph.  They have now admitted in

6    answers to interrogatories and in answer to paragraph 13 of the

7    complaint they did advertise it that way.  So, that's now not at

8    issue.

9            The second thing is we're saying that it doesn't remove

10   tattoos.  And the fact that they're saying it's photo-shopped is

11   absolutely an admission.  Judge, as you point out, if it truly

12   worked as represented, why did they take model after model after

13   model and photo-shop it.  If it works, then why didn't they just

14   use their machine.  It's that simple.  I mean, I think a jury's

15   going to get that in about a nanosecond.

16           THE COURT:  It looks like they kind of did with this

17   document.

18           MR. BRUCE:  Yes.  Absolutely.  The very document that

19   Mr. Samore is providing to the court as further, you know,

20   proof.  I mean -- so, I mean, Judge, and plus I'm relying upon

21   their representation.  I mean, I would like to know from leaving

22   here today, you know, from Mr. Samore, are they saying that this

23   removes or not.  Because I know what they told the FDA, it

24   doesn't, and I know that it doesn't do that based upon their own

25   advertising and what they've said.  So, at any rate -- so, I

1    guess that's my response to some of these issues.

2         So, then what they want to do, Judge, and you can read

3    my -- I don't like to -- I'm not one to like recite my brief and

4    just -- you can read what we've written, as well.  But each one

5    of these -- it's a very fact-based argument, right?  If you

6    accept as true that they said the car would go a hundred miles

7    an hour and they advertised it that way, which we've proven, and

8    the car doesn't go a hundred miles an hour, all of these facts

9    about whether the purchaser of the car was satisfied or whether

10   or not they knew how to drive in an Indy 500 or just they were a

11   16-year old kid first learning to drive, the car doesn't go a

12   hundred miles an hour.  Period.  Full stop, end of story.  So,

13   why --

14        THE COURT:  Why wouldn't it go to damages?

15        MR. BRUCE:  I'm sorry?

16        THE COURT:  Why wouldn't it go to damages?

17   Hypothetically.  Hypothetically.  Various plaintiffs, meaning

18   spas, surgical places, removal places, dermatologists, say

19   they've got a folder, manila folder, with the compliments.  I

20   assume it's going to be on a hard drive now in an electronic

21   folder, and all the ultimate customers who went in for a tattoo

22   removal, and there's five letters in there saying thank you,

23   thank you, thank you.  The tattoo is gone.  No one can see it.

24   My kids are happy.  My employer can't see it.  I'm happy.  I was

25   drunk and stupid at the time.  That would seem like it would go

1    to damages.

2         MR. BRUCE:  Can I address that?

3         THE COURT:  That's why I'm asking the question.

4         MR. BRUCE:  Yes.  So, first of all, that's falling --

5    and I'm being respectful, your Honor.  That's the trap that they

6    want you to fall in is let's start getting into all of these

7    extraneous facts that have nothing to do with it.  Whether or

8    not some --

9         THE COURT:  Nothing -- when you say it, what's it?

10        MR. BRUCE:  Yeah.  So, whether or not a customer or

11   customers -- I mean, I would like to take each one of these

12   facts to the extent that you have the time to tee some of these

13   up.  Let's give them the best case scenario and see why it

14   matters in the allegations I've made in this case, right?  It's

15   a breach of contract case.  All we're saying is they advertised

16   that it would do this, and they now have acknowledged --

17        THE COURT:  But it's more than a breach of contract

18   case.  There's a lot of claims, including the Texas Consumer

19   Fraud Act, which, boy, you don't want to be stuck with that

20   thing.  That's the worst thing for defendants on the planet.

21        MR. BRUCE:  So, to get to your point here, your

22   specific point about damages, Judge, I'm always over here -- and

23   I told Mr. Gravino.  I'm always over here on the left side for

24   the plaintiff.  I've never done the otherwise.  And having done

25   this quite a few years now, Judge, every once in a while we get

1    the playbook, which is they don't have a real response, but what

2    the defendants do is they contort, confuse, and kind of reallege

3    my complaint.

4            And to this point here, first they started to say,

5    well, he's saying rescission.  Then he's saying no, no, no.

6    He's saying restitution.  No, no, no.  He's saying -- and in the

7    reply brief it was no, no, no.  We need the revenue damages for

8    consequential damages.  Right?  They've made every claim under

9    the sun.

10           If you read the complaint and my brief as you have, we

11   are making a very simple UCC claim.  It is the claim under

12   sections -- I think it's two dash -- I don't have them all

13   memorized, Judge.  2-714 subsection --

14           THE COURT:  But the complaint has more than just a UCC.

15           MR. BRUCE:  I'm sorry?

16           THE COURT:  The complaint has much more than just a UCC

17   count.

18           MR. BRUCE:  So, well --

19           MR. SAMORE:  Misrepresentation, fraud, consumer fraud.

20           MR. BRUCE:  Well, Judge, I cited --

21           MR. SAMORE:  (Inaudible) fraud.

22           THE COURT:  Hold on.  You'll get a chance to talk.

23           MR. BRUCE:  Well, first of all, we get to frame our

24   damages the way we want, and the way we frame them -- I even

25   pointed this out in a brief.  There's good case law, and I cited

1    a case to you about in all of those different areas and

2    theories, the UCC says I get to use the breach of contract

3    damages as the damages that I can seek, and that's what we've

4    sought here.

5              And so, the point there is, Judge, to go to your point

6    about, you know, why is that not important on damages, they want

7    to get into these revenues so badly, and there's not a single

8    case that they cite in their opening brief or in their reply

9    brief -- because I whacked them pretty hard in our response

10   brief saying that the revenues are completely irrelevant for the

11   damages that we're seeking, and I thought they would come forth

12   with some case law if there was some out there because they cite

13   zero cases, zero cases at all that stand for the proposition

14   that with the allegations that we're making you get into

15   revenues, right?  There's no case that says that.

16             So, then I looked in their reply brief, and if you look

17   at Page 13 and 14, which is their entire section in their reply

18   brief on revenues, there's not a single case cited for that

19   proposition.  They don't have a case for that, Judge.

20             I'm not seeking consequential damages.  If they want to

21   waive the disclaimer that they made in their form contract to

22   every one of these purchasers, which obviously benefits us in

23   terms of the commonality, but if they want to waive that and say

24   we are not going to enforce that, then we can get into revenues,

25   and we can talk about lost revenues and expected revenues and

1  get into all that.  But they have a very clear disclaimer about

2  that, and we're not -- and I didn't allege that in the

3  complaint.  So, I --

4          THE COURT:  What kind of damages are you seeking on

5  your fraud claims and misrepresentation?

6          MR. BRUCE:  Same -- three whatever it is.  Yeah.  And I

7  knew that was -- I mean, you're making -- they didn't make that

8  argument, but you bring up a good point, and that's why I

9  fronted it, Judge.  And I'm sorry.  I can find that.  But I did

10 cite that in our brief, that all these different theories of

11 liability can avail themselves of that thing.  I'll find the

12 passage.

13         THE COURT:  All right.  I mean, I rarely have a

14 plaintiff tell me that they want to limit their damages.

15         MR. BRUCE:  Well, I mean, that's what I'm saying is,

16 Judge --

17         THE COURT:  I'm not saying it's never happened.

18         MR. BRUCE:  Yeah, but we're not making that claim,

19 Judge.  I mean, they sold this thing and it doesn't work for

20 $300,000, and we want the breach of contract damages.  And see,

21 they want to confuse and say, oh, Mr. Bruce is claiming -- I'm

22 not claiming that.  I'm not claiming that.  I mean, I don't --

23 and they don't have a case that says that they can get into it.

24         Why is the revenue -- if you look, every time they say

25 that, they throw out these broad propositions, but they don't

1    have a case.  The reason why they don't have a case is because

2    that's not the proper element of damages.  I mean, it's just not

3    there.

4         So, at any rate, I wanted to comment about some of

5    these other arguments that counsel's making.  I mean, so, you

6    know, all of this goes to customer satisfaction.

7         THE COURT:  That was my hypothetical.  Tell me why that

8    wouldn't --

9         MR. BRUCE:  Why is that relevant?

10         THE COURT:  Why is that not relevant to the merits, as

11    well as to class cert, to the extent you can separate those

12    cleanly.

13         MR. BRUCE:  Because, Judge, I'm sure that they're -- I

14    mean, give them the best case scenario that they dig up somebody

15    that says it removed you know, my tattoo.  Okay.  Give them

16    that, right?  Their own data that they provided to the FDA says

17    it absolutely doesn't do that.  I think Marc's got data here

18    that shows 51 to 74 percent of blue and greens do not on the

19    PicoSure machine get removed, right?  It doesn't remove these

20    tattoos.  That is an absolute truism.  It is an undisputed fact.

21         So, the fact that they can dig up somebody from my

22    clients, we go through all their patient HIPAA records, we go

23    through all the photographs of the patients, we go through all

24    the e-mails, we do this massive search, and they come up with

25    this block of people.  I mean, I'm answering your question.

1    Where does that get them?

2           THE COURT:  Because you're not seeking consequential

3    damages?

4           MR. BRUCE:  We're not talking consequential damages.

5    The car doesn't go a hundred miles an hour, and they've admitted

6    it.  So, whether or not somebody was happy with the car that

7    goes 20 miles an hour is irrelevant.  That's the crux of our

8    argument, and they don't really have a response to that.

9           They want to get into all these individual issues to

10   create some issue so that class cert will be denied, and I'm

11   not -- I mean, it's just -- the individuals that declined to use

12   the product.  That's the next thing that counsel talked about

13   today.  Same thing.  If somebody decided not to use the product

14   or they decide to use the product, you know, these third-party

15   people, that doesn't matter, Judge.  I'm representing,

16   hopefully, a class of people that bought this machine that were

17   told that it would go the hundred miles an hour, and it doesn't,

18   period, and we now know that.

19          THE COURT:  And those are all -- and I get where you're

20   coming from that those -- assuming it's all true, those are

21   terrible facts for the defendant.  But they're still entitled to

22   defend their case, though, aren't they?

23          MR. BRUCE:  But, Judge, they're not entitled -- and,

24   actually, one of their cases --

25          THE COURT:  I mean, it's not a binding absolute

1    judicial admission that they can never defend against, is it?

2            MR. BRUCE:  Okay.  And, I mean, I'm glad you -- first

3    of all, their own case law that they cited that I pointed out to

4    the court specifically talked about how you don't create these

5    frivolous defenses, you know, because they want to go into these

6    issues, and their own case law supports my proposition.

7            But to answer your question, Judge, how are they

8    calling -- in fact, Mr. Samore just admitted on the record that

9    they've now changed all their advertisements.  Now they're

10   saying it's models, and it doesn't do that.  Okay.  I mean,

11   which is it, right?  What they told the FDA is -- I don't know

12   how that can't be a judicial -- an absolute admission.  And the

13   fact --

14           THE COURT:  Well, and that's my point.  There's a

15   difference between an admission and a judicial admission that

16   you can be bound to.  That is going to be a statement by a party

17   opponent.  It's going to be all kinds of --

18           MR. BRUCE:  By counsel to a federal agency.  This is

19   huge, Judge.

20           THE COURT:  It's all kinds of things.  I get it.  I get

21   it.  Look.  People admit to all kinds of crimes, right?  Right?

22   And then say, well, no, I didn't do it.

23           MR. BRUCE:  But, Judge, you are in an unenviable

24   position.  You've got to balance all this, right, in terms of

25   discovery?  I mean, why do we have to go through all these

1    charades?  That's the point of -- that's the crux of our entire

2    motion.

3            THE COURT:  And I was going to go there.

4            MR. BRUCE:  Why do I have to go sit and have them ask,

5    you know, this fellow in Texas --

6            THE COURT:  How do we know?  Right now we don't know

7    what burden would be placed on your clients.  You're telling me

8    there's a huge burden.  Maybe there isn't a burden.  I don't

9    have an affidavit or anything in front of me.

10           MR. BRUCE:  Judge, I mean, I guess don't we have to

11   have an initial discussion before we even get to -- I mean, I do

12   think it's a burden, and we can do all that and get you an

13   affidavit, I suppose, but, I mean, at the end of the day, it's

14   got to have some semblance to the issues that are in the case,

15   right?  Customer satisfaction.  Give him the best case scenario.

16           THE COURT:  Well, it's got to be relevant and

17   proportional.  Once it gets over the low burden of relevant,

18   then I start looking at proportionality, which then you start

19   talking about burden, and that's where I start going are there

20   ways to resolve the burdens.

21           MR. BRUCE:  And we're fighting tooth and nail on all

22   these areas.  For example, let's take his research one, right?

23   Any one of these I think we can make an awesome argument that it

24   has nothing do with the issues as I framed them.  Talk about

25   research.  What did -- you know, what did whomever do in terms

1     of the research.  It doesn't matter.  It doesn't matter.  It

2     doesn't do what they said it does, and that's what is

3     undisputed.  It doesn't do that.

4          So, whether or not my client did five minutes of

5     research or 20 hours of research, where does that get them?  I

6     mean, oh -- I mean, at the end of the day -- and this whole

7     argument about, you know, showing -- I mean, that gets into

8     their -- I mean, really what they're asking you to do in a most

9     succinct manner is to look at -- the reason why I handed you

10    those brochures is they're not nearly as much of lies as these

11    ones that I have that I'm using, those advertisements where it

12    shows the fading, right?

13         And so, what really the defendants are asking you to

14    do, and it's in the briefs, but they don't come out and say it

15    is, what they're saying is it's okay in this country to

16    nationally advertise and on the website -- and these were on the

17    website.  Okay?  It's okay to advertise bold-faced lies to say

18    it will do something and not another, but if we have other

19    advertisements that aren't nearly as bad or, heaven forbid, are

20    actually true, that it's okay that you should know about the

21    non-lies, and you should know that the lies are lies.  That's

22    what they're arguing today, which is -- I mean, I can't believe

23    that they're making that argument, but that's really what

24    they're asking you to rule.  They're saying, oh, look at these

25    ones because they're not nearly as much of lies and disregard

1    these because we've had to admit that they're photo-shopped, and

2    it just fundamentally doesn't do what we've asked it to do.

3           So, I mean, Judge, I mean, what is the research -- and,

4    you know, the consent.  Give them the best case scenario on the

5    consent.  Give them the best case scenario.  Let's say we have a

6    client that says -- let's give Mr. Samore the best background

7    we can.  Let's say it says something like not all tattoo removal

8    machines can remove tattoos.  Best case scenario.  Where does

9    that get them?  That's the communication, first of all, between

10   the plaintiff purchasers --

11          THE COURT:  Well, that goes to reasonable reliance.  It

12   goes right to the --

13          MR. BRUCE:  I don't --

14          THE COURT:  -- representation claim because look.  And

15   I don't know what the facts show, but maybe every one of your

16   plaintiffs saw this and none of those.  That's best case

17   scenario for them.  Best case scenario for you is none of your

18   plaintiffs saw this, but they saw all of those.

19          So, assuming we've got warranties and reliance and

20   negligent and intentional misrepresentation, that all goes to

21   reasonable reliance, which is why it's hard to have -- not

22   impossible, but it's hard to have fraud claims as class actions

23   depending on what the pitch was.  If it's an individualized

24   pitch versus this or that, you're at different ends, right?

25          So, it would seem to me that -- again, now we're

1    getting -- you're getting into merits.  What the individual

2    plaintiffs saw, were told, and understood would go to their

3    reliance and whether it was a reasonable reliance.

4         MR. BRUCE:  I didn't mean to interrupt, Judge.  Just so

5    we're clear, and I think I cited this.  I know the motion is

6    before Judge Kapala and not you.  But the case law is very

7    clear -- and I'm happy to brief that -- that express warranties,

8    even after the purchase of the product, are incorporated into

9    the product description.  I mean, so that express -- that case

10   law is clear.  And so, you know, that's why I was like wondering

11   why he's arguing that because that doesn't help them.  If they

12   came out with this afterwards, which is not the case -- these

13   clients saw it beforehand.  But even assuming his fact pattern,

14   that doesn't matter.

15        I mean, they are damned by these things.  That was the

16   thrust of their advertising campaign.  It was on their Internet.

17   And, you know, I just -- and all of this discussion about what

18   my clients advertised, Judge, what he didn't tell you is that

19   those advertisements, the vast majority of those, were given to

20   the purchasers by PicoSure for them to put on their websites.

21   They bought the snake oil, as Mr. Gravino keeps reminding me.

22   My clients unfortunately bought the snake oil, and then they

23   just reconveyed what PicoSure literally wrote these

24   advertisements and put them back up there on the Internet.  So,

25   I mean, I'm sorry that they lied, and I'm sorry then that

1    these -- they said keep proffering our lies.  But I mean,

2    that -- and again, I think that's -- again, even if you assume

3    there's some best case scenario, that's the relationship, Judge,

4    between the plaintiff purchasers and all these third-party

5    people.  There's no claim here.  I'm not -- as of yet, I'm not

6    representing a bunch of people that said I got treated by a

7    PicoSure, and I'm suing them because the machine doesn't work.

8    They're not here.  He's not representing them.  I'm not

9    representing them.  I'm representing the purchasers.  So, the

10   relationship is what did they tell these people, and we know

11   what they told them in the pictures.  I mean, the pictures

12   are -- they just can't get away from the pictures, and that's

13   the thrust of their campaign.

14          THE COURT:  They're bad facts for them, and I think

15   they know that, and if they weren't bad facts, they wouldn't

16   have changed it, and then they get into a -- you know, an

17   evidentiary issue come determination.

18          I want to hear from Mr. Gravino.  Before I hear from

19   Mr. Gravino, I'm just going to throw this out.  The amended

20   complaint has claims in it that include attorney's fee

21   provision.  So, I think we're outside the ball park of a

22   common -- assuming plaintiff prevails or there's a settlement of

23   some kind, we're outside common fund, and we're talking about

24   attorney's fees, which is -- so, there's attorney's fees versus

25   common fund, right?  In my mind they're different.  They're

1    different aspects.  It's not like you've got a statute that says

2    if you win, you get your attorney's fees, right?  A couple

3    statutes that say that.

4         So, not that class actions never settle because they

5    almost always do, but if this is going to settle, it should

6    settle sooner rather than later so that the attorney's fee

7    provision -- or the attorney's fees don't go through the roof

8    and into the stratosphere, which would interfere with a possible

9    settlement.  Just throw that out there.  I don't determine

10   merits of the case unless the parties consent to me.

11        MR. BRUCE:  My brief response is, Judge, at any time

12   we'd be happy to pretry the case with your Honor.  I mean,

13   that --

14        THE COURT:  I'm always open for a settlement

15   conference.

16        So, let me hear from Mr. Gravino.  Tell me what you

17   wanted to tell me.

18        MR. GRAVINO:  Your Honor, on the issue that was just on

19   the table, I think my response to that would be even if the

20   defendants are successful if you were to allow this discovery

21   and they get into some of these individualizes inquiries, from

22   all the cases that I read in the handbook on class

23   certification, what the court really looks at is sort of the

24   thrust of the claim.  Has the plaintiff pleaded a claim that,

25   you know, if true, the thrust of that claim is appropriate for

1      class certification.

2              So, for example, there's a case -- and, your Honor, I

3      apologize.  This is probably not in our briefs.  It's Rikos v.

4      Procter & Gamble Company, Sixth Circuit Court Of Appeals.  I

5      need my glasses to see the cite.  799 F.3d 497.  It's a 2015

6      case.  And I think the analogy is strong and apparent to our

7      case.  In that case there was a probiotic nutritional supplement

8      that the plaintiffs allege didn't work.  It didn't have this

9      digestive health benefit.  It was expensive.  People bought it.

10     They didn't get any benefit.  And one of the holdings was the

11     alleged misrepresentation that the manufacturer's probiotic

12     nutritional supplement promoted digestive health was the only

13     reason to buy the supplement.  People didn't buy these so they

14     had something to swallow in the morning with their morning

15     vitamin.

16             And thus on consumers' class claims against the

17     manufacturer under North Carolina's Unfair and Deceptive Trade

18     Practices Act, it was reasonable to infer classwide reliance

19     based on the nature of the manufacturer's misrepresentations in

20     its advertising such that common questions predominated over

21     individualized inquiries as required.  So, what the court did

22     was it looked at whether you could have had some of these

23     individualized inquiries that may have cut against the larger

24     class and said even if --

25             THE COURT:  And you did balance it, and it comes out

 1    because it overwhelms the individualized.  Got it.  I'm with

 2    you.

 3         MR. GRAVINO:  That's right.  So, even if you let them

 4    go on this fishing expedition and they come in and say, oh,

 5    Judge, this plaintiff saw this, and this one saw this, I

 6    think -- and we've got a 30(b)(6) notice, deposition notice,

 7    Judge, that's out, and we think we're going to very readily

 8    prove that some version of this machine will do this -- and I'm

 9    pointing to this model with the butterfly tattoo.  Some version

10    of that was conveyed to each purchaser because sort of like the

11    probiotic case, Judge, the prior machines I understand were on

12    the order of 30 to $50,000.  You know, why rationally would

13    anyone spend upwards of the cost of a beautiful home in Rockford

14    for a tattoo machine that lightens tattoos marginally better

15    than the prior unit, when you can get the prior unit for 30 to

16    $50,000.  We think the essence of that claim is pleading.  The

17    only way they got the buyers over that $300,000 hump was a

18    representation that it would do this, the butterfly.

19         THE COURT:  The eliminate.

20         MR. GRAVINO:  The eliminate.  Eliminate in the context

21    of this picture, not eliminate in the abstract that it would do

22    this.  That's how they got there.

23         So, our position is that even giving the defendants

24    their due and assuming that they can unearth a couple of people

25    who said, oh, we loved it, it was the greatest thing that ever

1    happened, as your example, or whatever, those individualized

2    complaints are not going to predominate.  The predominant claim,

3    as stated in that case, is that it's reasonable to infer that

4    people bought it because of the advertisement.

5         THE COURT:  Okay.  And I haven't read that case.  So, I

6    don't know about it.  I understand where the court would be

7    coming from on that, and class certification issues are highly

8    factual dependent.

9         Let me ask you this.  Why should I keep it on a

10   bifurcated track?  Why shouldn't I just open this whole thing up

11   for merits discovery, send you folks on your way to get done

12   what you need to get done?  Because if a plan doesn't work when

13   you set it out at the beginning and you realize it's not

14   working, why stick with it?

15        MR. GRAVINO:  Judge, I think two reasons.  One is

16   legal, and one is practical.  Picking up on your earlier

17   comment, I think the vast majority of these cases do settle, and

18   I think they typically settle either during the pendency of a

19   motion to certify class or after a class has been certified, and

20   in the interests of justice, in the interests of moving this

21   case along, I think that if we can conclude this phased

22   discovery, as you earlier approved, I think the chances of

23   getting this case briefed and then the parties either try to

24   talk about a settlement prior to the ruling or awaiting a ruling

25   on class certification, I think it gives us a far greater chance

1    to get the case resolved expeditiously and not, you know, a year

2    or two or three from now after plenary discovery is opened up

3    and -- I'm trying to envision the breadth of their discovery

4    requests if we do that.

5            THE COURT:  That's my point.  I don't know how much --

6    when we spit-balled this whole idea on phased discovery, it made

7    sense that it would narrow the scope of discovery.  As I'm

8    getting into more of the details on the case, I don't know if it

9    does, in fact --

10           MR. BRUCE:  Judge, we could --

11           THE COURT:  -- saves.

12           MR. BRUCE:  Judge, I didn't mean to interrupt you.

13   Judge, we could bring our motion, which is on file.  We could

14   get the evidence for that in, you know, I'm just -- Marc's going

15   to kill me, but probably four or six of their witnesses max.  I

16   mean, and it's our motion and --

17           THE COURT:  All right.  Well, of course, they get a

18   response, and they get the opportunity to do discovery, too, on

19   their motion.

20           MR. SAMORE:  That's the whole point of --

21           THE COURT:  Hold on.  Let me finish with the

22   plaintiffs.  Anything else, Mr. Gravino?

23           MR. GRAVINO:  Judge, I think the -- you know, they've

24   created a self fulfilling prophecy, I think.  By doing this,

25   they're suggesting, oh, look what a mess this is, and it

1    overlaps with plenary discovery, and it facilitates the argument

2    we may as well just do plenary discovery.  But --

3            THE COURT:  They're not asking for it.  I'm the one

4    that's raising the issue.  And it's rare that a defendant says,

5    hey, let's open everything up for discovery.  Because the costs

6    jump through the roof for them, too.

7            MR. GRAVINO:  I understand, Judge, but my impression is

8    that in class certification defendants do what the defendants

9    are doing, and that is they forage through every avenue to try

10   to show that all these plaintiffs are different.  I understand

11   that.  That's their job, and they're doing that.

12           THE COURT:  That's the process.

13           MR. GRAVINO:  Again, it gets back to this -- sort of my

14   position that it seems -- in this case that I cited, Judge, I

15   think it's representative of these balancing ones.  The court's

16   kind of take a so what approach and say okay.  Even if you were

17   to get that, does that really gut the essence of the claim, and,

18   if it doesn't, the courts I think prudently say this thing goes

19   forward as a class.  You can't let individual variances --

20           THE COURT:  But the case you said is on class cert

21   issue, I haven't even gotten there.  I'm at the discovery.  I'm

22   the hair on the tail of the dog.

23           MR. GRAVINO:  I understand, Judge.

24           THE COURT:  I'm not the dog or the tail.

25           MR. GRAVINO:  But it goes to the relevance issue

1    because this opinion suggests and others that cite this say even

2    if they show that -- so, we'll give them all their due and say

3    they'll go out and find this -- and we'll agree for the sake of

4    argument.  They're going to find somebody who was happy with

5    this.

6            THE COURT:  So, as a matter of law, it cuts off all

7    opportunities to do the discovery?

8            MR. GRAVINO:  Not all.  Just the broader inquiry that

9    they're doing on these particular issues the way our claim is

10   framed.

11           THE COURT:  Well, I didn't read the case.  It wasn't in

12   the brief.  So, I didn't read it.  So, but that seems like --

13           MR. SAMORE:  And I apologize for that.

14           THE COURT:  It seems like a pretty Draconian process.

15   It doesn't seem to allow the defendants to defend.

16           Everybody's going to get an opportunity.  And, you

17   know, everybody knows my rule on the fishing expedition.  Meyers

18   v. Prudential Insurance Company.  Much of discovery is a fishing

19   expedition of sorts, but the Federal Rules of Civil Procedure

20   allow the courts to determine the pond, the type of lure, and

21   how long the parties can leave their lines in the water.  That's

22   my job.

23           So, anything else from the plaintiffs before I hear

24   from the defendant?

25           MR. BRUCE:  To the extent that you -- I mean, it sounds

1    like we're having a healthy discourse about this with both sides

2    and all that.  Judge, to the extent that you would rule that

3    some of these things should be subject to discovery, if we're

4    going to keep to the phase one, Judge, I really -- I mean,

5    there's a couple areas that I really think -- I just -- I mean,

6    the way I'm approaching -- I'll leave you with this thought.

7         First of all, on the revenues one, I just invite you

8    and everyone to look at the law on that because what they're

9    saying, they're contorting what I'm claiming in damages.  If you

10   look at what I'm claiming and then all of the arguments that

11   they make and throughout their briefs on the revenues, there is

12   just nothing to suggest that they're entitled to that in the

13   case law.  We are not claiming lost revenue period.  And the

14   element of damages I'm claiming under that UCC provision does

15   not look at revenues.  It doesn't.  And so, I just -- that I

16   feel quite adamant about.

17        The second thing is, Judge, I mean, patient records,

18   HIPAA patient records, I mean, that -- I mean, maybe it's our --

19   maybe I dropped the ball and I should have given the affidavit

20   or, you know, whatever.  We can supplement the record.  I mean,

21   depending upon which of these areas or categories that you say

22   okay is discoverable places -- if you're even saying they're

23   relevant, you know, place a tremendous burden on these

24   plaintiffs who have active practices and all of that in terms of

25   coming up with --

1              THE COURT:  Litigation is burdensome.

2              MR. BRUCE:  Okay.  I mean, I just -- yeah, but to what

3     end?  I mean, that's the crux of my motion, and I'll shut up

4     now.  To what end?  If you take each one of these isolated

5     things, they're just throwing everything up there saying, gosh,

6     it's all individualized.

7              But this is a very odd case.  I've been practicing law

8     for 25 years.  I never had just an absolute that somebody'd come

9     in and say we lied.  I've never had that in my life.  This is an

10    absolute lie, and I've never had that.  This is unique.  And as

11    you said, Judge, these are very fact-specific cases.  I've never

12    had a -- I did not expect when we got all these FDA documents

13    dumped on us right before our last hearing, I didn't expect

14    sitting home Saturday night reading these things to find out the

15    sentence where they say it doesn't remove tattoos.  I didn't

16    expect that.

17             And I'm not being facetious or whatever.  This is a

18    unique case.  They can't deal with these facts.  And so, you're

19    saying, Devon, why are you asking me to limit discovery.

20    Because of the unique facts that are here.  They've admitted

21    under oath these are all photo-shopped, and they never existed.

22    So, what does it matter if, you know, some customer is satisfied

23    out in Delaware.  That's not the case that I'm presenting.  I'm

24    saying that they were told and they represented clearly,

25    undisputably the car went a hundred miles an hour.  Now they've

1    said, based upon what we've learned so far in discovery, the car

2    doesn't go a hundred miles an hour.  Period.  Now they want to

3    say, well, Devon's talking about efficacy and satisfaction and

4    whether people were happy.  I'm not talking -- that's not the

5    allegation in the complaint, Judge, and they've admitted this.

6        THE COURT:  So, you just want your money back, the

7    $275,000 for each machine?

8        MR. BRUCE:  The UCC is very specific about the value,

9    and we can get into that.  I mean, that wasn't the crux of this.

10   My crux of my motion is is that the revenue damages -- or that

11   we're not claiming consequential damages.  We're not claiming

12   rescission.  I mean, they keep saying, well, Devon's claiming

13   this, and then I go in the brief and I say I'm not claiming

14   that.  Okay?  So, then the last one was --

15       THE COURT:  So, that's why I am asking you.  Do you

16   want -- does each plaintiff --

17       MR. BRUCE:  Okay.  So, it's the UCC --

18       THE COURT:  Hold on.  Let me ask a question.  Does each

19   plaintiff just want the $275,000 back?

20       MR. BRUCE:  Yes.

21       THE COURT:  Okay.  That's all I needed to know.

22       Let me hear from the defendant.

23       MR. SAMORE:  Okay.  They've said so many things that

24   were factually erroneous that it's hard --

25       THE COURT:  You can just say I disagree with them, and

1    then tell me what the importance of it is.

2          MR. SAMORE:  Just among other things, their own doctor,

3    after she had bought the product and used it for several months,

4    said PicoSure truly is the most advanced system available for

5    tattoo removal.  We're clearing most tattoos in fewer treatments

6    without causing harm to the skin, and results are like nothing

7    I've ever seen.  That was something she said.  That was not from

8    an internal website that was used for customers.  That's what

9    the plaintiff said.

10          We absolutely made no admission to the FDA.  What the

11   statement to the FDA said was something like unfortunately, not

12   all tattoos can be completely removed.  That is a true -- that's

13   not inconsistent with what we represented in our brochures and

14   in our statements and on our website that was available to the

15   public.  It's totally consistent.  There's absolutely no

16   inconsistency.

17          The photographs he mentions, not only is there no

18   testimony on it, that two of the three photographs aren't

19   even -- there are no allegations.  It's not attached to his

20   complaint.

21          And I'm a little bit -- I'm sorry for being a little

22   bit worked up, but he said so many factually erroneous mistakes

23   I think that --

24          THE COURT:  I've heard a great closing argument for

25   eight people from the Western Division to hear.  All right?  And

```
 1    if that's the way the case goes, that's fine.  That's great.

 2    And that's a good thing.  We should have more trials.  So, focus

 3    on the discovery component.

 4         MR. SAMORE:  This is not a summary judgment case.  This

 5    is not -- they've presented no evidence.  Their understanding is

 6    relevant to the merits.  It's relevant to whether there was

 7    reliance and actual deception.  All of the records that we

 8    request are relevant and --

 9         THE COURT:  Well, can you address Mr. -- the

10    plaintiffs' point is look.  If all they're saying is we only

11    want our money back, nothing else, how is damages and

12    consequential damages and those types of things, why would it be

13    relevant.  If all they're saying is you made a representation

14    that it would, quote, remove, meaning eliminate, it doesn't, we

15    want our money back, their point is that none of this is

16    relevant.  Address that.

17         MR. SAMORE:  Whether they're entitled to this -- they

18    first have to establish liability and whether --

19         THE COURT:  No, no, no, no, no.

20         MR. SAMORE:  Okay.

21         THE COURT:  Very specific question.  Their argument is

22    straightforward.  All they want is their money back.  They want

23    their $275,000 back.  That's the only thing they want in the

24    case.  That's their damages for each plaintiff.  They want the

25    purchase price back.  Therefore, their argument goes, all these
```

1    issues relating to damages aren't relevant either for purposes

2    of class cert, individualized component, or to the merits.  So,

3    address that.

4         MR. SAMORE:  Okay.  In reading the brief, I thought

5    they were very clear that they wanted the difference between the

6    value as represented and the value that was given.  That's what

7    their brief said.  They're saying something different today.

8         THE COURT:  Please answer my question.

9         MR. SAMORE:  Okay.  And I'll --

10        MR. BALFOUR:  Judge, a couple of things.  One is that

11   the plaintiffs aren't entitled to get their money back.  They

12   are -- if they were to get all of their money back, the only way

13   to do that would be through a rescission and restitution claim

14   and not through a UCC warranty claim.  If they want to be able

15   to make that sort of claim, they need to show, A, that they did

16   not revoke their acceptance or, B, that they were -- there

17   was -- well, they need to show that they did not revoke their

18   acceptance.

19        Beyond that, plaintiff in their most recent brief said

20   they just want their damages under the UCC.  Damages under the

21   UCC aren't their money back.  It's the difference -- for a

22   breach of warranty, it's the difference between the amount they

23   paid and the fair market value.  They've given us zero

24   inclination of how they intend to establish fair market value

25   without showing if they were going to sell this on the open

1   market, a buyer would ask what their revenues were.  That would

2   determine how much they could get on the open market.

3   Therefore, the revenues are relevant to the market value of the

4   product.

5            THE COURT:  Okay.  So, if the difference -- if the real

6   damages under the UCC are the difference in what you paid and

7   what it's worth, why aren't damages or all these things about

8   customer satisfaction relevant?

9            MR. GRAVINO:  Judge, my response to that is we intend

10  to show that, you know, what is it worth is almost a

11  mathematical comparison to a predecessor, you know, tattoo

12  lightening machine that lightens but does not remove tattoos.

13  That happens to be their predecessor machine that we also

14  bought, the RevLite.  I don't have the number offhand, but

15  $50,000.  We would have paid 50 if you told the truth and said

16  this does a marginally better job of lightening, but it's a

17  great machine.

18           So, it's really a mathematical mechanical calculation.

19  It's not how did you feel about your experience.  Well, we're

20  going to give that a $10 value.  I mean, that's -- we'll never

21  get to a number with that.  We framed our claim as the

22  difference between what a commercially -- you know, on the

23  commercial market what a tattoo lightening machine is worth

24  versus the 275 we paid.  It's a mathematical formula.  That

25  evidence doesn't go to that calculation.  We purposely framed it

1    that way to --

2         THE COURT:  Okay.  All right.  So, I got that.  Go

3    ahead.

4         MR. BALFOUR:  Judge, that's absolutely wrong.  If the

5    machine were identical to the previous machine, perhaps the

6    market value of the previous machine would be the only relevant

7    information.  As it is, the market value of the previous machine

8    is a piece of relevant information, but there are other pieces

9    of relevant information, such as if this machine allows them to

10   generate more revenues than the previous machine did, it would

11   thereby be worth more.

12        Separately, putting aside the damages, revenues are

13   also relevant to whether their claims are even true.  If the

14   plaintiffs have continued using the machine and continued making

15   money from the machine, despite claiming that it doesn't work --

16        THE COURT:  How does that go to the class cert issue?

17   How does that go to the class cert issue?

18        MR. BALFOUR:  If these plaintiffs did not -- these

19   plaintiffs claim in paragraph 55 of their complaint -- and this

20   is the crux of their entire complaint.  After plaintiff

21   purchased the PicoSure product, it administered the treatment as

22   directed to numerous patients.  None of the patients' tattoos

23   were removed or eliminated, contrary to Cynosure's

24   representations and promises.  They provided no evidence that

25   that statement is true, and if they're lying in their brief,

1    they're not adequate or typical class representatives.

2          MR. SAMORE:  I mean, what we hear from the plaintiff is

3    they go back and forth.  First in their answers to

4    interrogatories they say they just want their money back.

5    That's what they said in answer to interrogatory number 16.  And

6    in their brief they say they want UCC damages, which is the

7    difference in value between what was represented and what they

8    actually purchased.  Now we hear -- and they've vacillated

9    several different versions today of what they're seeking in

10   terms of damages.

11         All we're seeking is for the court not to rule for

12   summary judgment in favor of the plaintiff and to allow this

13   discovery to go forward, which is directly relevant to the class

14   certification issues and whether, you know, the issue of damages

15   can be decided on a classwide basis.

16         THE COURT:  Well, just because damages are different

17   for various class members, that alone isn't a basis to deny

18   class cert, right?  We know that.  That's at one easy end of the

19   spectrum.  The other easy end of the spectrum is if they're

20   totally different, that individual -- the individualized

21   component isn't met.

22         MR. SAMORE:  I mean, if they're willing to bifurcate --

23         THE COURT:  Don't most cases fall between the two?

24         MR. SAMORE:  If they're willing to bifurcate damages

25   and saying that they want a determination on class certification

1    with respect to liability only, then damages are not -- I

2    believe the issue is a little more -- is nuanced, and the court

3    has discretion on class certification.  Whether to consider the

4    individualized inquiry of damages should preclude, I think the

5    district court has broad discretion.  But I agree with what --

6            THE COURT:  I mean, it's one of the factors under

7    Rule 23 that the court is required to consider, and, you know,

8    no one particular component is dispositive.

9            MR. SAMORE:  Exactly.

10           THE COURT:  All right.  Anything else?

11           MR. SAMORE:  No, your Honor.  Thank you.

12           MR. BRUCE:  Judge, just one final point.  I don't want

13   to be -- I don't want anybody, either the defense or the judge,

14   the court, to walk away from this saying we're vacillating on

15   what we're asking for.  I can't make it more clear.  In our

16   plaintiffs' motion, response to their motion to compel, because

17   they raised this issue of revenue, I very clearly, emphatically

18   stated what we are claiming, and I have never vacillated from

19   that in this case.  It's UCC Section 2-714 subsection two.  I

20   don't need -- I mean, the law is the law.

21           You asked me if we want our money back.  Yeah, we want

22   our money back.  They get a -- they don't get -- we don't get

23   the full value back, your Honor, and we follow the UCC 714

24   subsection two, which says -- it's called the fair market value

25   of the goods.  That's what we want back.  And, you know, if

1    there was any confusion on that by the defense, I'm being very

2    clear here.

3         And then the UCC gets into more specifics.  It's the

4    difference between the value of the goods accepted and the value

5    they would have had if they had been as warranted.  That's the

6    claim that we're making.  I thought it was clear, and if it's

7    not -- and, Judge, again, you asked the very specific question,

8    and you didn't get, respectfully, a response, a substantive

9    response.  You asked the question what does -- knowing that

10   that's what we're claiming, what does the revenues have to do

11   with anything, and counsel suggested, oh, that's a factor

12   that -- that's not in any case that they've cited, Judge.  They

13   haven't cited a case to you that says when you're claiming this

14   breach of damages, you get into the revenues of the product.

15   Full stop, end of story.  Thank you, your Honor.

16        MR. GRAVINO:  Judge, I just had one other practical

17   observation I was going to make, picking up on your question

18   about the insurance coverage, if I may.  I don't mean to belabor

19   this.  Counsel indicated that the defense is under reservation

20   of rights in this case.  Thinking back on some cases that I've

21   handled in that vein, both as defense counsel and coverage

22   counsel, looking at this claim, there's probably a reservation

23   because there's a fraud claim, and there are other claims that

24   don't sound in fraud.  That might create an opportunity at the

25   appropriate time for a settlement conference because the

1    company's interests might diverge from the insurance carrier's

2    in terms of the case with that coverage conflict.  And we've had

3    other cases where a defendant insured comes to a settlement

4    conference with a corporate counsel who's looking out for the --

5    and I'm not suggesting defense counsel is not doing that, but if

6    defense counsel was hired by the insurance carrier, that

7    coverage conflict sometimes sets up an opportunity to create a

8    climate where parties might otherwise consider an early

9    resolution where they might not have if there was no coverage

10   conflict.  I just point that out.  I was not aware until this

11   morning that there was a reservation of rights defense.  So, for

12   what that's worth, again, we certainly would entertain a

13   settlement conference at the appropriate time if there was any

14   interest.

15        MR. SAMORE:  And I can tell you absolutely the company

16   has no interest in settling this.  They stand by their

17   representations that were made.  They are, quite frankly, pretty

18   outraged at the allegations that are made and the misstatements

19   that have been made, and they do not have an interest.  I've

20   spoken with the general counsel, and he is fully apprised of the

21   case from start to finish.  So, at this point in time, I can say

22   there is not an interest in settling this case.

23        And I will say at the beginning when this first lawsuit

24   was first filed, I approached plaintiffs' counsel about settling

25   on an individual basis.  We made a generous offer.  It was

```
 1    rejected.  And now we're here.

 2              MR. BRUCE:  There wasn't an offer made.

 3              THE COURT:  Well, why would they be willing to settle

 4    before, but not now?

 5              MR. SAMORE:  What's that?

 6              MR. BRUCE:  There wasn't an offer --

 7              MR. SAMORE:  On an individual.  There was one plaintiff

 8    at the time, and then they amended the complaint.  They added

 9    additional plaintiffs.

10              THE COURT:  So, how does that change things other

11    than --

12              MR. SAMORE:  And if the plaintiff --

13              THE COURT:  Don't interrupt me.  How does that change

14    things other than that the dollar goes up?

15              MR. SAMORE:  If the -- because the problem is they're

16    defending their product.  They stand by this product.  This was

17    a significant breakthrough in technology.  It has, you know,

18    authoritative --

19              THE COURT:  I got it.  I got it.  Here's my problem.

20    Here's my problem.  You can't say this is about principle, never

21    going to settle it, and then say, yeah, but we'll settle with

22    part of it.  It's like being pregnant.  You either are or you

23    aren't.

24              And so -- and look.  If you want to litigate this thing

25    to the end, I'm fine with that, and if they want to litigate it
```

1    to the end, I'm fine with that.  If you want a settlement

2    conference, I'll make myself available.

3              MR. SAMORE:  And thank you.

4              THE COURT:  But -- and that's okay.  And no one gets

5    dinged for not having a settlement conference at all.  I've said

6    that I think twice already today.  There should be more trials.

7    I'll say it a third time, if I haven't.  There should be more

8    trials.

9              I'll take everything under advisement.  We'll get you

10   something.  Okay?

11             MR. BALFOUR:  Thank you, your Honor.

12             MR. SAMORE:  Thank you.

13             MR. BRUCE:  Much appreciate it.

14             THE COURT:  Have a good day.

15             MR. BRUCE:  And, Judge, we're just -- pursuant to -- we

16   had this discussion at the end.  We're kind of holding off on

17   dep schedule because that was what you --

18             THE COURT:  We'll get something to you.  We'll get

19   something to you soon.

20             Let's just roll right into the criminal call.  We've

21   had counsel sitting around way too long.

22        (Which were all the proceedings had in the above-entitled

23        cause on the day and date aforesaid.)

24

25

1          I certify that the foregoing was transcribed from digital

2     recording to the best of my ability.

3

4     _____
      /s/ Mary T. Lindbloom

5     Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25