```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            WESTERN DIVISION

 3   LDGP, LLC, et al.,              )  Docket No. 15 C 50148
                                     )
 4               Plaintiffs,         )  Rockford, Illinois
                                     )  Monday, April 10, 2017
 5        v.                         )  1:30 o'clock p.m.
                                     )
 6   CYNOSURE, INC.,                 )
                                     )
 7               Defendant.          )

 8                     TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE IAIN D. JOHNSTON
 9
     APPEARANCES:
10
     For the Plaintiffs:              POWER, ROGERS & SMITH
11                                    (70 W. Madison Street,
                                       Suite 5500
12                                     Chicago, IL  60602) by
                                      MR. DEVON C. BRUCE
13
                                      WILLIAMS McCARTHY
14                                    (120 W. State Street,
                                       P.O. Box 219,
15                                     Rockford, IL  61105-0219) by
                                      MR. JOHN J. HOLEVAS
16                                    MR. MARC C. GRAVINO

17   For the Defendant:               SMITH AMUNDSEN LLC
                                      (150 N. Michigan Avenue,
18                                     Suite 3300
                                       Chicago, IL  60601) by
19                                    MS. KATHRYN V. LONG
                                      MR. ERIC L. SAMORE
20
     Court Reporter:                  Heather M. Perkins-Reiva
21                                    327 S. Church Street
                                      Rockford, Illinois  61101
22                                    (779) 772-8309

23

24

25
```

 1          (Proceedings heard in open court:)

 2          THE CLERK:  Calling 15 CV 50148, LDGP, LLC vs.

 3  Cynosure, Inc.

 4          THE COURT:  I'm not doing this by myself.

 5          MR. BRUCE:  Good morning, Judge.

 6          Good morning, Judge.  Devon Bruce on behalf of the

 7  Plaintiffs.

 8          THE COURT:  Good afternoon, Mr. Bruce.

 9          MR. HOLEVAS:  Good afternoon, your Honor.  John

10  Holevas, also on behalf of Plaintiffs.

11          THE COURT:  Good afternoon, Mr. Holevas.

12          MR. GRAVINO:  Good afternoon, your Honor.  Mark

13  Gravino here for the Plaintiffs.

14          THE COURT:  Good afternoon, Mr. Gravino.

15          MR. SAMORE:  Good morning, your Honor.  Eric Samore

16  on behalf of Defendant, Cynosure.

17          THE COURT:  Good afternoon, Mr. Samore.

18          MS. LONG:  Kate Long, also on behalf of Cynosure.

19          THE COURT:  Good afternoon, Ms. Long.

20          Okay.  We are here on a big ol' stack of paper.

21  There is, essentially, cross motions to compel.  So I have got

22  Defendant's motion to compel.  There is two of them.

23  Plaintiffs' response.  Motion for leave to file under seal, I

24  ruled on that.  If it is something that goes into my thought

25  process, the Seventh Circuit says that it is unsealed.

1          And then the Plaintiffs' motion to compel responses

2     and the Defendant's response.

3          Sort of a big picture issue, I know you've heard me

4     say it:  I apply the goose-and-gander rule.  So if one side is

5     saying that an issue is relevant and they need it, and the

6     other side says the same thing, I'm probably going to rule

7     consistently.  It is going to go both ways, all right?

8          Party statements, any statement by a party.  Now,

9     once they are requested, and this has been known, the rule,

10    for a long time under 26(b)(3)(C), "Previous statement.  Any

11    party or other person may, on request and without the required

12    showing" -- that's kind of a key point -- "obtain the person's

13    own previous statement about the action or its subject matter.

14    If the request is refused, the person may move for a court

15    order" under Rule 37, and Rule 37 applies for expenses.  "A

16    previous statement," that is either a "written statement that

17    the person has signed or otherwise adopted or approved or a

18    contemporaneous stenographic, mechanical" -- I don't know if

19    that ever happens anymore -- "electrical or other

20    recording -- or a transcription of it -- that recites

21    substantially verbatim the person's oral statement."  So

22    those, if anybody has got those, both sides pass them.  You

23    have got to give them.

24         Proportionality, that has been around.  It just got

25    moved forward.  So burdensomeness, when that is raised, that

1   kind of hints of proportionality, but I need facts.  I need

2   facts to do the weighing process, to look at all six factors.

3   So I need facts for certain things.

4          I have got a big issue -- I don't mean that

5   pejoratively -- an issue that I'm confused about, and I need

6   to -- we will flesh it out as we proceed.  It relates to the

7   Defendant's inability to identify, essentially, the purchase

8   price of the machines.

9          MR. BRUCE:  Right.

10         THE COURT:  And my confusion stems from being alive

11  for 52 years and being an attorney for 20-something.  I have

12  never purchased -- I have never purchased anything and not

13  received an invoice, and I have never sold anything and not

14  given an invoice, and all my clients did the same thing.

15  Every company I represented in every commercial case, anything

16  under the UCC, any kind of commercial case, there is always an

17  invoice.  And so we will talk about it, but I'm a little

18  confused as to why it would be difficult to figure out the

19  cost of the product, okay?

20         So let me do this:  I made an attempt -- well, it is

21  a little rough, but I made an attempt to try to figure out

22  what was really at issue as best I could.  I wrote "resolved?"

23  on a whole lot of things.

24         So I don't know if the parties have talked since all

25  the filings were made.  Have you talked at all to try to

1    figure out what is resolved and what is not?

2              MR. BRUCE:  No.

3              MR. SAMORE:  Well, we did with respect to their

4    attorney-client assertion and request that they produce a

5    privilege log.

6              THE COURT:  Okay.

7              MR. SAMORE:  We did not receive a response.

8              THE COURT:  Okay.

9              MR. BRUCE:  Yes, that was late last week, Judge, and

10   I would like to address that at the appropriate time.

11             THE COURT:  And that's something, the attorney-client

12   issue, I have got a big ol' star next to it, and it says it

13   needs to be fleshed out.

14             So I will make this attempt to see what's really at

15   issue.  So let me go to -- this is Plaintiffs' motion to

16   compel.  Plaintiffs' Fourth Set of Interrogatories, No. 2, it

17   says, "Identify the names and address of all third-party

18   individuals and/or companies that Cynosure" -- am I

19   pronouncing that right, Cynosure?

20             MR. SAMORE:  I think it is Cynosure, but I'm glad --

21             THE COURT:  We will go with Cynosure, then.

22             -- "Cynosure hired or retained which provided web

23   advertisements or other advertisements for the PicoSure

24   machine."

25             My read of the Defendant's response is that it

1    provided the information, so the issue is moot.  Is that your

2    position, that you have provided the information?

3            MR. SAMORE:  Yes, your Honor.

4            THE COURT:  Okay.  Have you had a chance to look at

5    the response to see if you received the information?  Because

6    I don't know what you got.  I don't know --

7            MR. BRUCE:  You are asking about Interrogatory No. 2?

8            THE COURT:  Plaintiffs' Fourth Set of

9    Interrogatories, Interrogatory No. 2, correct.  Defendant says

10   they gave you the information.

11           MR. BRUCE:  I'm sorry, the response that I'm looking

12   at, they didn't give us an answer to that, so maybe there is a

13   miscommunication.

14           THE COURT:  Okay.  Do you see --

15           MR. BRUCE:  You see, that's why I did it this way,

16   and maybe we made a mistake.  I tried to kind of make it

17   easier for you, Judge, and for me, like in this context, to

18   have what I asked for and their response.

19           THE COURT:  Right.  And there has been lots of

20   follow-up after that, so I want to make sure we are all on the

21   same page.

22           MR. BRUCE:  Yes.  To be clear -- okay, fair enough.

23   I mean, maybe I missed something, but out of all this stuff

24   that went back and forth, they only changed their mind on

25   about two out of 20-something.

1           THE COURT:  Okay.

2           MR. BRUCE:  So unless I missed, if this is one of

3    them.

4           THE COURT:  Okay.  So let's go -- what did you

5    provide in response to Interrogatory No. 2?

6           MS. LONG:  This is one of the two.  So we sent them

7    an amended interrogatory answer on the Thursday before these

8    motions were due, and we attached it to our response as

9    Exhibit B.

10          MR. BRUCE:  All right.  Let me look at that, Judge.

11   As I said, I'm frequently wrong.  I will stand corrected.

12          I have their amended response.

13          THE COURT:  Yes, docket entry 99-2.

14          No, that's the affidavit, sorry.  So why don't you --

15          MR. BRUCE:  They told -- I'm sorry, I didn't mean to

16   interrupt.

17          THE COURT:  Go ahead.

18          MR. BRUCE:  I'm just trying to skim through.  They

19   have identified Doc Web, and as long as they are -- and that's

20   an entity we already know about, and we served them with a

21   subpoena.  If that's -- you know, without all of the

22   thaumaturgic language, if they are representing formally, as

23   officers of the court, that's the only company, then the

24   answer is, fine, we're done.

25          THE COURT:  Okay.

1           MR. BRUCE:  Are they representing that?

2           THE COURT:  Okay.

3           MR. SAMORE:  To our knowledge, that's correct.

4           THE COURT:  Okay.  I'm going to come back to that.

5           All right.  Plaintiffs' Fourth Set of Production,

6    that's a statement of any kind by named plaintiff or named

7    plaintiff representative which is not encompassed in the

8    previous request, that was my point under Rule 26.  If you've

9    got statements of the Plaintiffs --

10          MR. SAMORE:  Just so long as it is clear, we

11   haven't -- the information they are asking is on the web and

12   within their possession and control.  What we would -- we will

13   produce whatever we have, but we are not representing that we

14   have, and I don't think we have, any obligation, as your Honor

15   would acknowledge, to scour the Internet for all the

16   statements that they have made in the past.

17          THE COURT:  If you don't have it, you don't possess

18   them, right?

19          MR. SAMORE:  Yes.  We will produce what we have.

20          THE COURT:  Good deal.  But if you have got

21   statements from the Plaintiffs, you have to provide them.

22          MR. SAMORE:  We will produce them, yes, Judge.

23          MR. BRUCE:  And just so you know, the concern that we

24   have is, before we embark on the Plaintiffs' depositions, in

25   every case, from the simplest auto to the most complex cases,

1    I give them, their statements, to defendants that I have and
2    vice versa.
3           I don't want a circumstance, Judge, and what I'm
4    trying to flesh out is they have been making a lot of
5    objections up until this moment, when they changed their
6    position right now.  They have been saying, "We will get back
7    to you.  We will amend.  We will respond."  We have been at
8    this for nine or twelve months.  I don't want my clients being
9    shown right at the deposition, when I'm down in Texas, a
10   document I have never seen before that purports to be from my
11   client.  That's not fair, and that's what I'm trying to avoid.
12          And he is now saying, "We are going to give you
13   everything we have got," and that's fine.  Because if it comes
14   up later, we are going to be here on a motion immediately.  We
15   have had plenty of time for them to get it.  I think they have
16   been -- I would like it.
17          MR. SAMORE:  We have no obligation to search for
18   their statements that --
19          THE COURT:  If it is not in your possession, custody,
20   and control, it is not in your possession, custody, and
21   control.  But if you have got them --
22          MR. SAMORE:  We will produce them.  Yes, your Honor,
23   I agree.
24          THE COURT:  All right.  We will come back to that
25   one.

1          Plaintiffs' Fifth Set of Request to Produce, all

2    communications, form letters -- this is the Fifth Set of

3    Request to Produce, No. 2, "All communications, form letters,

4    e-mails, and correspondence with any punitive" -- I'm sorry,

5    "putative" -- "putative class member which in any way concerns

6    this litigation."

7          Defendant said produced the requested communications,

8    right?

9          MR. SAMORE:  Concerning produced?

10         THE COURT:  I'm reading the question.  I'm telling

11   you what my understanding of the response is.

12         MR. SAMORE:  Yes, the litigation --

13         MS. LONG:  Yes, we have a limited number of e-mails

14   between defense counsel and the putative class member who

15   wrote the declaration, that we attached to one of our other

16   motions, and we can produce that.

17         THE COURT:  All right.  You can produce it or you did

18   produce it?

19         MR. SAMORE:  We will produce it.

20         MS. LONG:  We will produce it.

21         THE COURT:  Okay.  So, obviously, the next follow-up

22   question is when will you produce it?

23         MR. SAMORE:  We can do that, I think, within seven

24   days.

25         THE COURT:  Okay.

1       MS. LONG:  Yes.

2       MR. BRUCE:  Judge --

3       THE COURT:  Hold on a second.

4       MR. BRUCE:  Okay.

5       THE COURT:  All right.  Go ahead, Mr. Bruce.

6       MR. BRUCE:  They indicate, after a number of the

7   boilerplate objections, they will amend and supplement.  I

8   just want to understand, with the exception of the person that

9   they are now using in their reply brief or whatever it is,

10  their motion regarding whatever it is, motion to reconsider,

11  with the exception of that person, I think what they are

12  representing formally, as officers of the court, is they don't

13  have any other communications with any other putative class

14  member regarding communication, because I don't want to

15  just -- the one that they are using as an affiant, I want any

16  of those correspondence or communications.

17      THE COURT:  The request says, "All communications,

18  form letters, e-mails, and correspondence with any putative

19  class member which in any way concerns this litigation,"

20  right?

21      And you are telling me those will be produced by

22  April 18th, right?

23      MR. SAMORE:  Yes, your Honor.

24      THE COURT:  All right.  So that seems like it has

25  been resolved.

1      Okay.  Now we kind of hit a vein here.  Let's go to

2  Plaintiffs' Fifth Request to Produce, No. 3.

3      All right.  This is what drives everybody crazy in

4  pretrial litigation.  So there is an objection, lots of

5  objections, including burdensomeness.  But after we sift

6  through all of that, it is the Defendant's response that you

7  are not withholding any documents.

8      So are there any documents that would be responsive

9  to the Fifth Set of Request to Produce, No. 3, that are being

10  withheld?

11      MR. SAMORE:  What does that concern?  Okay, yes.

12      We have conducted a reasonable search.  We are not

13  withholding any documents that we found responsive to this

14  request.

15      THE COURT:  Okay.  So that's where -- we are all

16  attorneys, so we are naturally suspicious.  So when you get a

17  whole list of objections, including burdensomeness, and at the

18  very end, you say, "And there aren't any," it is hard for

19  something to be burdensome if they don't exist, because you

20  don't have to produce them, right?

21      MR. SAMORE:  Well, it is possible our answers could

22  have been more succinct.

23      THE COURT:  Okay.  All right.  I'm just telling you

24  what I have found, okay?

25      MR. SAMORE:  Right.  Okay.

1       THE COURT:  All right.  So that appears to be
2   resolved because they said they are not withholding anything,
3   all right?  Now, if they say they don't have them, they don't
4   have them.  And if they pop up later, that's a whole other
5   issue.  And my crystal ball is at the shop, so I don't know
6   what's going to be happen in the future.
7       MR. BRUCE:  I don't know either, Judge, and it is
8   always -- you know, I'm always kind of even glass.  So I have
9   got the single plaintiff, and I'm always against these
10  corporate entities, and I just -- for the record, I don't know
11  how you have this company that is marketing this machine, and
12  they market it worldwide, and then they come in with an
13  upgrade and additional software, and they have all these
14  marketing people and all that, and they are saying, as a
15  matter of course, "There is no e-mails, there is no documents,
16  there is nothing at Cynosure which is in any way how we
17  upgrade this or how we market it, how we are doing the
18  software."  I mean, I find that very difficult to believe.
19  But, again, Judge, I can't say they are wrong.  I don't know.
20      THE COURT:  Okay.
21      MR. BRUCE:  I mean, as you said, Judge, I was going a
22  different direction.  They had all these boilerplate
23  objections.  If they didn't have any, it would have been easy
24  just to say "none."
25      THE COURT:  Okay.

 1          MS. LONG:  As further explanation, which might help

 2     elucidate, my client -- you know, the way that I understand

 3     from the client is that the PicoSure machine never needed an

 4     upgrade.  Upgrades were provided, but the machine would work

 5     fine on its own.  As to why additional software was needed,

 6     they weren't really sure what that meant.  We don't know what

 7     "et cetera" means in the context of this.  So I'm not sure if

 8     there are documents that may be responsive to what Plaintiffs'

 9     counsel thought they were looking for, but we don't have any

10     responsive to the request as it was written.

11          MR. GRAVINO:  Judge, it sounds like they are saying

12     that they interpreted this as only to ask for documents as to

13     why this upgrade was needed, but if it was recommended or

14     advisable or something that they were selling, they are saying

15     that's not really within the scope of this.  And my

16     recollection, we had a Rule 37 conference about that.  I think

17     our intention was clear in saying if you marketed this upgrade

18     and said that, you know, you can buy this and it will improve

19     the performance of the machine, that's what we were looking

20     for.  Certainly, I think we could agree to narrow that as

21     well.

22          Devon, I don't know your position on that.

23          THE COURT:  Well, if you narrow it, you are not going

24     to get any more because they are saying --

25          MR. GRAVINO:  Not narrow.  I misspoke, Judge.  Not

1    narrow, but change the word "needed" to how to respond and/or

2    market as to why the PicoSure machine might benefit from or be

3    enhanced by an upgrade or whatever.

4         But we were not intending to suggest that -- you

5    know, seek an admission from them that it utterly didn't

6    function at all unless you bought this.  I think that was

7    clear in our Rule 37 conference.

8         But, Devon, I think we can --

9         MR. BRUCE:  I mean, however they want to handle it.

10   Judge, I know for a fact, at least the named plaintiffs that

11   are currently before you, they tried to sell them this

12   software and this upgrade when the machine didn't work as

13   advertised.  That's the fact, and that's going to come out in

14   the deps.  And then they, obviously, developed this software

15   or these upgrades.  It wasn't just for our clients.

16        So I find it difficult to believe that they didn't

17   have any correspondence and e-mails about why they are doing

18   that and address the concerns, but --

19        MR. GRAVINO:  Judge, I think that it strikes me,

20   given the response that counsel just clarified with, that they

21   are kind of hiding behind the word "needed" and saying, "Well,

22   it really didn't need an upgrade, so we don't have any

23   documents responsive to that," and my suggestion is that we

24   agree to amend that to say that if the unit --

25        THE COURT:  Well, the problem is we can't really

1    amend it on the fly because then they have to go back --

2         MR. GRAVINO:  I understand.  If that's --

3         MR. BRUCE:  We can send one out tomorrow that doesn't

4    have the word "needed," and it is going to be the same thing.

5         MR. GRAVINO:  Hopefully, we won't be back here,

6    because if you agree that it states a generally discoverable

7    request, we will amend it, and hopefully we can get better

8    compliance with that.

9         THE COURT:  Okay.  In the -- I assume there were

10   instructions in the interrogatories the Plaintiffs sent out

11   and the production request.  Is there any kind of time frame

12   scope, time frame that limited the scope of these?

13        MR. BRUCE:  No, I would -- no, I would just say -- I

14   mean, I'm narrowing -- I'm just focused on this one PicoSure

15   machine.  I mean, the workstation as defined in the complaint,

16   that's what we are after.

17        MR. GRAVINO:  And, Judge, they actually, in an

18   earlier discovery request -- I apologize, I'm two weeks into a

19   cold, at the tail end, and my voice is still coming back.

20        THE COURT:  Keep your distance.

21        MR. GRAVINO:  We requested documents relating to this

22   machine, and they produced a list of approximately 350 to 400

23   PicoSure purchasers.  That really is the field, I think, we

24   are working with here.  So I think that defines the scope,

25   at least at that point, which was about, maybe, 18 or 20

1   months into the litigation.

2           THE COURT:  Okay.

3           MR. SAMORE:  Your Honor, I just --

4           MR. GRAVINO:  So if we got -- I apologize.

5           If we got the documents responsive to that group that

6   they produced a list of, the 400 customers, I think that would

7   certainly be a good start.

8           THE COURT:  Okay.  Go ahead.

9           MR. SAMORE:  Just real briefly.  Substantively --

10          MS. LONG:  There are other requests to produce that

11  cover a more broader topic.  Like the request to produce 14,

12  in their sixth set, it asks for documents regarding the use of

13  a software update or add-on.  I think another one, that I'm

14  having a hard time finding right now, but I'm pretty sure,

15  they asked for one about how to market the add-ons.  So we

16  have produced some documents responsive to their concern that

17  they are expressing now in response to their discovery

18  requests that were tailored, you know, that actually asked for

19  that information.

20          MR. SAMORE:  Regarding the upgrade, if they want the

21  documents regarding an upgrade to the product, I believe

22  that --

23          MS. LONG:  They have been covered in at least one or

24  two other.

25          MR. SAMORE:  In a more direct correspondence.

1          THE COURT:  All right.

2          MR. SAMORE:  But the other thing I just want to say

3    is that I was at the conference with Plaintiffs, and Devon was

4    very clear.  He did not want to talk about the requests.  We

5    certainly didn't -- there was no explanation of this request

6    or any others.  It was basically, "I think we have got this

7    covered," as he said in the beginning.  "I think we have got

8    this covered."  Can we agree that we complied with Rule 37.2?

9    I, perhaps, mistakenly agreed to that, but there was certainly

10   no discussion.  I just want to make the record clear with

11   respect to that, although it is an ancillary point.

12         THE COURT:  Well, we are all here, so I am going to

13   see what we can get accomplished today, okay?

14         MR. SAMORE:  Okay.

15         THE COURT:  All right.  Let's go to Plaintiffs' Sixth

16   Request For Production, No. 6:  "Any and all documents,

17   including internal memoranda, e-mail, and/or correspondence

18   that involved the development, use, and/or distribution of any

19   other advertisements utilized by Cynosure to market or

20   advertise the PicoSure" -- I'm going to give you the

21   spelling -- "produce where the tattoo was 'photoshopped' on to

22   a model."

23         There is objections, but then subject to the

24   objections, there is no documents.  So if there is no

25   documents, there is no documents, right?  That's what you are

1   telling me?

2           MS. LONG:  Actually, this is going to be an easy one.

3   This is included in the -- we are going to produce additional

4   documents.

5           THE COURT:  All right.  And that would occur on

6   April 18th as well?

7           MR. SAMORE:  Well, your Honor, we may -- I don't know

8   that we can do everything within a week --

9           THE COURT:  Okay.

10          MR. SAMORE:  -- within that time frame.  They took

11  eight months to promulgate their responses and took over a

12  year to respond to our first set.  So we may need -- when we

13  are all done, we can maybe --

14          THE COURT:  How much time do you need?

15          MR. SAMORE:  I'm going to say, what, three weeks,

16  maybe, just to be on the safe side, and that would be true for

17  the Plaintiffs as well in terms of their production.

18          THE COURT:  Is that going to allow people to take

19  depositions in a timely manner?

20          MR. BRUCE:  No.  And, Judge, I can't -- I disagree

21  with his assertions about the Rule 37 conference, and I just

22  can't keep letting him make assertions on the record and

23  impugning my character.  That is not true.  We gave them 4,000

24  pages of Plaintiffs' medical patient records, and my

25  recollection is that all was in November or December.  You

```
 1    know, it hasn't been a year.  It doesn't take me a year to
 2    respond to them, but it is anecdotal.
 3             THE COURT:  Okay.  All right.  We will talk about
 4    when the documents will be produced.
 5             MR. SAMORE:  Okay.  Thank you.
 6             THE COURT:  So then let's -- and at the end of this,
 7    I'm going to need a certification from the Defendants that
 8    what has been produced is complete and that is it.
 9             MR. SAMORE:  What we would certify to is what we are
10    required to, which is that we have made a reasonable
11    investigation and that we have produced every document we
12    found pursuant to that investigation.
13             THE COURT:  Well, I will tell you what the --
14             MR. SAMORE:  Okay.
15             THE COURT:  I will tell you what the certification
16    will be.
17             MR. SAMORE:  Okay.
18             THE COURT:  Can we continue with my process?
19             MR. SAMORE:  Yes, your Honor, absolutely.
20             THE COURT:  Okay.  All right.  So No. 9, again, we
21    are talking about Plaintiffs' Sixth Request For Production of
22    Documents.  No. 9, "All communications of any kind (whether
23    paper, electronic or otherwise) between Defendant and any
24    other person or entity (including, but not limited to,
25    internal communications), wherein Defendant discussed or
```

1   considered how they would create market demand for this

2   product, taking into account any considerations, including,

3   but not limited to, the selling price of the PicoSure product

4   compared with the selling price of the Revlite product or any

5   other machine that is sold by any company to lighten or

6   purportedly 'remove' tattoos."

7          The Defendant says it is not withholding any

8   responsive documents.  Is that right?

9          MR. SAMORE:  Yes, your Honor.

10         THE COURT:  Okay.  All right.  So if you are not

11  withholding anything, you are not withholding anything.

12         Now we are going to hit a vein because we go through

13  a bunch where this is all said.  Again, we are staying on the

14  Plaintiffs' Sixth Request For Production of Documents, and

15  No. 10 has a request and a long objection, and then the

16  Defendant says it is not withholding any responsive documents.

17         So no responsive documents are being withheld for

18  No. 10?  Everything has been produced?

19         MR. SAMORE:  We have conducted a reasonable

20  investigation, and we have produced -- we have spent hours

21  trying to comply with these requests, and we are not

22  withholding any that we found were responsive, yes, your

23  Honor.

24         THE COURT:  Okay.  The same for No. 11, the same for

25  No. 12, the same for No. 13, the same for No. 14, the same for

1  No. 15.  They all have an objection and then says nothing is

2  being withheld.  So it is the same representation, correct?

3          MR. SAMORE:  Yes, your Honor, as I just stated.  Yes.

4          THE COURT:  All right.  So let's go to 16.

5          MR. BRUCE:  Judge, can I just -- I'm sorry.

6          THE COURT:  Go ahead.

7          MR. BRUCE:  Just as an example, so Cynosure is

8  telling me and you under oath that they have given us every

9  e-mail that they had with respect --

10         THE COURT:  Which number are you on?

11         MR. BRUCE:  I'm still at 10 because I'm still --

12         THE COURT:  Okay.

13         MR. BRUCE:  -- shell shocked.

14         THE COURT:  Okay.

15         MR. BRUCE:  They have given us, according to what I

16 just heard, every e-mail regarding any marketing materials by

17 Cynosure to any purchase of their PicoSure machine?  So let's

18 just pause and think about this.  They had 350 purchasers, let

19 alone ones that looked at it and didn't buy.  So 350 people

20 bought this machine.

21         THE COURT:  Let me pause you right there, Mr. Bruce.

22         MR. BRUCE:  Sure.

23         THE COURT:  Because he hasn't really said that.  He

24 said it three times, and I'm going to hold him to it, that the

25 Defendant has made a reasonable investigation.

1        Now, if there is an e-mail server where somebody has

2   got a bunch of e-mails, and it comes up in a deposition that

3   there were e-mails about this issue and all they needed to do

4   was hit print and provide it, well, that doesn't sound like a

5   reasonable investigation.  But I don't have that before me,

6   right?  So I think he gets my point.

7        MR. BRUCE:  I don't know that he does, Judge, that's

8   the point.  I don't know that he does because there -- I mean,

9   there are e-mails that he hasn't given.  There has got to be

10  e-mails where they said to the guy, a hypothetical, in

11  Maryland who bought the machine, "Here is the girl with the

12  tattoo, and here is how this thing is going to work out."

13  There has to be e-mails, and not only do they have -- I mean,

14  we got a reply brief after a year of this, pinning on them.

15       In the reply brief, I get sandbagged with some guy

16  named James Palastra, who absolutely has no foundation.  He

17  doesn't say he did any search for any discovery.  He didn't

18  say he did any e-mail search.  He doesn't tell us who did the

19  e-mail searches.  He doesn't tell how the e-mails were

20  searched.  I mean, this is preposterous, and now he is saying,

21  "Oh, yes, we gave it all."

22       THE COURT:  Well --

23       MR. BRUCE:  I mean, I'm hogtied here, Judge, because

24  I don't know -- I can't tell you what I don't have because I

25  haven't seen it, but I am quite -- I mean, what do I do, fly

1   out to New Jersey?

2       Judge, I'm going to have to then go out to New Jersey

3  or wherever these people are, two or three times, and every

4  time I have to prove up that they don't have -- they give me

5  e-mails, and I have got to fly back out there again.  I mean,

6  really, it would be a lot easier if they went and did a search

7  and gave me the e-mail.

8       I'm sorry, Judge.

9       THE COURT:  Well, in my notes, it says "reasonable

10  investigation???", which is my note to myself saying we are

11  going to talk about what the reasonable investigation was.

12  And to your point, if that's what happens, there are

13  consequences to that and there are remedies for that.  If

14  that's what turns up, that there are e-mails that are right on

15  point, that are in a request, and that it was said that they

16  were produced after reasonable investigation, if it turns out

17  that's not true, I don't know what your billing rate is, but

18  I'm pretty sure it is not --

19       MR. BRUCE:  It is high.  It is high.  And just for

20  the record, instead of going down that rabbit hole, I would

21  much rather have the stuff so I take the dep for the first

22  time in a competent and --

23       THE COURT:  I'm not disagreeing with you, but I can

24  only deal with what I have in front of me.

25       MR. BRUCE:  My billing rate is high, Judge.

1          THE COURT:  Go ahead, Mr. Samore.

2          MR. SAMORE:  We will address -- one of the topics is

3     e-mails communications, and we can address that with you in

4     some detail, too, if you would like now.  So we will get -- I

5     think that --

6          THE COURT:  As much as you're trying to be diverted

7     from my path, no one is going to change me, all right?  I am

8     one stubborn individual.  So we are going to keep going

9     through this process, and I'm going to see what has been

10    resolved.

11         MR. SAMORE:  Okay.  I will --

12         THE COURT:  We will come back to that.

13         MR. SAMORE:  I would like to comment on the

14    burdensomeness of the investigation because --

15         THE COURT:  We are going to talk about that.

16         MR. SAMORE:  We have spent thousands of hours.

17         THE COURT:  We are going to talk about that.

18         MR. SAMORE:  Okay.

19         THE COURT:  But my point, again -- I can't make this

20    any clearer -- is you are telling me that everything on these

21    requests that I have identified, everything that was found

22    pursuant to this reasonable investigation, has been produced.

23    So I'm going through that checklist so that we have that

24    confirmed, okay?

25         MR. SAMORE:  And, your Honor, I will address the

1    burdensomeness of an e-mail investigation.

2           THE COURT:  Again, we will address burdensomeness

3    when I get through this process.  So as much as everyone wants

4    to divert me, we are going to do it, okay?

5           MR. SAMORE:  Okay.  Thank you.

6           THE COURT:  Okay.  No. 17, "Any and all documents,

7    including any e-mails or communications, that Cynosure has had

8    with any putative class member regarding their satisfaction or

9    opinion about the PicoSure machine."  All right.  Right?  This

10   is one where it says documents have been produced in the

11   complaint log, but anything else would be burdensome.

12          So is it the Defendant's position that if it is not

13   in the complaint log, it is not going to produce them?

14          MR. SAMORE:  Well, this is the Defendant's position.

15          THE COURT:  Okay.

16          MR. SAMORE:  Okay.  Your Honor, there were about 450

17   PicoSures that were sold.  We have 150 --

18          THE COURT:  450.

19          MR. SAMORE:  450.

20          THE COURT:  Okay.

21          MR. SAMORE:  Because that 300 number that was

22   mentioned was an earlier time frame.

23          THE COURT:  Okay.

24          MR. SAMORE:  And there is 450.  We have 150 to 200

25   people on our sales staff.  We have departments in the service

1     department.  We have got compliance.  We have regulatory.  We

2     have administration.  We have trainers, and so forth, and as

3     well as legal.

4              In order to search all of those e-mails, that would

5     be -- it would just be very burdensome, and I would request

6     leave to supplement with an affidavit.  We just got their

7     motion a week and a half ago.  We had a week and a half to

8     respond to a 35-page motion with -- that addressed 34, and I

9     would simply ask for leave to supplement.

10             THE COURT:  When you say "34," what are you talking

11    about?

12             MR. SAMORE:  What's that?

13             THE COURT:  You said "34."  What are you talking

14    about?

15             MR. SAMORE:  34 different requests that were the

16    subject of their motion.

17             THE COURT:  Okay.

18             MR. SAMORE:  And we moved as quickly as we possibly

19    could.  The woman who was primarily responsible for this was

20    on maternity leave the day after, essentially, we had our 37.2

21    conference, and I would simply ask leave to supplement.

22             But this product has been highly rated by customers

23    throughout the website.  This is the only lawsuit that has

24    been filed against this product.  In order to do this search,

25    it is going to take -- to search all the e-mails, it will be

1   thousands of hours, even before we get to certification.  It

2   is not relevant.  It is not important.

3        THE COURT:  Well, it is relevant.  So you can throw

4   that argument aside because it is surely relevant.  I made

5   that decision multiple times.

6        MR. SAMORE:  Okay.  That's fine.

7        THE COURT:  Three things for discovery.  Is it

8   privileged?  This is not privileged.  Is it relevant?  This,

9   yes.  Is it proportional?  That's No. 3.

10       MR. SAMORE:  Right.

11       THE COURT:  Those two, the first two don't apply.  We

12   are talking about the third.

13       MR. SAMORE:  Yes.

14       THE COURT:  We are going to talk about that.

15       MR. BRUCE:  I had some -- I didn't mean to interrupt.

16  Go ahead.

17       MR. SAMORE:  Okay.  And in addition, I mean, for

18  example, just to show you, the Plaintiffs haven't produced,

19  that we could find, any written communications of any

20  complaints about the effectiveness of this product before they

21  filed a lawsuit.  There is an independent website that this

22  product is one of the most highly rated products in the

23  industry that's put out by the various customer views.  There

24  is just no -- I mean --

25       THE COURT:  And that may be all true, and that will

1  be great evidence to present to seven people we put in the

2  jury box, but their point is not true.

3        MR. SAMORE:  Okay.

4        THE COURT:  And if there is complaints, they are

5  entitled to get them.

6        MR. SAMORE:  The complaints, we have a

7  regulatory -- that's -- that we are on very firm ground

8  because we have -- we are heavily regulated by the FDA.  We

9  have policies and procedures in place that train people to

10  report all complaints, and we produced them all.  There just

11  have been very few, and we are required --

12        THE COURT:  Let's circle back around to my question.

13        MR. SAMORE:  Yes.

14        THE COURT:  Which was -- and it is a yes or no -- is

15  it Defendant's position that it has produced this complaint

16  log and won't produce anything else?

17        MR. SAMORE:  It is our position that to conduct an

18  e-mail search of 450 separate purchasers, finding their names,

19  the one to five different salespeople that could have dealt

20  with them, along with the service people that would have

21  serviced the unit, the people that would have trained them,

22  that is unduly burdensome.

23        THE COURT:  Okay.

24        MR. SAMORE:  Or not -- strike that -- or not

25  proportional to the needs of the case at this point in time.

1          THE COURT:  Okay.

2          MR. BRUCE:  I'm dying to comment on this, whenever he

3    is finished and you will allow me.

4          THE COURT:  I just need to write the word "yes."

5          Go ahead.

6          MR. BRUCE:  Judge, I think what I just heard from

7    Mr. Samore is, at one level, some of these issues are pretty

8    straightforward and basic.  I'm saying that the machine

9    doesn't work as they had the women with the tattoos.  That is

10   misleading, those ladies.  I'm saying it doesn't do that.  And

11   contrary to what he says, I think when this fleshes out, there

12   is going to be a lot of evidence, I think, of this machine not

13   doing what they put in that picture, okay?

14         So in any product liability case or case of this

15   manner, I am just asking for complaints.  And before you say

16   it or he says it, I'm readily embracing the fact that some of

17   these interrogatories, requests to produce, they overlap,

18   right?  I'm trying to get them to give me the complaints where

19   people were not satisfied and said, "This thing doesn't work.

20   It doesn't do what you told us."  And I'm trying to get that.

21   Where I get that, it is basic form of law.

22         I think I just heard Mr. Samore shockingly say,

23   implicitly, although not expressly, is "We haven't looked."

24   That's what I heard him say.  I think he just said, "We

25   haven't looked."  What he said is "Judge, give us some more

1   time, after we have wasted six or nine months," and now you

2   are going to be on me about "Mr. Bruce, you have got to get

3   these deps done."  Your Honor, I'm just saying we have wasted

4   six or nine months.  Whenever all this stuff was filed, he sat

5   in the background and had not gone out and done any type of

6   e-mail search for this stuff.  They want to give me some

7   little paper log that says, "This is what we keep and this is

8   the complaints."

9          I'm asking for stuff far broader than that.  I'm

10  asking for people that are dissatisfied.  I want the e-mail

11  correspondence between the people who bought this thing and

12  their company.  That's what I want.  And it is not

13  complicated.  And I don't want to play a semantics game, like,

14  "Well, you used the word 'needed.'"  I don't -- that's

15  not -- I mean, it is clear what I'm looking for.  And I think

16  I just heard Mr. Samore say implicitly, not expressly, they

17  haven't done anything.

18         So now he is saying at the eleventh hour, after we

19  have gone and done all these Rule 37 conferences and they have

20  completely stonewalled, they have not answered 80 percent of

21  my discovery I have sent to them, now he is saying, "Give us

22  more time to get together an affidavit," for somebody that is

23  going to show that e-mail is too difficult.  Judge, they

24  should have done that before.  He is making oral

25  representations to you with no basis at all.

1          My understanding of the federal case law is very

2     clear.  He has got to come with an affidavit, and it is not in

3     the reply brief from somebody that said -- there was no

4     attestation by this guy Palastra --

5          THE COURT:  Hold on one sec.

6          Have you caught up, Heather?

7          THE REPORTER:  Yes.

8          THE COURT:  Okay.

9          MR. BRUCE:  There was no attestation from this guy

10    Palastra what role he played in the discovery, whether he ever

11    looked at an e-mail, who looked at an e-mail, what searches

12    they had, nothing.

13         So now at the eleventh hour, he throws this one-page

14    thing at you and says, "Well, here is the proof."  Now he is

15    saying, "I want more time.  I want more time to go and do

16    this."  This is ridiculous.  I would object to him

17    having -- you know, to get some paid person from Cynosure to

18    come and say, "Oh, it is all burdensome."  He has had six

19    months to do it.  I object to that.  I object to that.

20         I want somebody to go and give me the e-mails from

21    these people so we can see what they truly thought about this,

22    and, you know, he is trying to take you in a different

23    direction.  "Well, people are very satisfied with this."

24    Well, I would like to test that.

25         THE COURT:  I said you would have the opportunity to

1    test that.

2              MR. BRUCE:  Thank you.

3              THE COURT:  You can make that pitch to the seven

4    people in the jury box, and we will have that information, and

5    as I said, it is relevant.  It is the issue of

6    proportionality.

7              MS. LONG:  Judge --

8              THE COURT:  Nope, nope, nope, nope, nope, nope, nope.

9    Done.

10             No. 19 --

11             MR. SAMORE:  Your Honor --

12             THE COURT:  No.

13             No. 19 --

14             MR. SAMORE:  Your Honor, we did an e-mail -- he made

15   a false representation.

16             THE COURT:  We are going to come back to that.

17             MR. SAMORE:  We did an e-mail --

18             THE COURT:  Do you understand the word "no"?

19             MR. SAMORE:  I do.

20             THE COURT:  Okay.  Then listen to me.

21             No. 19, "Any and all market surveys, studies,

22   internal e-mails, and/or correspondence regarding the value of

23   used or aftermarket PicoSure machines."

24             Defendant's contend they are not withholding any

25   responsive documents.  Again, true?

1          MR. SAMORE:  We have -- yes, it is the same response.

2    We have conducted a reasonable investigation.  We have

3    produced everything we have found.

4          THE COURT:  No. 20, "Any and all market surveys,

5    studies, price lists, and/or internal e-mails regarding the

6    cost of any alternative tattoo 'removal' or tattoo lightening

7    machines on the market."

8          Again, the Defendant is representing to the court

9    that they are not withholding any responsive documents after

10   this reasonable investigation, correct?

11         MS. LONG:  Yes.

12         THE COURT:  Okay.  The same for 22, 23, 24, right?

13         MR. HOLEVAS:  Your Honor, can I have those numbers

14   again?  I'm sorry.

15         MS. LONG:  Yes.

16         THE COURT:  22, 23, 24.

17         MR. HOLEVAS:  Thank you.

18         THE COURT:  All right.  So their representation is

19   that they have conducted a reasonable investigation and they

20   are not withholding any documents, correct?

21         MS. LONG:  Yes.

22         THE COURT:  Okay.  So, hopefully, that made some

23   headway.

24         I think I stated early on, if it is disproportional

25   or someone is saying burdensome, I need facts, and I just

1    don't have facts.  I have got conclusions, but not facts.

2         But let's go to Plaintiffs' Six Request For

3    Production, No. 4:  "Any and all contracts, letters,

4    communications, e-mails, and/or correspondence with any

5    modeling agency, model, and/or third party regarding the

6    advertisements utilized by Cynosure to market or advertise

7    where in which any tattoo was 'photoshopped' on to a model.

8         "Objection, burdensome and relevance."

9         I don't know how it is possibly not relevant.  How is

10   it not relevant?  Their whole claim from day one is they are

11   showing pictures with models with a butterfly in one picture

12   and no butterfly in another picture, and they are saying it is

13   false advertising.  How would that not be relevant?

14        MS. LONG:  Your Honor, our relevance argument was

15   based on the idea that there was an actual modeling company

16   and saying, "Hey, can we have a model come on Monday from 1:00

17   to 5:00."  It is not substantive enough to be relevant, but

18   this is included in the requests that we will supplement.  We

19   will give them those e-mails.

20        THE COURT:  Okay.

21        MS. LONG:  I don't know that they are going to have

22   what they think they are going to have in them, but --

23        THE COURT:  It is not just e-mails.  It is letters,

24   communications, e-mails, and correspondence, okay?  So you

25   will produce those as well?

1          MS. LONG:  We will conduct a reasonable search for

2    those and produce.

3          THE COURT:  Well, what kind of time frame is that?

4    Because, again, it seems pretty relevant.

5          MR. SAMORE:  Yes.  Well, I think that we should have

6    three weeks.  I think the three-week time frame would be fine.

7    They had our first set of production requests since January.

8    We didn't get responses until December.  We have not -- my

9    point is that we have not been the cause of any delay in the

10   written discovery.  We served one set.  They waited almost a

11   year to comply.  And three weeks is a reasonable period of

12   time to request.

13         THE COURT:  Okay.  Well, how long it takes for your

14   client to get the documents together has nothing to do with

15   what they did or did not do in response to your request,

16   right?  It is a non sequitur.  It is a debater's point is what

17   it is, right?  You are both going to point the finger and say,

18   "You guys are going to delay.  You guys are going to delay."

19   To me, it doesn't matter.  I don't care what he did.  I care

20   how fast you can get these clearly relevant documents to the

21   Plaintiffs.  So we will talk about that three-week time frame,

22   okay?

23         Shouldn't that be -- do we need discovery on that?

24   Isn't that a stipulation?  I mean, didn't --

25         MS. LONG:  Yes.  I mean, that was the other relevant

1    thought, was that we are not arguing that we didn't do these.

2    We are not arguing this wasn't photoshopped.  We told them it

3    was photoshopped.

4         THE COURT:  Well, did you tell them you would

5    stipulate to it?

6         Did you tell them you would stipulate to it?

7         MR. SAMORE:  We stipulated to it.  We admitted it in

8    our responses, which is what got, you know, this position we

9    are in.

10        MR. BRUCE:  That's not true, Judge.  They answered

11   one thing on one photograph, and then that's what they said

12   was photoshopped.

13        But I want to answer the question, because you bring

14   up a good question, Judge.  If you look at Request to Produce

15   No. 4, it says, "Any and all contracts, letters,

16   communications, e-mails with any modeling agency, model, or a

17   third party regarding the advertisements used by Cynosure to

18   market or advertise where in any tattoo was photoshopped on to

19   a model."

20        So, Judge, I can think of a myriad of examples, and

21   just tell me when you have had enough, why this might be

22   highly relevant.

23        THE COURT:  I think it is relevant.

24        MR. BRUCE:  Oh, okay.

25        THE COURT:  I don't need to be convinced of that.  I

1    have been saying it is relevant.

2              MR. BRUCE:  Okay.

3              THE COURT:  Okay.  Talked about.  Talked about.

4    Talked about.  Talked about.

5              Okay.  I'm going to need some help on this one.

6    Plaintiffs' Sixth Request For Production, No. 18, I don't

7    understand the request and I don't understand the response, so

8    I can't rule on it with any certainty.

9              No. 18 is "Any and all video clips, digital or

10   electronic downloads, and/or paper copies of any of the named

11   plaintiffs to the instant lawsuit, including websites,

12   brochures or advertisements, but not limited to all

13   marketing/advertisement of products of the PicoSure product by

14   the named plaintiffs."

15             So, Mr. Bruce, what are you looking for?

16             MR. BRUCE:  Yes, so it is very -- it is very simple.

17   Mr. Samore's response seemingly -- or one of his responses to

18   this is "Your dermatology practices, your tattoo removal

19   practices made certain advertisements on the Internet for

20   their services."  Okay.  They made certain representations for

21   their services, and he wants to use that, notwithstanding the

22   fact that we got them from their client, right?  That's a

23   little fact he is going to have to get over with those seven

24   people over there.  But they have their own advertisements out

25   there and brochures.

1          THE COURT:  Who is "they"?

2          MR. BRUCE:  My clients, the dermatology practices and

3    the tattoo removal practices.

4          THE COURT:  Okay.

5          MR. BRUCE:  So I'm asking for video clips, downloads

6    of the -- that's why I said "of the named plaintiffs to the

7    instant lawsuit."

8          So he is saying, "Oh, Devon, your people advertised

9    this.  Your people advertised."  Okay.  "Well, give me what

10   you got."  I know he has downloaded them.  Just give them to

11   me.  He is going to use them at the deps.  He is going to want

12   to use them at trial.  And if he doesn't want to give them to

13   me, that's fine.  We will just preclude him -- I will have a

14   motion, which I think will be well brought, now or at the

15   trial.  If he doesn't have them, that's fine, we are not going

16   to get into it.  But if that's his defense, and he is telling

17   me that -- he is suggesting that he has them, I would like

18   them.

19         MR. GRAVINO:  Judge, if I could add one thing very

20   briefly.  I think the other reason we asked for this, when

21   Devon and I talked, is there are websites that go up and then

22   they come down, and there are these web crawlers that go, and

23   they will take a picture of the website, and they archive this

24   stuff.  I have been through this in commercial cases.  So I

25   will ask my client, "Can I see your website?"  And they will

1    say, "Well, here it is now, but I can't tell what it was a

2    year ago."  They are evolving.  We don't know if they have

3    archived historical websites and things of that nature.

4    That's why the simple answer might be "Well, go print your own

5    client's websites off there.  You know what they are."  It is

6    these historical ones, clips that may have been posted and are

7    no longer available.  We want to make sure we are not

8    sandbagged when they sit down to take depositions, that

9    everything they have, we have in advance.

10              MS. LONG:  I mean, we don't have --

11              THE COURT:  Hold on.

12              MS. LONG:  Okay.

13              THE COURT:  So what Mr. Bruce is saying, and your

14    position -- I get your position, that makes perfect sense, is

15    "Look, if you guys are whining and complaining about these

16    machines, but meanwhile you are advertising them as they are

17    the greatest things since cold beer, we want to see those

18    statements," because they support your position that the

19    machines are good.  That makes sense.

20              What they are asking for, now that I have read it in

21    that context, is, "Okay, do you have us making those

22    statements, so we can -- you know, we can -- we are ready for

23    brutal cross-examination."

24              MS. LONG:  I'm not sure how they can be sandbagged by

25    something that they themselves said.

```
 1              THE COURT:  All right.

 2              MS. LONG:  If they put it out there, they put it out

 3   there.  So I'm not sure how they could claim that we would be

 4   hiding it from them.  If they want me to go to their --

 5              THE COURT:  Is it privileged?  No.  Is it relevant?

 6   Yes.  Is it disproportionate?

 7              MS. LONG:  Is it in our possession, custody, and

 8   control.

 9              THE COURT:  Well, that's an easy answer.  Then it

10   would just be "We don't have it."  But that's not your answer

11   to that question.  But on all the other ones, you told me when

12   you didn't.  So when I see that, it raises questions.

13              MS. LONG:  If they want us to go to their website and

14   print it out and produce it to them, fine.

15              THE COURT:  You don't have to produce it if it is not

16   in your possession, custody, or control.

17              Do you have the type of documents or does your client

18   have the type of documents that they have just identified?

19              MS. LONG:  We have looked at their website.  I think

20   we have probably downloaded it.  I can produce to them their

21   downloaded website.  But I think we want to make sure we are

22   not precluded from using -- if we have not used any historical

23   web crawlers to look back at previous things, and we do so, I

24   don't see why we should be precluded from using it.

25              THE COURT:  In the future?
```

```
 1              MS. LONG:  Yes.
 2              THE COURT:  Sure, as long as it is done before the
 3   supplementation date, which is in the case management order.
 4   So if you are going to do it, do it before the supplementation
 5   date, and then you are going to have to produce those.  But if
 6   you don't have it, you don't have it.  That's the simple
 7   answer.
 8              Now, it sounds like you have downloaded some, so
 9   produce it.
10              MR. SAMORE:  There was a newspaper article in which
11   their clients said this was the greatest machine, and "It is
12   fantastic.  We love it."
13              THE COURT:  Okay.
14              MR. SAMORE:  And we will produce that.  We are happy
15   to produce that to them.  We mentioned that at the last
16   hearing, too.
17              THE COURT:  Okay.
18              MR. GRAVINO:  That was in the early stages, Judge,
19   before the fog lifted.
20              MR. SAMORE:  After they used it 200 times.
21              MR. BRUCE:  It sounds like Mr. Samore wants to try
22   this case.
23              THE COURT:  We need more trials, and I don't mean
24   that sarcastically.  We need more trials.
25              Okay.  So that takes care of 18.  If you have got
```

1    them -- you don't have to go get them.  But if you have
2    downloaded them, they are entitled to them, and you will
3    produce those as well.
4              Response.  Okay.  No. 21, again, I do not understand
5    the request or response.  So maybe we can make some headway
6    like we did on the last one.
7              MR. BRUCE:  I'm sorry?
8              THE COURT:  21.
9              MR. BRUCE:  Their response or my request?
10             THE COURT:  Your request 21.  I didn't understand the
11   request or the response.
12             So No. 21 says:  "Any and all contracts, agreements,
13   correspondence, and/or e-mails between Cynosure and Doc Web
14   Services regarding the creation of web advertisements for the
15   sale or marketing of the PicoSure product."
16             So what are you looking at?  How is that relevant?
17             MR. BRUCE:  So, Judge, this didn't make any sense
18   because you don't know who "Doc Web" is.
19             THE COURT:  I do not know, and I have questions about
20   other people that were asked.
21             So who is Doc Web?
22             MR. BRUCE:  So Doc Web, apparently, what Cynosure
23   did, and I can't tell you in all circumstances because they
24   stonewalled, but at least as to one of my clients, if not
25   more, they say -- Cynosure says, "Hey, you have got your

1    dermatology practice," which it would be that -- that's the

2    only type of client, dermatology practice or a lightening

3    tattoo parlor, okay?  They say, "Hey, you buy this machine,

4    and we will help you advertise, and, by the way, here are some

5    examples to put up on your website," right?

6          THE COURT:  Okay.

7          MR. BRUCE:  It is just basically the

8    misrepresentations they made to our clients, and then they

9    say, "Okay, go ahead and make them to your people by putting

10    them up on your website," but they also said, "Go to Doc Web

11    Services."

12          THE COURT:  Okay.

13          MR. BRUCE:  That's a third-party company, and they

14    said, "If you want to, you can hire them, and they know all

15    about us, and we work with them, and they can help advertise

16    the PicoSure machine services."  That's what is Doc Web.

17          So it is a third-party company that Cynosure told the

18    purchasers of the machine that they could utilize if they want

19    to get help in advertising the services for the PicoSure

20    machine, and the genesis of this request to produce No. 21 is

21    to find out all of the e-mails and correspondence because,

22    hypothetically, there may be communications between Cynosure

23    and the third-party thing, these Doc Web people, where Doc Web

24    people are saying, "Hey, we are helping advertise this stuff,

25    but people are giving us feedback.  It doesn't do what it is

1    supposed to do," this type of thing.  "What do you want us to

2    represent for these purchasers of your machine?  What do you

3    want us to push on these people in terms of how to advertise

4    it?"  I don't know what is out there, but it is certainly not

5    privileged.  And they haven't proven anybody that says it is

6    burdensome.  And so that's why we want it.

7              THE COURT:  All right.

8              MR. GRAVINO:  It is one company, too, Judge.

9              THE COURT:  Go ahead, Mr. Samore -- or Ms. Long.

10             MS. LONG:  Yes, we can produce it.  We have got a

11   limited number of e-mails where the company basically provides

12   to Doc Web the name of purchasers who have purchased this.

13             THE COURT:  That Cynosure provides the documents?

14             MS. LONG:  Yes.  Cynosure basically sends Doc Web the

15   name of the purchaser who has purchased this optional

16   marketing package.  All substantive communications regarding

17   that happened between Doc Web and the purchaser.

18             THE COURT:  So it almost is a broker kind of --

19             MS. LONG:  Yes, it is a very minimal.

20             THE COURT:  "These are the guys.  Go see them."

21             MS. LONG:  Yes.  It is a very middleman-type

22   position.  We can produce those e-mails.

23             I think one thing in particular here, I think we have

24   gotten a fair number of invoices for them that would simply

25   be -- there would be no contents about the efficacy of the

1   PicoSure machine, and it would basically be a request for

2   finances.

3           THE COURT:  You want to see invoices?  There is no

4   substance to that.

5           MR. BRUCE:  Mr. Gravino?

6           MR. GRAVINO:  It may go to bias, Judge.  I don't

7   know.

8           MS. LONG:  There is thousands of them.

9           THE COURT:  All right.

10          MS. LONG:  We can give them a limited number of

11  e-mails.  Again, this is one of those things where I think

12  that they are not going to be very excited about what they

13  see, but we will give them what we have got.

14          MR. BRUCE:  I was going to say at this point in time,

15  Judge, to be lawyerly about it, I will just say we will

16  narrowly, based on her -- I mean, this is the first time I'm

17  hearing that.  We will just agree on not to ask for the

18  invoices at this time.

19          THE COURT:  All right.  So the communication, sort of

20  that setup e-mail, things like that, those things can be

21  produced, but no invoices.

22          See, they have invoices.  All right.

23          Okay.  No. 25, again, I don't know who the parties

24  are here, so I don't know how it fits in.  "All contracts,

25  agreements, correspondence, and/or e-mails between any agent,

1    employee of Cynosure and Dr. Stephen" -- or

2    Stephen -- "Mulholland, Sarah Brice, and Lori Mackey,"

3    M-a-c-k-e-y.  I have no idea who those people are, so I don't

4    know how it is relevant.  I need something more.  So flesh

5    this out for me.

6              MR. BRUCE:  Sure.  I believe, and I'm sure

7    Mr. Samore will correct me if I'm mistaken, in terms of, A,

8    and this -- and I just want you to know and Mr. Samore to know

9    where my head is on this.  They go around and they get these

10   doctors to help espouse and talk about how great the PicoSure

11   machine is.  Upon information and belief -- I'm not

12   representing this to the court -- upon information and belief,

13   some or perhaps many of these doctors are well-compensated

14   either through salary, stipends, expenses, et cetera, okay?

15             So to the extent that any of the studies he is going

16   to start citing to you or any of the witnesses that he

17   contemplates calling at trial are these doctors that they have

18   and that they are paying in any way, shape, or form, he is

19   going to see a similar request from me.  If they are going to

20   use them, that goes directly to bias.  I get to know what

21   Cynosure has paid these people, and if he is going to say, as

22   an officer of the court, never been paid, no contracts, they

23   just do it because they love the machine, that's fine.

24             THE COURT:  Okay.

25             MR. BRUCE:  So that's Mulholland.  And then Sarah

 1    Brice and Lori Mackey, again, these are a different kettle of

 2    fish.  These people are in a different category.  My

 3    understanding is that these people were key people in Cynosure

 4    that dealt with the PicoSure machine.

 5          It is a matter of course, Judge, whether it is a

 6    medical malpractice case, a trucking case, or any of a litany

 7    of other -- I didn't want to rain on you with case law.  I'm

 8    happy to do that.  We always ask for the personnel file,

 9    especially for those people.  If he wants to redact their

10    medical records, appropriate redactions, I deal with that.

11    You deal with that all the time.  These are main corporate

12    employees of the Defendant.

13          THE COURT:  This isn't seeking personnel files.  It

14    is contracts, agreements, correspondence, and e-mails.

15          MR. BRUCE:  Yes, okay, so poorly worded.  Well, I

16    certainly want all that, and then we can ask for the personnel

17    file at a subsequent time.  But certainly that's the genesis

18    of this.

19          THE COURT:  Okay.

20          MS. LONG:  So --

21          THE COURT:  Let's start with Mulholland,

22    Dr. Mulholland, first.

23          MS. LONG:  My understanding, and this is somewhat

24    limited -- your Honor, I have only been on this case a month;

25    I'm taking over for the woman who is on maternity leave, so

1    forgive me for a little bit of lack of knowledge here -- he is

2    a consultant.  He does go around and talk about PicoSure.  He

3    goes to conferences and things.  I'm not sure that any e-mail

4    that he has ever sent to the company, you know, would be

5    relevant.  I'm just not -- they don't make any allegations

6    about him in their complaint.  Are they going to ask this

7    about everyone we have ever employed, who we have ever given

8    any kind of stipend to attend any kind of conference?  Where

9    does it end?

10           MR. SAMORE:  He is not listed as a witness of ours,

11   and they haven't alleged that they attended any of his

12   conferences.  This appears to be a fishing expedition.

13           THE COURT:  Okay.

14           MR. SAMORE:  If we were retaining him -- if we had

15   disclosed him as a witness to testify, he would be on firmer

16   ground.

17           MR. BRUCE:  Judge, I can --

18           MR. SAMORE:  But there is no allegation that the

19   Plaintiffs had anything to do with this individual.

20           THE COURT:  Okay.

21           MR. BRUCE:  Yes, I didn't mean to interrupt

22   Mr. Samore.

23           First of all, the last time I checked, I don't need

24   to allege something in my complaint with respect to a matter

25   like this in order for it to be discoverable, let alone

1   relevant.  This guy is their A-team poster child.  He flies

2   around the country, and he talks about how great this very

3   machine is.  That's what this guy does.  And contrary

4   to -- because we have never gotten to deps, he would find out

5   that some of my clients have gone to seminars in which he was

6   in attendance, but I don't need to allege that, nor do I need

7   to -- and even if that wasn't true, that doesn't restrict me

8   from asking about this guy.

9        They want to use this guy as their poster child,

10  Cynosure does, to go around and promote and sell this stuff.

11  I think every e-mail between him and Cynosure is highly

12  discoverable.  We are not at relevance.  It is highly

13  discoverable because it is about him peddling this machine.

14       THE COURT:  It doesn't say that.  So if he sends an

15  e-mail to the IT department and says, "I have the blue screen

16  of death," that would be captured, but it is certainly not

17  relevant to the case, right?

18       MR. BRUCE:  Absolutely, Judge.  We will narrow it.  I

19  will narrow the e-mail request, anything -- any and all

20  references to the PicoSure machine.  That's fine.  And same

21  with correspondence.

22       THE COURT:  Produce any contracts or agreements with

23  Dr. Stephen Mulholland.  I can see how that is relevant.

24       MS. LONG:  We could produce the contract, I think.

25       MR. SAMORE:  Yes.

1          THE COURT:  The contract, agreement, whatever you

2    want to call it.

3          MR. SAMORE:  Thank you.

4          MS. LONG:  Master document.

5          THE COURT:  Okay.  Correspondence and e-mails,

6    especially if it is somebody who is not -- if it is not on

7    their 26(a)(1), which means they are not testifying, I think

8    that is overbroad at this point.  But if something comes up in

9    a deposition, I can revisit it.

10         Sarah Brice and Lori Mackey, who are they, and how do

11   they fit into this?

12         MS. LONG:  Yes.  So Sarah Brice, my understanding is

13   that she is also a nurse in our sort of clinical area.  So

14   that similar to Doc Web as a person, she is also kind of a

15   consultant nurse.  So it is similar to Doc Web in that we

16   middleman to them for marketing.  We middleman to her for

17   clinical issues.  So I think the majority of the

18   communications with Sarah Brice are sort of, you know, how

19   does this thing work.

20         Again, I'm not sure what they -- you know, whether

21   they interacted with her.  We could produce -- my

22   understanding is that she is a consultant.  So I would say

23   that I think we probably have a consultant agreement with her.

24   I can't say a hundred percent.

25         THE COURT:  Well, that's in your possession, custody,

1    and control.

2          MS. LONG:  But I can ask the client to go back and

3    look for that.

4          Lori Mackey would not have a contract.  She is a

5    current Cynosure employee in the contracting department.

6          THE COURT:  What does that mean, "contracting

7    department"?

8          MS. LONG:  I think that that has to do with the

9    initial purchasing.

10          THE COURT:  Okay.

11          MS. LONG:  But I can't give you more specifics beyond

12    that as to what her role and responsibilities are.  But the

13    way that this request is worded now, you know, it is a single

14    Cynosure employee, any e-mail that she ever sent to anyone

15    else in the company.

16          THE COURT:  All right.  If you have contracts or

17    agreements for Sarah Brice or Lori Mackey, produce those, and

18    produce any correspondence or e-mails between Sarah Brice and

19    Lori Mackey with any of the named plaintiffs.

20          MS. LONG:  Okay.  I think we have already done that,

21    but we will confirm.  We may have.

22          THE COURT:  Okay.  That's what you are going to do --

23          MS. LONG:  Yes.

24          THE COURT:  -- if you haven't done it already.

25          MR. BRUCE:  And just so you don't think ill of me,

1   based on your ruling --

2          THE COURT:  I don't think ill of you.

3          MR. BRUCE:  No, no, because I don't want you to be

4   like "Why is he doing that?  I just said no."

5          So if they are not willing -- they don't represent

6   this man, Dr. Stephen Mulholland.  He is part of their

7   whole -- this is a false advertising case, right?  I'm saying

8   the machine doesn't work, that is.  They have got this man on

9   retainer.  Now I'm just learning that I was right.  Upon

10  information and belief, what I told you I didn't know now has

11  been confirmed.  He is on -- they are paying this guy.  They

12  are paying this guy to go out and peddle this.

13         This is a false advertising case.  It is obvious to

14  me that communications between them and him about how to sell

15  this machine is not only discoverable and relevant.  I

16  understand your ruling.  You are saying he is not an employee

17  of theirs and they don't have to give us the e-mails.

18  Probably today, if today is Monday, by Good Friday, I'm going

19  to serve by Friday, I'm going to serve this man, wherever he

20  lives, with a subpoena asking for any and all e-mails between

21  Cynosure and them, and then they might come running in here

22  saying, "Well, we represent him."  I just don't -- I mean, I

23  don't want to -- we are going around in circles.

24         THE COURT:  We will see how that goes.  And I'm not

25  going to be here Good Friday.

1      MR. BRUCE:  Okay.  All right.  I will issue the

2  subpoena.  Thank you.

3      THE COURT:  Okay.  Hold on one second.  It's 2:45.

4  When did we start, 1:30?

5      Why don't we take a quick review.

6      Okay.  We are going to take a quick break.  Some, but

7  not all, of the things we will talk about when we get back are

8  the attorney-client issue -- attorney-client privilege issue

9  with regard to, I believe it is, Defendant's Interrogatory

10  No. 18.  We need to talk about that.

11      We definitely need to talk about what the

12  investigation has entailed to date.

13      MR. BRUCE:  I'm sorry?

14      THE COURT:  What the reasonable investigation has

15  entailed to date.

16      And then we are definitely talking about how a

17  company doesn't know the price of its product that it sold,

18  okay?  Because that I'm just -- I'm going to have real trouble

19  wrapping my head around.

20      Okay.  We will take a quick break, and then we will

21  come back and talk about those three things and anything else

22  we need to talk about, okay?

23      MR. BRUCE:  Okay.  Thank you, Judge.

24      MR. SAMORE:  Thank you.

25      (Recess taken.)

1          THE COURT:  Okay.  Let's talk about -- and that was

2     supposed to be the easy part.  That was the easy part.  Now we

3     are heading into the teeth of the matter.

4          Let's talk about -- I think both of you wanted to

5     talk about -- it seems like you are both loaded for bear on

6     this.  It is the attorney-client privilege issue.

7          Hold on here.

8          Yes, okay, it is defendant's motion to compel,

9     Interrogatory 18, "Identify any and all bases for your

10    allegations that Cynosure 'knew' or 'was aware' its

11    representations regarding the PicoSure product were false."

12         And then we have got an attorney-client issue.  We

13    have got all kinds of things.  Attorney-client issues, these

14    type of things, are really fact driven.

15         So let me hear from Mr. Samore.  Give me some

16    context.  I understand the request, but give me some context

17    for it.  I want to hear what your perspective is.  And then I

18    will ask Mr. Bruce.

19         Go ahead, Mr. Samore or Ms. Long, either one.

20         MR. SAMORE:  This is our request for their

21    communications with class members.  It is very simple --

22         MS. LONG:  It is not, no.

23         MR. SAMORE:  I just want to make sure I'm on the

24    right topic.

25         THE COURT:  Interrogatory 18.

1        MR. SAMORE:  Defendant's Interrogatory 18.

2        THE COURT:  Yes.

3        MS. LONG:  Yes.

4        MR. SAMORE:  Yes.  So, essentially, Plaintiffs have

5   the burden of establishing a privilege.  There is no question

6   that communications between putative class counsel and

7   putative members is not attorney-client privilege under normal

8   circumstances.  In their response, for the first time they

9   asserted that they were being consulted and were providing

10  consulting professional services.

11       My position is if that's the case, I think we can

12  deal with this very quickly.  They clearly have the obligation

13  to identify who they spoke with, when they spoke with them,

14  the subject matter, and so forth, in order to lay a foundation

15  for the privilege.

16       THE COURT:  Okay.  All right.  Mr. Bruce, give me

17  some context here.

18       MR. BRUCE:  This is first semester of law school,

19  Judge.  If I gave him what he is asking for, the ARDC would

20  have my ticket.  If Joe Jones in Nebraska hears about this

21  lawsuit and calls me, e-mails me, sends me a letter and says,

22  "Hey, I want to join.  Tell me about your lawsuit.  I have got

23  this thing.  It is a piece of, you know, whatever," that's him

24  seeking my counsel, period, full stop, end of story.  We don't

25  have to go through the charade of attorney-client privilege.

1   End of story.  That is protected, and that is protected

2   whether or not I ultimately decide to take him on as a client,

3   whether he decides to keep me as a lawyer.  I can't give that

4   information at all.

5          And his suggestion is laughable that I'm going to go

6   through all these different communications and say, "Okay,

7   this guy called me on this date, this guy."  Is he going to

8   give me every privilege log of him and Cynosure?  No, I didn't

9   ask for that, and that's not --

10         THE COURT:  That's mutually assured destruction.

11  That's mad.  But I'm not so sure that's what they are asking

12  for.

13         MR. BRUCE:  Well, that's what I heard him ask.

14         THE COURT:  Okay.  Go ahead.  I will come back to you

15  in a second.

16         MR. BRUCE:  He told me he wants those communications,

17  and I'm saying they are privileged, period, full stop, end of

18  story.

19         THE COURT:  Okay.  I think they are looking for

20  something broader and different, so let me find out.

21         MS. LONG:  So we don't dispute if Joe Jones calls you

22  up and says, "Hey, give me some legal advice about that

23  lawsuit," even if you haven't signed a retainer, that's

24  privileged.  Great.  Put it down if you have a written copy of

25  that.  Obviously, if it is a phone call, there is no privilege

1    log for that.  If there is a document, there is an e-mail,

2    tell me Joe Jones sent it to you, tell me who it was and say,

3    "Requesting information about this litigation."  You have to

4    support the privilege.

5            If Joe Jones sends you an e-mail and says, "I can't

6    believe you are doing this litigation; I love the PicoSure; It

7    is fantastic; This litigation is terrible," that's not seeking

8    legal advice.  Every communication between a person and a

9    lawyer is not privileged.  It has to be for the purpose of

10   seeking legal advice.

11           THE COURT:  Okay.  All right.  So they are -- it is

12   an assumption that somebody called you, that they saw the

13   lawsuit and were angry.

14           MR. BRUCE:  I will say as an officer of the court

15   that I have received no communications that I recall since I

16   started this lawsuit with people calling or communicating,

17   saying, "I bought it.  It is a great thing."

18           THE COURT:  All right.

19           MR. BRUCE:  I will say that.

20           THE COURT:  Anybody call and complain about the

21   lawsuit, other than opposing counsel?

22           MS. LONG:  How about any communications that didn't

23   request legal advice?

24           MR. BRUCE:  No, I'm not --

25           MS. LONG:  They are not privileged.

1          THE COURT:  Hold on.

2          How would it be relevant, then?

3          MS. LONG:  Related to the litigation.

4          THE COURT:  Okay.  So if he gets a call from a

5   reporter, would that need to be produced?

6          MS. LONG:  No, because we have putative class

7   members.

8          THE COURT:  Okay.

9          MS. LONG:  The request is limited to putative class

10  members.

11         THE COURT:  So someone who purchased the machine, who

12  called, communicated in some manner with Plaintiffs' counsel

13  about the litigation.  So it is people who, by definition,

14  purchased the machine, contacted Plaintiffs' counsel about the

15  litigation, but not seeking legal advice.  Do you have any of

16  those?

17         MR. BRUCE:  I have no --

18         THE COURT:  Well, first of all, is that what you are

19  looking for?

20         MR. SAMORE:  I am looking for a privilege log.  I

21  don't know that it is overly burdensome.  There may have been

22  three people.  There may have been ten people.  I don't know.

23         THE COURT:  Can you answer the question, though?  Is

24  that what -- I want to know what you are looking for.

25         MS. LONG:  That's what we would like to be produced.

1    Those are the documents we would like produced.  We would also
2    like a privilege log telling us that the other ones exist.
3            THE COURT:  Again, so that's what you are looking
4    for?
5            MR. SAMORE:  But ultimately, I mean, if there were,
6    for example, solicitations, that clearly would not be -- if
7    this was the Plaintiffs' firm --
8            THE COURT:  See, that's why I ask these questions.
9            MR. SAMORE:  Yes, right.
10           THE COURT:  And I said I think they are looking for
11   something bigger.  So that's why I asked you what are you
12   looking for.
13           MS. LONG:  Yes.
14           THE COURT:  So now that's -- solicitations, that is a
15   whole -- what did you say, kettle of fish?  That's a
16   whole -- that's not kettle of fish.  That's like squid in a
17   different country.
18           All right.  So any communications -- two things now
19   we know:  One, communications from putative class members, so
20   somebody who purchased the machine, contacted you about the
21   litigation, but wasn't seeking legal advice.  Do those even
22   exist?
23           MR. BRUCE:  I don't think so, No. 1, and, no, I'm not
24   going to get into -- I mean, I will talk to you about it, but
25   the context has been people are not happy with the machine and

1    they are seeking legal advice.  That's it, Judge.

2              THE COURT:  Okay.

3              MR. BRUCE:  And I have never in 26 years filed a

4    privilege log for attorney-client communications, so I haven't

5    done that.  Maybe that's something new.

6              What was the other thing?  I haven't solicited.  I

7    have never solicited.

8              THE COURT:  Hold on a second.

9              So that's one.  They don't have them.  Your

10   representation is no one -- no putative class member has

11   contacted Plaintiffs' counsel about the litigation that wasn't

12   seeking legal advice.  So there is your answer to that.

13             You are also asking about solicitations, so talk to

14   me about that.

15             MR. SAMORE:  Well, I mean, I would like to hear from

16   the other counsel on this.  Solicitation is clearly not

17   privileged.

18             THE COURT:  Can you play my game?

19             MR. SAMORE:  Okay.

20             THE COURT:  So I'm asking you -- we have got one

21   issue that we have clarified what you are seeking.  They don't

22   have them.  You also mentioned solicitation.  So now I'm

23   turning to you to ask you to flesh out for me, to give me

24   context, what you're looking for and why.

25             MR. SAMORE:  Okay.  We were looking for

1   communications between counsel and potential class members

2   with respect to whether they wanted to join the lawsuit, if

3   there was a solicitation.  That would be -- that would be

4   potentially relevant.

5            But let me just cut right to it.  I think, as I

6   understand the rule, they have the obligation to establish

7   attorney-client privilege.  If he produces a privilege log,

8   this whole issue may be gone, and there may only be five.

9            THE COURT:  The first step is what are you asking

10  for.  And that's what I'm stuck on right now.  And now I know.

11  Now I know what you are looking for --

12           MR. SAMORE:  Yes.

13           THE COURT:  -- is whether Plaintiffs' counsel

14  solicited, looked for, contacted other putative class members.

15  That's what -- and I want to know.  I just want to make sure I

16  have got my head on this issue and I know what you are asking

17  for.  That's what you are looking for, right?

18           MR. SAMORE:  But in addition, if they were contacted

19  by a putative class member --

20           THE COURT:  We already talked about that and resolved

21  that.

22           MR. SAMORE:  Okay.

23           THE COURT:  Okay.  So, look, if you haven't figured

24  it out now, I'm very compartmentalized.  I try to be simple.

25  Issue one, were they contacted, we resolved that.  Now we are

 1    talking about solicitation.

 2              So was there any solicitations that were sent out?

 3              MR. BRUCE:  No.

 4              THE COURT:  Okay.  And that resolves that.  There are

 5    no documents.

 6              MR. SAMORE:  Okay.

 7              THE COURT:  So we don't even need a privilege log,

 8    okay?

 9              MR. BRUCE:  Yes.

10              THE COURT:  Okay.

11              MR. BRUCE:  Right.  I just want to be clear, Judge,

12    that there is absolutely people that have contacted me

13    regarding my legal advice that are putative class members.  I

14    have represented that, and I'm representing that to you.  And

15    if we get to the end of this hearing today, one of the things

16    I want to tell you just up front, an issue, is we are going to

17    be adding some more plaintiffs, to my point.  It is not just

18    four people.  There is many others.  So we are going to be

19    adding some plaintiffs.

20              THE COURT:  Okay.

21              MR. BRUCE:  Mr. Samore wants to push this case, so we

22    are going to give him more feed for --

23              THE COURT:  So let me pause you there.

24              Hypertechnically, everybody who has contacted,

25    including the named class members that filed a complaint, they

```
1    have contacted Plaintiffs' counsel, I'm sure there is

2    communications.  There is probably an engagement agreement and

3    all kinds of stuff.  You are not seeking that, are you?

4    Because if you sought that, then they would say, "Okay, give

5    me a privilege log of every time you e-mailed your general

6    counsel."

7              MR. SAMORE:  Yes.

8              THE COURT:  And you don't want to do that, play that

9    game, right?

10             MS. LONG:  No, I think that's why we said putative

11   class members as opposed to named plaintiffs.

12             THE COURT:  Okay.  So we are good on that.  All

13   right.  So no solicitations.

14             Go ahead.

15             But you have made your representation.  People have

16   contacted you.  Again --

17             MR. BRUCE:  Some I have taken, some I haven't.

18             THE COURT:  All for the purpose of legal advice?

19             MR. BRUCE:  Yes, and about this litigation, and

20   that's privileged.

21             MR. SAMORE:  Your Honor, just like, I mean, they want

22   no surprises with respect to their statements that their own

23   clients made at depositions, we don't want --

24             THE COURT:  Hold on one second.

25             (Brief pause.)
```

```
 1              THE COURT:  All right.  So I interrupted you.

 2              MR. SAMORE:  So we don't want to be surprised.  And,

 3      also, I didn't hear Mr. Gravino indicate that there was no

 4      solicitations on his end.

 5              MR. GRAVINO:  I can similarly represent that to the

 6      court, your Honor.

 7              THE COURT:  And you, counsel?

 8              MR. HOLEVAS:  No solicitations.

 9              THE COURT:  Okay.  All right.  And you said you

10      didn't want to be surprised.  Anything else?  I didn't want to

11      cut you off.

12              MR. SAMORE:  No, your Honor, that's it.  Thank you.

13              THE COURT:  Okay.  See, I had that as a difficult

14      issue, and we worked right through it.

15              Okay.  Talk to me about --

16              MR. SAMORE:  I --

17              THE COURT:  Go ahead.

18              MR. SAMORE:  No, I'm sorry.

19              THE COURT:  All right.  Talk to me about -- let me

20      make sure I understand this correctly.  It sounds as though

21      the Defendant is saying it does not know the price of the

22      product it sold to the putative class members.  Is my

23      understanding correct?

24              MS. LONG:  So we know the price paid by each person

25      who purchased it.
```

```
 1              THE COURT:  Okay.

 2              MS. LONG:  But in order to compare apples to apples,

 3    there is math that needs to be done manually because sometimes

 4    they purchased --

 5              THE COURT:  Let me pause you right there.  They just

 6    want to know the price, right?

 7              MS. LONG:  They want to know the price of the

 8    PicoSure workstation, but if someone bought a PicoSure

 9    workstation and another couple of lasers, and also some

10    optional upgrades and maybe this marketing package, that all

11    goes into the final price.  So I could give you a price, but I

12    couldn't tell you that that price is for the PicoSure as

13    opposed to the PicoSure and a lot of other things.

14              THE COURT:  So the invoice -- I assume there is

15    invoices, right?

16              MS. LONG:  Yes.

17              MR. SAMORE:  Yes.

18              THE COURT:  Okay.  So the invoice will be X number of

19    dollars, but in the X number -- it will say total, X number of

20    dollars, but cooked into the X number of dollars are, could

21    be, the machine, plus that Doc Web Service deal, plus some

22    other things, maybe marketing and other things.  That all gets

23    cooked into the X dollars, is that what you are telling me?

24              MS. LONG:  Uh-huh.

25              MR. SAMORE:  Yes.
```

1      THE COURT:  Okay.  And the price of the machine is

2  going to be different?

3      MS. LONG:  I think it is sometimes -- I don't know if

4  you have ever purchased something, you know --

5      THE COURT:  I've purchased a few things.

6      MS. LONG:  -- and you get something at the store, and

7  you get a big discount, $25 off if you buy $50, but then you

8  try and return one thing, and it is not always clear what you

9  are going to get back because it went into this larger

10  calculation.  I don't know.  That has happened to me.

11      MR. SAMORE:  And we could produce the invoices.  This

12  is very confidential and proprietary information.  They have a

13  competitor that may have helped fuel this, maybe a source of

14  some information for the Plaintiffs.  So if we do produce the

15  invoices, we would ask that they be produced solely for

16  attorneys' eyes only.  That may be a way of resolving it.  And

17  it may include a bunch of --

18      THE COURT:  Theoretically, you could show them 450

19  invoices, right?

20      MR. SAMORE:  Yes.

21      THE COURT:  Right?  And that's what I wrote down, 450

22  PicoSures sold.

23      MR. SAMORE:  Yes.

24      THE COURT:  Okay.  So we know that there are 450

25  invoices, documents, hard documents, that will have the price

1  paid, maybe some other things cooked into them or not cooked

2  into them, but the price for that machine will be included in

3  that document, right?

4          MS. LONG:  The price for that transaction.

5          THE COURT:  Well, that's why I just did the whole

6  analysis with you.  The X dollars is the price for the whole

7  transaction.

8          MS. LONG:  Uh-huh.

9          THE COURT:  In there, again, having purchased

10  products many times, there will be on one column the things

11  you purchased, and at the bottom, it will say the total.  So

12  are you just telling me there is a total and not a separate

13  demarcation for the services, the web service and the machine?

14          MS. LONG:  I actually haven't seen an invoice, your

15  Honor, so I can't answer that, but I think that we could

16  produce the invoice attorneys' eyes only and let Plaintiffs

17  know that that's what we have.

18          THE COURT:  And that will get you the information you

19  want regarding the price, right?

20          MR. BRUCE:  Yes, your Honor.

21          THE COURT:  All right.  That seems reasonable.  All

22  right.

23          MR. BRUCE:  Yes.

24          THE COURT:  Okay.  Do we have a protective order in

25  this case?

1          MR. GRAVINO:  We do.

2          MS. LONG:  I'm not sure that it has an attorneys'

3    eyes only designation within it.  I think there is a

4    confidential designation, but I'm not sure that it is that

5    restricted.

6          THE COURT:  Let me do this:  I don't like attorneys'

7    eyes only because it makes it hard for either side to litigate

8    your case.  I will include it, but they need to be able to

9    talk to some client about it so they can litigate their case.

10   It is hard to -- attorneys can't get information in a vacuum

11   and then go, "Oh, great, I know this," and not talk to the

12   client and figure out how it works.  So I am open to limiting

13   the review to attorneys and then maybe a subset.

14         MR. BRUCE:  Judge, this is getting -- respectfully, I

15   would like to comment on this.

16         THE COURT:  Go ahead.

17         MR. BRUCE:  They don't want to give us in this simple

18   case the most basic stuff.  I want the contracts between each

19   of those 450 people.  It is asked for over and over.  I want

20   the contract that they had.  It is a two-page whatever.  I

21   want the contract, and I also want the invoice.  These are not

22   complicated issues, right?  They won't give me the most basic

23   things.

24         Now, after fleshing out what I think was an obvious

25   fact for like ten minutes and wasting everybody's time, "Yes,

1    we have an invoice that shows what they paid for," I don't

2    want to now get carried down a rabbit hole which is "Oh, it is

3    attorneys' eyes only."  They want to do anything -- they want

4    to obfuscate this issue.

5         Judge, I have told you in this court and I have said

6    in briefs what we are claiming in this case.  I have cited to

7    you over and over the specific UCC provision, and there is a

8    definition in the UCC that talks about how to calculate

9    damages.  And I'm paraphrasing, so I'm not making

10   representations.  I don't have it in front of me.  But,

11   ostensibly, it is the price, the value of what you paid for it

12   versus what the defective product is as sold on the open

13   market, what it is as defective.

14        So if you said the car is worth -- it goes 60 miles

15   an hour, and it goes 5 miles an hour, the price is what was

16   the cost of the car that goes 60 miles an hour, let's say it

17   is ten bucks, and when you sell it after everybody knows it is

18   defective, what is the value of the car that goes 10 miles.  I

19   mean, it is not more complicated than that, right?

20        So I think -- I can't imagine a situation where I'm

21   going to get through them, the invoices, what they sold.  It's

22   just this 450 people.  It is not 10,000.  It is a class

23   action.  It is not 10,000.  It is not 5,000.  It is 450

24   people.  I'm going to take that list, and I'm going to give it

25   to my economist and the people that are involved, and if it

1    says "attorneys' eyes only," I don't want to have to come back

2    in here, to court.

3             THE COURT:  And I would allow you -- like I said, you

4    have to be allowed to share with somebody, but let me pause

5    you right there.

6             Is there something on the invoice that says it is

7    privileged?  Because it is --

8             MR. GRAVINO:  Judge --

9             THE COURT:  Hold on.

10            Because if it is just an invoice that Cynosure gives

11   to its customers, I'm not sure how that is proprietary,

12   confidential, or falls under trademark or copyright or any

13   other kind of privilege that would exist.

14            MR. SAMORE:  I think the pricing information is

15   proprietary information.  And under the case law, I think the

16   way a product is priced is proprietary.

17            THE COURT:  The under -- I agree with you that the

18   underlying way that you determine a price of a product is

19   absolutely confidential.  I mean, that's how you figure out

20   your profit margins, right?

21            MR. SAMORE:  Yes.

22            THE COURT:  But the ultimate price itself, especially

23   if it is on a document that you give to a third party, how is

24   that --

25            MS. LONG:  I think it is the aggregation.

1         THE COURT:  What do you mean aggregation?

2         MS. LONG:  Concerning what one person paid for it

3    versus what everyone has paid for the PicoSure.  There is a

4    lot of information that becomes available in the synthesis of

5    the aggregate of information when you know what each and every

6    person paid, which one person getting one invoice doesn't have

7    the context of all of the rest.

8         MR. SAMORE:  Yes.

9         THE COURT:  I mean, it is going to have a price for

10   the product, right?

11        MS. LONG:  I think it doesn't have a sticker price

12   the way that you are thinking, you know, the way that one

13   thinks of a receipt that pops up with a sticker price of a

14   product, I think.  So it doesn't have that.

15        THE COURT:  So some got deals and some didn't get

16   deals.  Is that right, that some people got a better deal than

17   others, maybe because they bought the web service thing?

18        MR. SAMORE:  Over time, the price changed.

19        THE COURT:  That's a different issue, but I don't see

20   how that would be confidential.

21        MR. SAMORE:  Right.

22        THE COURT:  I mean, gas prices change every hour.

23        MR. SAMORE:  Right.

24        THE COURT:  Okay.

25        MR. GRAVINO:  Judge, if I could, very briefly on

1    that, as you noted, the contract and the invoice that they

2    actually give to the buyers has the price right on it.  When

3    our client contacted us, Hartsough Dermatology, some time ago

4    and said, you know, "We want you to look into this," they gave

5    us the contract with the price on it, and it doesn't have any

6    attorneys' eyes only.  Under the protective order, they have

7    to have a good faith basis to designate something as

8    attorneys' eyes only, and I don't want to be unhelpful --

9            THE COURT:  Well, they are telling me there is no

10   attorneys' eyes only provision at all.

11           MR. GRAVINO:  I thought it had a two step, but under

12   any protective order, there has to be a good faith basis to do

13   that, Judge, and since it is on the contract that they already

14   gave to our client and others, without putting confidential

15   attorneys' eyes only, I'm having a hard time understanding why

16   we should be -- it is really going to make this a headache,

17   especially when we sit down at the next phase and try to

18   calculate, as Devon said, the purchase price -- or the fair

19   market value.  We need to know the starting point of the

20   selling price.

21           THE COURT:  It is not going to be that difficult

22   because I will certainly allow your -- even if there were

23   attorneys' eyes only, I would certainly allow any experts to

24   view it so you can come up with a number.

25           Hold on.  I will answer a question here.

74

1          Confidential, confidential.

2          MR. GRAVINO:  Judge, I would anticipate that we would

3     move to lift that at some point.  We wouldn't be able to put

4     our case on without that information.

5          THE COURT:  All right.  Hold on.

6          Confidential, subject to a protective order.

7          I am not seeing an attorneys' eyes only in the

8     confidentiality order, just a general protective order.  No

9     attorneys' eyes only.

10          Produce them subject to the confidentiality order,

11     and if it becomes an issue, I will let you know.  All right.

12     So stamp them as confidential.  I am highly suspect that they

13     are.  But at some point -- so you will be allowed to share

14     with all the people that are listed, including experts and all

15     that, but you can't post them on the Internet.

16          MR. SAMORE:  Can't post them.

17          THE COURT:  Okay.  If at some point we need to

18     address it, we will address it, but you will get them.

19          MR. GRAVINO:  Thank you, Judge.

20          MR. BRUCE:  Thank you.

21          THE COURT:  So that's the 450 invoices.

22          Counsel, parties, contractors, consultants, experts,

23     witnesses at depositions, you are fine for now.  It won't hold

24     things up.  Okay.

25          MR. BRUCE:  Mr. Holevas is making the point that

1    maybe I'm going to say something at my peril because you have

2    got an organized way to go through this.  Mr. Holevas is

3    asking "Did he mean to include those contracts of each of the

4    450?"  Because like the contracts that we have actually have

5    the price.  I think it is even filed in court.

6            THE COURT:  Okay.

7            MR. BRUCE:  You know what I'm saying, Judge?  You

8    know, like when they filled out the form contracts, I think

9    the pricing -- I could be mistaken -- I think it is in there.

10   It doesn't matter whether it is in there or not.  We wanted

11   the contracts for each of these 450 people.

12           MS. LONG:  We produced all of the -- we produced

13   exemplars of every contract that we have ever used.

14           THE COURT:  Well, there is 450, contracts, right?  I

15   can't imagine a business's file management system where

16   pulling up contracts would be difficult.

17           MR. SAMORE:  Yes, but it is 450 times.  I mean, that

18   is a lot of -- I mean, for each one, it takes time.  That's

19   all.

20           THE COURT:  It is a two-page contract, right?

21           MR. SAMORE:  Yes, I believe.

22           THE COURT:  So it is 900 pages?

23           MS. LONG:  I think they are not stored together.

24           THE COURT:  How are contracts kept at this major

25   national business?

1      MS. LONG:  Yes, so I think that we have our -- my
2   understanding, and, again, I will caveat this a little bit,
3   but we have produced to them all contracts that we have used
4   to sell the PicoSure without client-identifying information.
5   Every iteration of the contract that we have used has been
6   produced, and those are centrally stored, so I believe that
7   those were kind of pulled and tada.  But each individual
8   contract that is filled in with the client name lives in the
9   client file.
10      THE COURT:  Okay.
11      MS. LONG:  Which for many of them, and probably most
12   of them, lives online, but for older sales, lives in hard copy
13   documents, which would require going to hard copy documents
14   if you are looking for the contract that has been filled in
15   and retrieving them from that file.
16      THE COURT:  How many years back are we going here?
17      MR. BRUCE:  It is not that long, Judge.
18      THE COURT:  Like 2011?  Were they doing hard copies
19   in 2011?
20      MS. LONG:  The client has told me that some previous
21   sales have files that only are in hard copy.
22      MR. GRAVINO:  Judge, I think the FDA approval was
23   like 2012-ish.  So they have only been out since 2012 or 2013.
24   They weren't allowed to sell the first unit until they got the
25   FDA approval.  So this doesn't go back to the dark ages.

1          MS. LONG:  Let me say that there is a chance that I'm

2   thinking of the Revlite product, which they have also asked

3   for, potentially, a calculation of everything with the

4   Revlite.  I guess I can't say a hundred percent that the hard

5   copy files are PicoSure or Revlite.

6          THE COURT:  The contracts need to be produced unless

7   there is some affidavit, specific information that explains to

8   me how a company of this size and this sophistication can't

9   produce 450 contracts.

10          MS. LONG:  Okay.  It is just going to take a little

11   bit of time.

12          THE COURT:  I mean, how long?  This is kind of stuff

13   that, quite honestly, I'm surprised wasn't identified in a

14   26(a)(1) disclosure, right?  Isn't that -- they have been

15   grumbling about it from day one.

16          MR. SAMORE:  You know, your Honor, actually, the

17   theory behind --

18          THE COURT:  Go ahead.

19          MR. SAMORE:  It is just -- I mean, some people will

20   say, look, they want to take depositions of every class

21   member.  I mean, to produce this granular information for

22   every class member is burdensome, and it is very -- it is

23   unusual at this point in the litigation, before the court has

24   ever said this can ever be certified, before it can ever be.

25   So I think that the better practice, I mean, would be to wait

1    until after --

2              THE COURT:  I'm asking how it is burdensome, and I'm

3    going off of my life experiences, plus my experience as an

4    attorney.  I did a lot of commercial litigation, including UCC

5    work, and I can't imagine in that context and with where I'm

6    coming from as this being difficult to produce 450 contracts

7    that are two pages each.

8              MR. SAMORE:  Okay.

9              THE COURT:  If for some reason, some bizarre reason,

10   your client does things, and they put their contracts pursuant

11   to astrological signs, okay, we will see, and then maybe

12   boohoo on them for keeping bad business record management.

13             But, you know, absent hearing some reason why

14   producing 450 contracts, 900 pages, which in the scope of

15   large commercial cases is a flyspeck, right, than what we are

16   used to these days, those will be produced.

17             MR. SAMORE:  Okay.

18             THE COURT:  All right.  We are going to come back to

19   that.

20             All right.  So there was attorney-client.  That was

21   the invoice issue.

22             Okay.  Talk to me about this reasonable investigation

23   that was done to gather documents and things like that.  And,

24   look, I get it.  It is asymmetrical.  That's the unfortunate

25   life of most defendants in litigation.  Then there is burden,

1   and that's why the rules talk about proportionality.  So tell

2   me what was done.

3           MS. LONG:  So we, initially, went over the requests

4   with a representative from the legal department, who kind of

5   digested them and thought about which department would be most

6   likely to have responsive communication and engaged those

7   departments.  You know, they include quite a few, which I

8   think we went over in the class 4 declaration.  So we have got

9   clinical, regulatory, marketing, sales reporting, IT, service,

10  finance, and legal, and those departments were sent their

11  requests where they might have responsive documents, and then

12  there was a specific document pull when there was the thought

13  of specific documents.

14          When it comes to e-mail searches, that's where it

15  gets particularly burdensome, and so here's what we didn't do

16  in response to the request for every -- basically, there are a

17  couple of requests, but they amount to every e-mail

18  communication with every putative class member, and that gets

19  complicated because Cynosure has about 150, 200 sales staff,

20  and those are the people who are most likely to have

21  communications with clients, although, again, the relationship

22  with the client and the company is ongoing beyond the sale.

23  It is not, sort of, you buy a laser and walk away.  The

24  clients or customers continually reach out with questions

25  about service or training or clinical questions.  So there are

1    a lot of those communications, even just among the sales

2    staff.  They talk to between one and five people depending on

3    the region because there are regional managers and territory

4    managers and things like that.

5         So for each -- that's what we did for each of the

6    named plaintiffs.  We basically pulled their files and

7    determined which one to five people in this sales hierarchy to

8    search, and then we put together search terms for the

9    Plaintiffs.  This is a particularly difficult context for that

10   because, let's say, we sell a laser to ABC Clinic.  ABC Clinic

11   has, you know, Doctors A and B who work there.  Maybe they

12   have Admin C who does a lot of their e-mailing.  So figuring

13   out the search terms for the names of people who represent

14   that purchaser is sort of another added layer.

15        And then we ran the searches in the relevant team

16   members' texts and e-mail.  That has to be privilege reviewed

17   because there is not a way to search it just in the to/from

18   fields to narrow only communications that came to or from a

19   third party because you have to be searching by the name,

20   because I don't know if ABC Clinic's e-mail address is, you

21   know, Dermatology XYZ at Gmail or Yahoo.  I can't search the

22   to/from field.  I have to search content.  So those might pull

23   back e-mails that are between counsel or that have to do with

24   the litigation.

25        We can't search PicoSure because PicoSure comes up in

1    the signature box or the signature line of the salespeople

2    because they sell the PicoSure.  So if we just searched for

3    PicoSure, it comes back with all of the salespeople.

4          THE COURT:  But you can do a search -- I mean, how

5    many attorneys are we talking about?  You can just do a simple

6    search of that subset and find Ms. Long, Mr. Samore, all

7    those, right?  You will find those.  That's an easy cull out.

8          MS. LONG:  And people that -- you know, and we would

9    have to include the paralegals and people who are asking the

10   departments, because if the attorney asks the paralegals, who

11   ask --

12         THE COURT:  How many would those be?

13         MS. LONG:  Personally, in my practice, I like to

14   review pretty closely for privilege because if a paralegal

15   asks nonlegal person A, and nonlegal person A asks nonlegal

16   person B "I need this for Jean," which is the name of a

17   paralegal, that follows privilege because it is work product,

18   because it is, you know, work product.  It is at the request

19   of a lawyer.  So I'm not sure that we can just pull out

20   attorney names.  We have documents.  You know, privilege

21   exists in context.

22         THE COURT:  Right.  But they only exist -- privilege

23   is only going to exist if there is somebody seeking legal

24   advice and there is a lawyer in the mix, right?  So a

25   paralegal could do it, the advice.  So that's why I'm asking

1   sort of basic, simple questions, is how many -- you have got

2   things going forward from the case.  It's probably not going

3   to be caught up in this thing, right, because they are not

4   really looking for that.  But throw your names into the mix,

5   and you can cull those out pretty quickly.

6           In-house counsel, how many members are in in-house

7   counsel?

8           MR. SAMORE:  There are three.

9           THE COURT:  Okay.

10          MR. SAMORE:  In addition, at least --

11          THE COURT:  How many paralegals?  So we have got

12  three more to cull out.

13          MR. SAMORE:  Yes, but --

14          THE COURT:  Answer my question.  How many paralegals?

15          MR. SAMORE:  I think there is --

16          MS. LONG:  I know of at least one.

17          MR. SAMORE:  There is one.

18          THE COURT:  So four people you have to cull out.

19          MR. SAMORE:  Okay.  Your Honor, we have a system for

20  maintaining in a centralized area every complaint that has

21  been made, and that has been produced.  People are trained to

22  do that.  They have to do it.  So what's the relevancy of all

23  of the -- there could be thousands.  There could be tens of

24  thousands of communications between these people about, you

25  know, their training, their service, their certification, all

1    things that have nothing to do with the case.  We aren't even

2    at -- we don't even have a case that is certified that would

3    be the subject of a ruling by the court, and it is not

4    proportional to the needs of the case.

5              THE COURT:  We don't know that yet because I keep

6    asking these really simple questions about how many are we

7    talking about.  You can cull them out.

8              MR. SAMORE:  Okay.

9              THE COURT:  We have a 502 order that gives you the

10   clawback provision that protects you.

11             MS. LONG:  Yes, well, that's just on the privilege

12   issue.  So even if we put that aside, coming up, pulling each

13   file to figure out who purchased the laser and who the

14   relevant names to search for with regard to that purchase

15   would require pulling each 450 sales files, because even if

16   the invoice has a client name, I mean, they have had -- one of

17   their clients has a d/b/a.  There is -- I'm sorry, I'm

18   blanking on the initials, but Hartsough, they have a d/b/a for

19   the company, and there is at least one doctor who works there.

20   So putting up a search term for coming up with the names of

21   what to search for each of the 450 purchasers is a very

22   individualized process.

23             THE COURT:  How about using -- go ahead.

24             MR. BRUCE:  Judge, I have a couple observations.  You

25   asked a simple question of them.  We are way into this in

1    written discovery in terms of time and when I asked for basic

2    stuff, right, complaints about this product.  You just asked

3    them a very simple question, "What reasonable inquiry did you

4    do on the e-mails?"  That's what you asked.  And there was

5    this big, long dissertation by counsel, who has been very

6    candid with this court and said "I just have been on this case

7    a month," about all the different departments at Cynosure and

8    all the different things they have to do.

9          First of all, I think what we are hearing is they

10   have done nothing --

11         MS. LONG:  No.

12         MR. BRUCE:  -- on searching for the e-mails.

13   Mr. Samore keeps coming back, "Well, we have to do this for

14   the updating.  We will give it to them, whatever they want."

15         I want to know -- I want to know -- and I have asked

16   five ways from Sunday in different interrogatories and

17   requests to produce, people who have made complaints about

18   this product, the PicoSure product.  I have asked for that,

19   and I have yet -- and even if they start coming back now and

20   saying, "This is what," there is nothing in front of you.

21   They have not signed -- they have not filed what they were

22   supposed to file months and months ago.  When they make these

23   boilerplate objections about unduly and burdensome, they are

24   supposed to give the person.  "Here is the person that made

25   the e-mail search.  Here are the terms that we used.  We got

1    20,000 hits.  It is way too hard for us."  I mean, what I am

2    hearing is, A, they haven't done it, and then, B, even if they

3    have done it, they don't have anybody that's in front of you.

4    This is fluff from the lawyers, one of who just started a

5    month ago in this case, okay?  So I'm a little bit bothered.

6         But what she did say was very interesting.  I have

7    asked also -- and I know you are going through, but this is a

8    related matter.  I have asked for two different things.  I

9    asked for our client's file; essentially, the file.  So they

10   sold the thing.  It is like if I go and buy a Ford Escort, you

11   know, at this place here in Rockford, over there on

12   Perryville, if I buy that, there is going to be an invoice,

13   there is going to be a contract, there is going to be

14   communications.  There is going to be a file somewhere,

15   whether it is electronic, written, or both.  They are going to

16   have a file on the purchase of the Ford Escort, right.

17        I have asked for the files of the purchase for my

18   named plaintiffs, everything in the file.  I have asked for

19   the file.  I think that's fair.  I have asked for it because

20   this is a class action, and they are saying it is all

21   different, and there is no way they are common.  Well, let me

22   test that, and this is done commonly in class actions.  I

23   asked for the file.  It is not 5,000.  It is not 10,000.  It

24   is not 500.  Now, I'm learning today it is 450.  I want the

25   files.

1       And she said something over and over.  She said, "We

2    pulled the file.  We pulled the file."  I want the file for

3    the people that bought the PicoSure machine.  I want the file.

4    This is not -- I mean, we are beating a dead horse here,

5    Judge.  I mean, they haven't done what they are supposed to do

6    in terms of providing you with evidence why it is unduly

7    burdensome.  It doesn't sound like they have done e-mail

8    searches, and lawyer's representations that just started on

9    the case doesn't cut it, respectfully, with all due represent.

10       So that's it.  Thank you.

11       Mr. Gravino?

12       MR. GRAVINO:  Judge, very briefly, as you know from

13    commercial litigation -- I do primarily commercial litigation,

14    a lot of copyright and IT litigation -- we routinely do these

15    things with forensic companies.  They are talking about

16    thousands and thousands of lawyers' hours.  It is headachy.

17    It does take time.  It does take some cost.  But given the

18    nature of this case, I don't think it is unduly burdensome at

19    all.  You hire a forensic person.  They come in.

20       I mean, they want to throw around odd numbers, 150,

21    200 salespeople.  How many servers are these on, I haven't

22    heard them represent to the court.  If this stuff is on one or

23    two or three or four servers, you have a forensic company like

24    Forensicon in Chicago come in.  They make a forensic image of

25    each server.  They take it back.  They work out the protocol.

1    I don't need to bore you with the details, Judge.  I know you

2    are more than familiar with this.  Also, the courts are using

3    these Sedona Principles now for culling and sifting.  It is

4    done.

5            So they want to throw around numbers about the number

6    of personnel, but in this day and age, all the good stuff is

7    on e-mails.  Everybody knows that.  People don't write letters

8    anymore by hand.  The real documents are in electronic or in

9    e-mail form.  It is very routinized to get this stuff with the

10   forensic image.  We do it all the time.  Everybody I work with

11   does it all the time.  It is not fun, but it is certainly not

12   unduly burdensome given the stakes of the case.  I haven't

13   heard anything from them about consulting with a forensic

14   person the number of servers, the cost of this, those kinds of

15   things.

16           MS. LONG:  I will say that apart from

17   burdensome -- they come back to sort of lack of facts on

18   burdensome -- I want to make clear that our main argument is

19   proportionality and the needs of the case, which doesn't need

20   facts to support it.

21           Going back to the complaint log, I want to make clear

22   to opposing counsel and to the court what the complaint log

23   is.  It is not something that we put some of the complaints.

24   Any complaint that comes in to the company from any source,

25   any e-mail, any random conversation with a maintenance

1   technician or a salesperson, any complaint that comes in is

2   logged on here.  So if we were to go and do an e-mail search

3   that would uncover complaints, it would be duplicative of the

4   complaints that are already logged in the complaint log.  We

5   keep this.  As a regulated industry, we are subject to FDA

6   audit.  So it is a practice to include all of the complaints

7   on that complaint log.  It would be redundant to search.

8           THE COURT:  But does it include all the

9   communications regarding each complaint?  That's what they are

10  looking for.  Now, whether it is unduly burdensome and

11  proportional is a different question.  What they are looking

12  for, and they can correct me if I'm wrong, is, okay, you have

13  given them a complaint log.  Good, that may be an excellent

14  starting point.

15          MR. SAMORE:  Yes.

16          THE COURT:  And I haven't seen it, and I don't know

17  what it looks like, but that can say complaint from this

18  customer about this machine, and there is a serial number.

19  But I don't know if caught in that log is a sales rep talking

20  to an engineer saying, "Oh, crap, it happened again.  It

21  didn't do what it was supposed to do.  This is the third time

22  it has happened.  What is going on with you knuckleheads?  I'm

23  having trouble selling the machine.  They are telling me it is

24  not working right."  That's what they want to see.  Whether it

25  exists, I don't know.

1        Would something like that be caught up in that

2    complaint log?  Because what I have just described is clearly

3    relevant.

4        MR. SAMORE:  Right.

5        THE COURT:  It is not privileged, so now we are into

6    the other issue.

7        MR. SAMORE:  I think if we were to limit -- if we

8    were to go to the complaint log, and then do a search of the

9    people in that complaint log for the types of communications

10   that you are talking about, I think that would be something

11   that would be proportional and that would make sense.

12       MR. BRUCE:  Judge, the complaint --

13       MR. SAMORE:  And just one other thing.

14       MR. BRUCE:  Sure.

15       MR. SAMORE:  And that is that he talks a lot about

16   the e-discovery.  I have been involved in a lot of cases,

17   cases where plaintiffs' attorneys and defense attorneys have

18   search terms and they discuss about a protocol.

19       THE COURT:  I assume you guys did that.

20       MR. BRUCE:  No, they won't give me anything.

21       MR. SAMORE:  There has been nothing, nothing from the

22   Plaintiffs.

23       THE COURT:  Well, since I am the co-chair of the

24   Seventh Circuit Electronic Discovery Pilot Program, I have a

25   little bit of background in this, and I push the program all

1    the time.  You can go on any -- it will be on every district

2    court judge in the Northern District of Illinois.  It will be

3    on every website in the Seventh Circuit, because I made them

4    do it, or you can just go to discoverypilot.com, and we have

5    got protocols on there.  We have got it all laid out.  So all

6    that hard work is done.  And I'm pretty confident if it comes

7    off of the Seventh Circuit program that I am the co-chair of,

8    I'm going to sign it.  I'm going to think it is good work.

9         So that should happen, because if you are just coming

10   up with search terms on your own, of course he is going to

11   balk, just like if he were to dump 5,000 search terms on you.

12   You would go, "I'm not doing all these.  This is going to

13   be -- I'm going to catch dups on this.  This isn't relevant.

14   We have got to shorten this.  There is other terms."

15        That process has to occur, and that's part

16   of -- that's cooked into is it disproportionate, because if

17   you go through that process, you have a couple of options

18   here.  One, it is massively voluminous and hugely costly,

19   probably not a good thing, or if what you catch is a little,

20   tiny guppy, and you spend a lot of money, well, that's

21   disproportionate for both sides, right?

22        But they are being about as clear as can be on what

23   they are looking for.  So they would be relevant.  They are

24   not privileged.  I need to figure out if it is proportionate,

25   and I don't have that information now because what should have

1    occurred didn't occur, and I don't know what IT people have

2    been involved.  I don't know what the systems look like.  I

3    don't know how many servers there are.  I don't know if you

4    can simply use a technology-assisted review, TAR, program.

5    That will save you buckets of attorney hours.  There is ways

6    to reduce the cost on this, which then makes it proportional.

7    So that takes the burden off of you and your client.  There is

8    ways to solve this, but we have got to start down that road,

9    right?

10          MR. BRUCE:  Great.  Thanks, Judge.  How do we start?

11          THE COURT:  Take a look at the Seventh Circuit

12   Electronic Discovery Pilot Program website.  Look at some of

13   the protocols on there.  Talk about the ways you want to do

14   it, whether you want to do search terms.  If you want to do

15   search terms.  Talk about what search terms make some sense.

16   You know, it is more of an art than a science because you are

17   going to have to come up with a number that isn't too many and

18   not too few.  If you go with technology-assisted review, you

19   don't even need your search terms, pretty much.  So figure out

20   which way you want to do it.

21          MR. BRUCE:  Thank you, Judge, because we don't want

22   to get -- you know, they keep trying to hang their hat on this

23   complaint thing.  I have zero confidence in that, and I have a

24   high degree of confidence that there are people that are not

25   happy with this PicoSure machine that appear nowhere on this

1  razor-thin complaint thing.  So I am not -- and Mr. Samore

2  cannot offload his responsibilities under the rules of this

3  court by simply saying, "Well, we have this complaint log and

4  everything is in there."  I'm not confident.  So I just want

5  to be clear I'm not looking for just what they are saying is

6  in the complaint log.

7           THE COURT:  Well, that's why I was questioning,

8  because it sounds like information, relevant information.  It

9  may not be captured by the complaint log.  So it is relevant,

10  non-privileged.  And whether it is proportional, we will find

11  out.

12           MR. BRUCE:  Right.  Thanks, Judge.

13           MR. SAMORE:  Your Honor, I mean, honestly, this case

14  has been pending for a long time, since 2000 --

15           THE COURT:  Do you want to settle?

16           MR. SAMORE:  Well, they are looking for a large,

17  multimillion dollar, class-wide settlement.  I have offered

18  many times from day one to settle on an individual basis.

19  They have no interest with his looking for the gold and the

20  diamonds in the sky.  This is a product that we believe in and

21  that has been verified, independent, you know, 90 -- it has

22  got an incredibly high approval rating by customers, and the

23  only complaints we saw were not complaints.  They praised --

24  their clients praised the PicoSure after they used it for

25  months, to the newspaper.

```
 1              THE COURT:  How would those get in the complaint log?

 2              MR. SAMORE:  What is that?

 3              THE COURT:  How would those get in the complaint log?

 4              MR. SAMORE:  My point is there is likely not going to

 5   be what he is looking for.  We are going to go through a lot

 6   of effort, and we are not going to get anywhere.  It is going

 7   to cost a lot of money.

 8              THE COURT:  Welcome to litigation.

 9              MR. SAMORE:  Yes.

10              THE COURT:  How many complaints are logged in this

11   complaint log, just number wise?

12              MS. LONG:  I'm sorry, I don't know off the top of my

13   head.

14              MR. BRUCE:  It is thin, Judge.  I don't know.

15              MR. SAMORE:  It is a good --

16              THE COURT:  More than ten?

17              MR. BRUCE:  Yes.

18              MS. LONG:  Yes.

19              THE COURT:  All right.  More than 50?

20              MR. BRUCE:  I don't know.

21              MR. SAMORE:  Yes, but most of them really don't even

22   deal with the issue that they are referring to, which is the

23   basis of their complaint, but -- I mean, we can have a

24   conversation, if your Honor would like us to, but I think it

25   is very --
```

1           THE COURT:  Look, I don't force settlement
2    conferences on people.  If you want to have one, you tell me.
3           MR. SAMORE:  We are happy, as we said from day one,
4    to settle individually.  We don't believe this case --
5           THE COURT:  And I have said it with a total straight
6    face:  There should be more trials.  There really should be.
7    Don't tell Judge Kapala I said that.  There really should be.
8    How are you going to determine the value of things if nothing
9    goes to trial?
10          MR. SAMORE:  Yes, right.
11          THE COURT:  Judges sit in chambers and work on
12   summary judgment motions, and it makes it look very -- it is
13   not an open, transparent process.  If you get seven people in
14   a jury box listening to the testimony, they are involved in
15   the system.  They have skin in the game.  They understand the
16   system.  So there should be more trials.
17          Okay.  So those are the -- we covered the things I
18   wanted to talk about.
19          Let me start with Mr. Samore and Ms. Long.
20          MR. SAMORE:  Okay.  Yes, your Honor.
21          THE COURT:  What issues do you want to raise that I
22   haven't addressed?
23          MR. SAMORE:  Okay.  Well, we would like to address
24   our motions to compel.
25          THE COURT:  Okay.  I think I have addressed some of

 1   it, but, okay, hold on.

 2          Okay.  Give me a production request or an

 3   interrogatory number.

 4          MR. SAMORE:  Okay.  Interrogatory No. 14 and 15.

 5          THE COURT:  Interrogatory No. 14 and 15, which is

 6   also related Document Request No. 25.

 7          MR. SAMORE:  Yes, sir.

 8          THE COURT:  Okay.  Go ahead.

 9          MR. SAMORE:  Okay.  All right.  Your Honor

10   previously, as you may recall, required compliance with these

11   interrogatories in this production request in August.  They

12   asked for customer responses, complaints about the product, or

13   any customers that declined to use the product.

14          THE COURT:  Now, when we say "customers," we are not

15   talking the people getting zapped.  We are talking about the

16   purchasers of the product?

17          MR. SAMORE:  No, we are talking about the people

18   getting zapped, the patients.

19          THE COURT:  Okay.

20          MR. SAMORE:  And your Honor specifically overruled

21   their motion for a protective order and required compliance,

22   and instead of complying, they objected on grounds of HIPAA.

23   They refused to identify any customers that they had who had

24   been zapped, who complained or declined to use service, and

25   they did so on the basis of HIPAA, which was specifically

1    addressed by an order that your Honor entered, that was

2    entered on September 22, 2016.  And in Paragraph 3, your Honor

3    ruled that "All covered entities as defined by 45 CFR

4    Section 160.103 are hereby authorized to disclose protected

5    health information pertaining to the treatment of any

6    individual treated by any Plaintiff to attorneys representing

7    the Plaintiffs and Defendant in the above-captioned

8    litigation."

9          THE COURT:  All right.  Let me pause you there.  I

10    thought the Plaintiffs' objection -- or not objection, but

11    response was that the complaints, general term "complaints,"

12    were verbal.

13          MR. BRUCE:  Yes, that's right, Judge.

14          THE COURT:  Okay.

15          MR. SAMORE:  No, no, they have not identified the

16    customers that made the verbal objections.

17          THE COURT:  Well, they can't produce documents if

18    they are verbal, right?

19          MR. SAMORE:  This is an interrogatory.

20          THE COURT:  Well, that's why I said it relates to

21    Document Request No. 25, which you said yes, and it is

22    "Produce each and every record documenting a patient complaint

23    or compliment regarding your treatment of that patient using

24    the PicoSure product."  So they are saying they are verbal,

25    and if they are verbal, there is not going to be a document,

1   unless somebody said, "Hey, Sally Smith said the product is

2   awesome."

3          MR. SAMORE:  But that's actually -- I don't

4   read -- their response was they all, essentially, just

5   referred to all of the medical treatment records.  They refer

6   to hundreds or thousands of pages of treatment records.  They

7   don't say "none."  If they would simply say they have no

8   written records of any complaints by any of their patients or

9   any records of any patient declining -- if we have that

10  clearly stated on the record, that would dispense with

11  Production Request No. 25.

12         THE COURT:  Okay.  Any documents?

13         MR. BRUCE:  None that have not already been produced,

14  Judge.

15         MR. SAMORE:  But that -- again, what they have done

16  is they have produced thousands of records, which we have

17  looked and we can't find any customer complaints about the

18  efficacy.  We want them to identify.  They know their patients

19  better than we do.  They were the ones that completed the

20  records.  They should be required to identify which records,

21  instead of "Here is 5,000 records.  You go look, because we

22  can't find any."

23         THE COURT:  Okay.  Look, did the interrogatory

24  response say they have been produced, and under Rule 33(d),

25  take a look at documents, Bates numbered whatever to whatever?

1          MR. BRUCE:  Judge, this is painful, right?  You know,

2    let me put this in context.  They are asking -- they asked for

3    any and all documents or something where a patient complains

4    about the PicoSure machine.  I'm paraphrasing, but that's what

5    he asked for, and it was really his colleague, who is not

6    here.  That's what she asked for, okay?  So then we did.

7          And I take umbrage with the fact that he is

8    suggesting that I'm not complying with your order.  We had a

9    motion for a protective order.  We argued it.  I lost.  He

10   won.  You said, "Mr. Bruce, you produce it."  And so then we

11   went through there.

12         MR. SAMORE:  Can I have the answers to

13   interrogatories?

14         THE COURT:  Go ahead.

15         MR. BRUCE:  So then at that juncture, right, we

16   talked to the clients and everything.  The complaints are

17   verbal.  They are oral.  You know, these people are

18   saying -- they are coming in and they are saying, "Hey, this

19   thing is really not taking the color off like I like.  It is

20   not really working like you told me," whatever.  I mean, these

21   are the context.  You have to put this in context, right?

22         So these people, they are not sending e-mails, they

23   are not writing out a form saying, "This thing doesn't work."

24   I don't have those, okay?  Whatever we have had on that, we

25   gave it to them.  So I said exactly what you just said, your

1    Honor, you know, "See the medical records of PicoSure,"

2    because you see this thing doesn't remove.  I mean, he has got

3    the photographs.  He knows this is just all about, you know,

4    spending a lot more time here.

5            You know, the bottom line is you can see from the

6    photographs in the medical records -- all of which he has,

7    right? -- which shows that, you know, photograph, butterfly,

8    butterfly, butterfly.  It doesn't go away like it does in the

9    picture, right?  It's not photoshopped.  It doesn't go away,

10   right?  So we said, "See medical records of the PicoSure

11   patients," which we have given to them.  And then it was, "Oh,

12   no, no, no, no.  Please provide a response" -- they didn't

13   like it -- "to the request by identifying all records

14   documenting patient complaint."  Okay.  So now they are

15   saying, "I don't want that.  I want this specific document

16   that says 'I'm complaining,'" right?  That's what she sent in

17   an e-mail, and I put in my response February 22nd, 2017.  You

18   have that in front of you.

19           So I gave them the answer.  I thought I was being

20   transparent, compliant with your order.  I thought I was being

21   a good guy.  I said, "Look, here are the documents.  You want

22   the documents?  It is there.  You can see the thing is not

23   getting removed, right?"  And that's what -- you know, if we

24   ever get to depositions in the case, they can ask these people

25   if that's what happened, right?

1      So then I do that, and then I limit it to this, and

2  now he is saying, "Well, he is not being compliant."  Well,

3  Judge, I don't -- I guess he is back and forth.  It is a

4  moving target.  I give him the medical records.  They say it

5  is -- you know, that's indicative of a complaint.  It doesn't

6  say complaint, but I'm being overly diligent in giving it to

7  him.  And then they say, "No, we want the ones that say

8  'complaint.'"  Well, I don't have that.

9      So now he is in here before you saying --

10     THE COURT:  If there is no documents that say it is a

11 complaint, there is no documents that say it is a complaint.

12 Now, if there is medical records that include photographs that

13 show a tattoo that still exists or is still visible or hasn't

14 faded, or whatever term we want to use, to the patient's

15 desire, and there is nothing written about it, there is no

16 document, right?

17     MR. SAMORE:  No, I think he is playing a game, your

18 Honor, because what he is saying is that nobody used the word

19 "complaint."  We are not asking whether the word "complaint"

20 is in the records.  We are asking for people that use any

21 words they may have used to complain that, or to state, to

22 convey, to communicate, that the tattoo removal was

23 unsatisfactory.

24     THE COURT:  He is saying he doesn't have any.

25     MR. BRUCE:  And there was like a blog site or there

1    was a text.  I mean, of the four plaintiffs, there was one or

2    two, and I have given them to him.  I mean, I don't have it in

3    front of me, but we gave them to him, whatever we got, that

4    complies with that.  He just doesn't like the answer.  He

5    doesn't like the answer.  There is nothing else.  I mean, it

6    is documented in the records in the sense that you have got

7    these photographs, as you point out, and whatever.

8              MS. LONG:  But that's not necessarily a complaint.  I

9    could see a picture, and it fades, and someone could be happy

10   with that result because they know that tattoo removal means

11   lightening.

12             THE COURT:  But if he didn't write it down, he can't

13   produce it.

14             MS. LONG:  Then he can't say it is a complaint.

15             THE COURT:  So they can't say it is a complaint.

16             Now, if you are deposing somebody, and these

17   documents, these pictures get shown, and say, "What did Sally

18   Smith say relating to this," and she says she was really

19   pissed off that the butterfly is still there or she was really

20   happy that it had faded so much, there is your complaint and

21   your compliment, right?

22             MR. SAMORE:  If he is saying that there were no

23   communications from patients conveying that they were unhappy

24   with their tattoo removal in the medical records, I would like

25   that to be stated clearly for the record.  Also, though, they

```
 1    haven't identified any person in response to the interrogatory

 2    that made any much complaints, but I would like that to be

 3    stated clearly for the record if they have nothing said about

 4    working.

 5          THE COURT:  I think he has already said there was

 6    some blog thing that was produced.

 7          MR. BRUCE:  That's right.

 8          MR. SAMORE:  Okay.  What blog thing are you talking

 9    about?

10          MR. BRUCE:  Read the answers to the interrogatories.

11          MR. SAMORE:  No, there is no --

12          MR. BRUCE:  There is some text or something, whatever

13    it is.  I don't want to take up the Judge's time.

14          MS. LONG:  I would love to talk about the text.

15          MR. SAMORE:  There is a text, and Hatchet identified

16    a Customer A who sent a text message.  They didn't produce the

17    text message.  They didn't identify the customer.  So what we

18    have is we have at least one individual that was identified

19    from all of them that made a complaint.  We don't know who

20    that individual is and we don't know what he said because they

21    haven't produced the text message and they haven't identified

22    the person.

23          THE COURT:  Do you have the text message?

24          MR. BRUCE:  I thought we produced it.  I don't know

25    if he has got it.  It was one text message.  We will try and
```

1    find it.  I will try to find out.  And I fronted the text

2    message.  I mean, it is not like I'm hiding it, if that

3    comports to their request.

4              THE COURT:  That would be responsive.  That should be

5    produced.

6              MR. BRUCE:  Right.  Thank you, Judge.

7              MR. SAMORE:  Also, we would like to talk about the

8    consent forms for tattoo removal.

9              THE COURT:  Give me a number.

10             MR. SAMORE:  Okay.  It is Request No. 27 and 28.

11             THE COURT:  All right.  I thought I have that

12   resolved, but go ahead.

13             MR. SAMORE:  Okay.  I don't think -- so because

14   Burke's response refers to over 2,200 pages of notes, some of

15   those notes state that written consent was obtained.  We

16   actually have a -- we have records, and I will just give an

17   example of one of them, and that's what their answers to

18   interrogatories -- may I approach the bench to provide your

19   Honor with a copy?

20             THE COURT:  I have two CSOs; not one, but two.

21             MR. SAMORE:  So we have a plaintiff that says in his

22   answers to interrogatories that they would obtain consent, we

23   have written records from when they obtained written consent,

24   and we don't have any written consent forms from that doctor

25   that we have been able to locate.

1          THE COURT:  Hold on one second.

2          MR. BRUCE:  Yes, I can respond to this easily, Judge.

3  I went out to wherever it is in Delaware, wherever it is,

4  wherever he is at.  This is Dr. Burke.  He is talking about

5  Dr. Burke.  I asked him, "Do you use specific consent forms?"

6  He said, "No."  And then when this came up again, he said,

7  "No."  So I don't know what else you want me to do, Judge.  I

8  asked a doctor, and I'm invading attorney-client privilege.  I

9  asked the man if he used a consent form, and he said, "No,"

10  and here we have it.  So I don't know what -- what are they

11  talking about.  I mean, this is all spelled out in my

12  response.  Written consent of pain, what can I do, Judge?  You

13  know, I don't know.

14          THE COURT:  All right.

15          MR. BRUCE:  It could be boilerplate.  I don't know.

16  I mean, he --

17          THE COURT:  So Dr. Burke, Thomas Burke, says in a

18  chief complaint form written consent obtained.

19          MR. BRUCE:  Maybe this is the written consent.

20          THE COURT:  There is a photograph of a tattoo.

21          MR. BRUCE:  Is it removed?  No.

22          THE COURT:  What is that?

23          MS. LONG:  I spent a lot of time in this case trying

24  to figure out what tattoos are.

25          THE COURT:  So this might be the written consent.  So

1   if this is all they have got, this is all they have got.  But

2   at Dr. Burke's deposition, you can ask, "Is this a written

3   consent?"  And if he says, "No, I have got a whole stack of

4   them," well, now we have got a different problem.

5           MR. SAMORE:  Well, the other problem with their

6   response is that they indicate in their response that they

7   don't have any consent forms, but our request wasn't limited

8   to just the PicoSure product.  It was for any tattoo removal

9   product.

10          THE COURT:  Okay.  27 is specifically the PicoSure.

11          MR. SAMORE:  That's true.

12          THE COURT:  And 28 is for tattoo -- "Produce all

13   forms, documents you have used to obtain patient consent for

14   tattoo removal using any other removal procedure."

15          MR. SAMORE:  Okay.

16          THE COURT:  Okay.

17          MR. SAMORE:  This is a very important request because

18   what we have found with respect to the other plaintiffs is

19   that they required the patients to understand that tattoo

20   removal means lightening of the pigment.

21          THE COURT:  What do you mean by "other plaintiffs"?

22          MR. SAMORE:  The other doctors that are plaintiffs to

23   this case --

24          THE COURT:  Okay.

25          MR. SAMORE:  -- produced forms contradicting his

1  theory of the case, consistent with our position that tattoo

2  removal does not mean making it invisible to the naked eye.

3  It means significant lightening of the pigment.

4           THE COURT:  Okay.

5           MR. SAMORE:  And these forms specifically address

6  that issue.

7           THE COURT:  Okay.

8           MR. SAMORE:  And it is a very cagy.

9           THE COURT:  So does Thomas Burke have them or doesn't

10  he have them?

11          MR. BRUCE:  He doesn't have any consent forms, Judge.

12  I asked him that.

13          MR. SAMORE:  For any machine, for any tattoo removal

14  machine in the last ten years?

15          MR. BRUCE:  I'm trying to find -- well, we might have

16  an objection on scope.

17          MR. SAMORE:  Okay.  Five years, then.  Five years.

18          MR. BRUCE:  What number?  Where are we at?

19          THE COURT:  It is Document Request No. 28.

20          MR. BRUCE:  For which plaintiff?  I'm trying to find

21  the interrogatory.

22          THE COURT:  It sounds like it is --

23          MR. BRUCE:  Burke?  Dr. Burke?  Is that what you are

24  talking about, Burke?

25          MR. SAMORE:  All of the -- I want to know whether

1  they have produced all consent forms that they used in the

2  last ten years for removal of tattoos.

3          THE COURT:  For any product.

4          MR. SAMORE:  Yes.

5          THE COURT:  And it sounds like Mr. Bruce has asked

6  Dr. Burke if he has any consent forms, and he didn't.

7          MR. SAMORE:  Is that true for any tattoo removal?

8          MR. BRUCE:  Don't cross-examine me.  I will go and

9  look.  Unlike you, I have made a reasonable diligence and sat

10  down with my client.

11          THE COURT:  That's enough.

12          How long do you need to contact Dr. Burke?

13          MR. BRUCE:  I have actually asked.

14          Judge, I'm trying to find it, because I want to see

15  how -- we are kind of glossing over this, respectfully.  I

16  want to know what interrogatory he is talking about, and I

17  would like to see how I responded, because that doesn't sound

18  like that was relevant or discoverable.  I know we got into

19  the issue of the consent forms for the PicoSure machine, and I

20  have set forth in our response at Page 3 everything we have

21  done.  Now they are asking a different question, and I would

22  like to know what interrogatory they are referring to.

23          THE COURT:  It is Document Request No. 28, and it

24  says, "Produce all forms or documents you have used to obtain

25  patient consent for tattoo removal using any other tattoo

1    removal" -- and it says -- "product you have used in the last

2    ten years." So that follows the 27, which is limited just to

3    the PicoSure.

4         MR. BRUCE: And I'm just looking, as an example, at

5    Dr. Ritacca's answers that I see. Once you read that, and I

6    now know where we are at, I said to see the previous response

7    on the consent forms. The question is, other than what we

8    have already produced, are there other ones for other

9    machines. I don't know the answer to the question. I mean,

10   I'm not going to make a representation. I don't want to make

11   a representation to the court if I don't know if it is true.

12        THE COURT: That's why I asked how much time do you

13   need.

14        MR. BRUCE: So I'm going to ask before I represent to

15   the court.

16        THE COURT: Okay. How much time do you need?

17        MR. BRUCE: Well, however much time he is taking,

18   your Honor.

19        THE COURT: My question was how much time do you

20   need.

21        MR. BRUCE: Well, actually, Judge, I have got four

22   clients, and I can ask them, and I will get a response in 14

23   days.

24        No, Mr. Gravino is saying no.

25        THE COURT: We have got Easter.

1          MR. BRUCE:  Yes, okay.  Three weeks, Judge, I will

2   get a response.  We will get a client response.

3          So that's No. 20?

4          THE COURT:  28.

5          MR. BRUCE:  28, request to produce.

6          THE COURT:  All right.  Mr. Samore, anything else?

7          MR. SAMORE:  Your Honor, one thing with respect to

8   interrogatory -- we dealt with No. 25, and I appreciate

9   counsel's response to Production Request No. 25, but I don't

10  think that, again, he has identified any customers that

11  complained, and if there were none that had any oral -- that

12  would include verbal or written complaints.  He hasn't

13  identified any.

14         MR. BRUCE:  Now, this is a moving target, Judge.  We

15  talked about this for 15 minutes.  I have said in the court, I

16  have said in my papers, there is all kinds of patients that

17  have complained.  I mean, there is all kinds of patients that

18  are unhappy with this.  He has asked for documents, and we

19  talked about the HIPAA issue, and we are not -- we gave them

20  all of the documents, which pursuant to your order were

21  redacted.  Now, it sounds like he wants to go back and revisit

22  this and get us to give you the names of our patients that are

23  not a party to this suit.  We have already talked about this.

24  I'm not giving them the names of my patients.

25         THE COURT:  Can you redact them?

1       MR. BRUCE:  He has them.  He has all of the

2   patients -- he has every scintilla of medical records of each

3   of my four plaintiffs who are the ones that are the doctors.

4   He has each of those medical records of every patient and

5   every photograph of the PicoSure machine.  He has got that.

6       Now he is switching gears.  He is unhappy with the

7   last response about he doesn't have any documents about

8   complaint.  Now he is saying, "Well, Devon hasn't told me the

9   patients that have complained."  I can't tell him the names of

10  the patients that have complained.  You have already talked to

11  me about -- I mean, we have talked about that in this

12  courtroom.

13      MR. SAMORE:  In your Judge's order, your Honor, it

14  specifically authorizes the release of protected HIPAA

15  information.

16      MR. BRUCE:  And I gave it to him.

17      MR. SAMORE:  But we don't have any of the names of

18  the --

19      MR. BRUCE:  This is the first that I'm hearing this.

20  Now they want the names?  I have got Mr. Samore saying, "We

21  don't need the names."  I will go back and get the report of

22  proceedings.

23      THE COURT:  We had moved on, and now apparently we

24  have backtracked.

25      MR. SAMORE:  If you look at Interrogatory No. 14 --

1          THE COURT:  Please don't interrupt.

2          So we have talked about Document Request No. 25.  We

3    had beaten that dead horse beyond belief.

4          Now the related interrogatories, having moved past

5    Document Request 25, the related interrogatories are

6    Interrogatory No. 14 and No. 15.  No. 14 says:  "Identify any

7    and all customers who complained about the services they

8    received from using the PicoSure product, and for each such

9    customer, state the amount paid by the individual" --

10          MR. BRUCE:  We have already ruled that out.

11          THE COURT:  -- "for the service and the amount you

12    subsequently refunded."

13          15 is:  "Identify any and all individuals who have

14    declined to use your tattoo removal services due to the

15    alleged defects."

16          All right.  Is there anything for 15?

17          MR. BRUCE:  I think -- is that where he is

18    saying -- asking me about people that didn't use it?

19          THE COURT:  These are --

20          MR. BRUCE:  Yes, that was the easy objection.  That

21    was on foundation.  How will I know what we don't know, right?

22    But now it seems like, orally, he is saying, "I want the names

23    of the patients," and I have candidly -- you know, pursuant to

24    your order and in discussion with Mr. Samore in this room, we

25    haven't given them the names of the patients.  I can't.  I

1    cannot.

2              THE COURT:  No. 14 says:  "Identify any and all

3    customers who complained about the services they received."

4    Do you know any?  Now, we are not talking about -- and that's

5    why I started with customers being the person who comes in the

6    door to have the tattoo removed, not the clients who purchased

7    the product.

8              MR. BRUCE:  Yes.

9              THE COURT:  So do you have any of that?

10             MR. BRUCE:  Do I --

11             THE COURT:  Do you know of a human being who walked

12   into one of your clients' offices and said, "Oh, my God, it is

13   still here.  Why?"

14             MR. BRUCE:  Well, I would imagine that there are many

15   of those.  I believe that there are many of those.

16             THE COURT:  Okay.

17             MR. BRUCE:  Okay.  Whether or not the doctors can

18   identify them is one question, right --

19             THE COURT:  Yes.

20             MR. BRUCE:  -- without, you know, sitting down and

21   looking at everything.

22             And the second thing is even if they get the name --

23             THE COURT:  You mean physically can or legally can?

24             MR. BRUCE:  No, I was getting to the second point.

25             THE COURT:  One I can fix, the other I can't.

1          MR. BRUCE:  That was my twirling of my finger.

2          THE COURT:  Okay.

3          MR. BRUCE:  The second point is I can't give them the

4     names of that, and so we can put a number next to it, an A or

5     B or C, whatever, if they know a specific patient, assuming

6     that, but that's what I put, violation of HIPAA.

7          And now we are getting pretty far afield, Judge, on

8     the allegations in this complaint, but that's okay.

9          THE COURT:  How?  I mean, my understanding of the

10    whole complaint is your clients bought a product that didn't

11    do what it was supposed to do, and I would think they would

12    learn that because their customers came in and said, "My

13    butterfly is still here, and it is supposed to be gone."

14         MR. BRUCE:  That's right, that they saw that this is

15    what happened.  I'm just keeping everyone focused that here is

16    the plaintiff here, who is the purchaser of the thing that

17    doesn't work, and then we have some people over here, right,

18    that these people can see that this thing is not working here,

19    and they have the evidence of that because they have all of

20    those people's records.

21         THE COURT:  Right.  But the people over on your left,

22    my right, who have the tattoo, if they are complaining about

23    "I'm giving you $200 to get rid of my tattoo; my tattoo is

24    still here," doesn't that sound -- isn't that pretty relevant

25    to your case?

1          MR. BRUCE:  Sure, yes.

2          THE COURT:  Okay.  And so that's why they want to

3    know who that person is.

4          MR. BRUCE:  I can't give them the name.

5          THE COURT:  Why?

6          MR. BRUCE:  HIPAA.

7          THE COURT:  I already took care of that at the last

8    hearing.

9          MR. BRUCE:  No, no.  Judge, I'm pretty clear.  I will

10   go back and dig up the proceedings.  I thought I suggested,

11   and Mr. Samore agreed, we are not getting into the names.

12         THE COURT:  I will have to go back and look.  The

13   transcript says what it says.

14         MR. BRUCE:  Okay.  Yes, I don't want to walk away

15   with everybody thinking ill of me.  Those medical records, the

16   4,000 pages that I have given to them on the four plaintiffs,

17   that is HIPAA-protected material.

18         THE COURT:  Uh-huh.

19         MR. BRUCE:  Okay.  I mean, I just want to give -- I

20   have given -- I understand your ruling.  I couldn't give those

21   without your order.  But there was a discussion, I believe,

22   about the names, the actual names of these people.

23         THE COURT:  I will find out.  I will have to check.

24         MR. BRUCE:  And if I'm mistaken, I will stand

25   corrected, but my understanding of the law is I can't give

1   them the names of a nonparty under HIPAA.  We can go back and

2   look at the transcript.

3          MR. SAMORE:  One solution might be to identify them

4   the way they did by pointing to a record and saying -- or

5   referring to Patient A or Patient B.  He says -- on the one

6   hand, he says there is tons of people who have complained

7   about the product.  He says there are tons of other customers

8   unhappy.  On the other hand, he has identified only one person

9   that sent a text message, which he never provided to us.

10         THE COURT:  I have already ordered him to do it.

11  Look, when I make a ruling and move on, I try to keep going.

12  That's why it gets a little frustrating when we are

13  backtracking because we have talked about this.  I'm not

14  making a decision until I read a transcript of what I decided

15  about it.  So I am going to read it.  We will figure out 14

16  and 15.  Let's move beyond 28 now.

17         MR. SAMORE:  The interrogatories, No. 6, 7, and 10.

18         THE COURT:  Okay.  7 and 8, okay.  I have got 6, 7,

19  and 8, but okay.

20         MR. SAMORE:  They deal with investigations or

21  disciplinary actions by any board or professional association.

22         THE COURT:  Right, right.

23         MR. SAMORE:  Okay.  And this is -- these are

24  relevant.  There could be an administrative or investigative

25  proceeding with respect to the competency of plaintiffs in

1    their medical practice.  There could be investigations or

2    disciplinary actions relating to their truth or falsity.

3           Your Honor has already ruled that whether they used

4    the product properly is relevant, and you ordered production

5    of records pertaining to whether they properly used the

6    machine.

7           THE COURT:  What if the criminal proceeding was

8    dismissed or disciplinary complaint was dismissed or it was

9    unfounded?  Civil investigations, proceedings, if they were

10   found unfounded, do those need to be produced?

11          MR. SAMORE:  Well, the scope of -- it may not be

12   admissible, but I think the scope of discovery -- I mean, it

13   is not -- they are not claiming it is too burdensome.  I think

14   that it should be produced, yes.

15          THE COURT:  All right.  Why would it be relevant if

16   there is -- if they are saying there was a complaint -- I will

17   use the Illinois version because I don't know where all the

18   other plaintiffs are.  Let's say there was a complaint to the

19   Illinois Department of Financial and Professional Regulation,

20   and they investigated about one of the plaintiffs and it is

21   unfounded.  How is that relevant?

22          MR. SAMORE:  If they made a specific, you know,

23   finding that the allegations were unfounded, then I would

24   agree with you, but oftentimes that could lead -- end in a

25   more ambiguous --

1          THE COURT:  That's why I started it with "unfounded,"
2     okay?
3          MR. SAMORE:  Okay.
4          THE COURT:  So if they are unfounded, do you need
5     them?  They don't seem relevant to me.
6          MR. SAMORE:  No, your Honor.
7          THE COURT:  Okay.  Any criminal.  So I assume you
8     don't need traffic tickets, parking tickets, things like that,
9     ordinance violations.
10         MR. SAMORE:  That's true.
11         THE COURT:  Okay.  How about bankruptcies?  How would
12    those be relevant?
13         MR. SAMORE:  I don't -- I agree with you.
14         THE COURT:  Okay.  So, Mr. Bruce, it sounds like any
15    criminal convictions, that was produced.
16         MR. BRUCE:  Yes -- well, again, I answered that
17    question in the interrogatories for each one.
18         THE COURT:  Right.  And that information was
19    provided, if there was any --
20         MR. BRUCE:  Yes, I amended the answer.
21         THE COURT:  Okay.
22         MR. BRUCE:  Let me put this in context, Judge.  What
23    they are doing is they are going on a fishing expedition for
24    dirt in a case where these people were unhappy with the
25    machine, and they say that it is falsely advertised, and they

1   want the difference in their money back.  That's what this

2   case is.

3           Now, they have asked about -- in about four

4   different -- and the reason why he didn't cite them is because

5   I answered all these for every one.  They are asking if any of

6   these people have a financial relationship with me,

7   personally, whether my law firm, whether John Holevas has any

8   financial relationship with any of these people, and they went

9   on and on and on.  They asked all these things, trying to dig

10  up dirt, and I answered all those financial questions, and the

11  answer is none, none, none, and none, okay?

12          Okay.  So then they asked about -- they want to know

13  about administrative hearings, board associations.  Judge,

14  look, there has to be a point.  So then not familiar with this

15  type of inquiry, I looked at his case law that he cited.  He

16  cites one case, Redman vs. RadioShack, which I have cited to

17  extensively in our response brief, and what that had to do

18  with, that had to do with the fact about whether or not there

19  was an undue influence due to the motives of the named

20  plaintiff who was employed by the class counsel's former law

21  firm, okay?  They are going far afield.

22          They have no authority to start crawling into these

23  people's backgrounds ad nauseum to try and chase these people

24  away and dig up irrelevant dirt.  That's what they are trying

25  to do.  They want to dig up their lives and say, "Well, we are

1    not interested in pursuing this class action," and they don't

2    have any authority to do it, even though I think all this

3    stuff is beyond the realm.  I have told them all about the

4    financial stuff.  I have told them about whether or not these

5    people have any felonies or convictions.  I have told them

6    about whether they have been a participant in any other class

7    action, which, of course, all of these answers are no.

8            And at some point -- and now he's -- I asked

9    him -- when I asked him under this Rule 37, Mr. Samore said he

10   wouldn't negotiate.  He didn't want to amend any of his

11   answers.  That's what the man said.  And so it was a short

12   conversation because I said, "Eric, I don't want to waste your

13   time.  Are you going to amend any of these?

14           "No."

15           And so now, like many of the other things we are up

16   here for, now you asked him a simple question, "Why do you

17   need them?

18           "Oh, I guess I don't.  I guess I don't.

19           "Well, why, if they are unfounded, do you need them?"

20           I mean, what do they want, Judge, that we, by law,

21   are required to give to them?  I don't think there is

22   anything.  I have told them about felonies, financial stature,

23   class actions.  I don't think any of them have bankruptcies.

24   So they are probably not -- he is not entitled to know that.

25           THE COURT:  Well, he just said he doesn't need them.

1          MR. BRUCE:  I mean, what's the professional --

2          THE COURT:  Good stuff comes out of the south

3     sometimes.  Tennessee, there is a lot of bourbon from there.

4     Meyer vs. Prudential Insurance Company, 581 F.2d. 904,

5     Page 913:  "Much of discovery is a fishing expedition of

6     sorts, but the Federal Rules of Civil Procedure allow the

7     courts to determine the pond, the type of lure, and how long

8     the parties can leave their lines in the water."

9          MR. BRUCE:  I like that.

10         THE COURT:  So I have got to figure this out.  So

11    that's why I go with the basic things about, okay, unfounded;

12    not going to get, not entitled to bankruptcies; not going to

13    get, not entitled to criminal convictions within ten years,

14    absolutely.  Criminal convictions relating to honesty, yes,

15    all that stuff that is impeachable under 609.  Sure, that's

16    fair game.

17         So then I will drill down.  Disciplinary proceedings,

18    say there is a disciplinary proceeding again by the Illinois

19    Department of Financial and Professional Regulation, and in

20    that proceeding, they find that one of the doctors is not

21    credible or committed perjury in some kind of way.  Yes, that

22    would be good cross-examination.  Is it burdensome?  I don't

23    know because I don't know how --

24         MR. BRUCE:  I haven't claimed -- I haven't claimed

25    burdensome.  I'm claiming relevance.

1      THE COURT:  I am just going through, in my head, why

2  something like that would not be discoverable.

3      MR. BRUCE:  Let's build on that because it seems

4  like -- he has got something he is after, and I don't know

5  what it is.  So we are narrowing it down to disciplinary

6  proceedings.  So let's say we represent these doctors, and

7  Dr. -- I'm giving a hypothetical for the record.  It is not

8  the case that I know at all.  But let's say Dr. Burke out in

9  Delaware has got some -- you know, he is a physician.  He does

10 a lot of different medical procedures.  Let's say there was a

11 complaining patient about something, and it had nothing to

12 do -- I mean, it has nothing to do with any of these issues.

13 So now are we going to crawl into that, Judge?

14     THE COURT:  Well, that's why I'm talking about the

15 pond and the lure because every doctor is going to have a

16 medical malpractice case.  There is not a doctor alive that

17 doesn't have a medical malpractice.  So I'm trying to limit

18 the scope to figure out where this goes.

19     MR. BRUCE:  And to that point, Judge, as a person who

20 practices a lot of medical mal cases, I know that a lot of my

21 cases end up in the IDPR, right?  So, I mean -- so you bring

22 up a good point, which is -- I hadn't even thought of that,

23 but to the extent that they have had ten malpractice cases

24 filed against them, which all has to do with negligence,

25 right, these are negligence cases about whether or not they

1    deviated from the standard of care.  You know, half of those

2    may have some reporting to the IDPR.  But what does that have

3    to do with buying a machine that they lied, because it says

4    photoshopped, and it doesn't say photoshopped, and the tattoo

5    is here, and then it is not here.  I mean, what does that have

6    to do --

7             THE COURT:  And if it is a medical malpractice case,

8    it has nothing to do with it.  But if it is a disciplinary

9    proceeding where they were distributing prescriptions

10   improperly and covering it up, yes.  Does it exist?  Probably

11   not, because it is probably a criminal conviction that goes to

12   it.  I just don't know.  And most of this stuff -- how many

13   plaintiffs are we talking about here?

14            MR. BRUCE:  Four today, but there might be more.

15            THE COURT:  Okay.  So you have got four.  All of that

16   stuff is online.  It is almost summertime.  You have got to

17   have summer associates coming into your firm.  Aren't they

18   going to be online, digging around?  It is all online.  If

19   there is something out there, they will find it.

20            MR. BRUCE:  Can we --

21            THE COURT:  I just don't -- criminal convictions,

22   that has been produced.  If there are -- I'm limiting it to

23   ten years, civil disciplinary proceedings -- or a civil

24   proceeding or a disciplinary proceeding in which

25   untruthfulness was found.  So you can ask your clients.  That

1    shouldn't take much time.  If they exist, that's fair game.

2    That's good cross-examination.  That goes to bias and that

3    kind of stuff.

4            MR. SAMORE:  All right.

5            MR. BRUCE:  And if there is not, if it doesn't fall

6    under the definition you just said, we are just saying none?

7            THE COURT:  Right.

8            MR. BRUCE:  All right.

9            THE COURT:  All right.  Mr. Samore, what do you got

10   next?

11           MR. SAMORE:  Well, you know --

12           MR. BRUCE:  We had a number that I wanted to raise

13   with you.

14           MR. SAMORE:  Let me finish.

15           THE COURT:  Let him finish.

16           MR. SAMORE:  I'm not finished.

17           Conversations with Cynosure representatives.

18           THE COURT:  Okay.  Give me a number.

19           MR. SAMORE:  I'm referring to No. 18.

20           THE COURT:  18.  I thought we talked about that, but

21   shoot.  Go ahead.

22           MR. SAMORE:  That's supporting allegations that

23   Cynosure knew that its representations were false.

24           THE COURT:  Yep.  We had that big -- that was the

25   attorney-client privilege.

1          MR. SAMORE:  Well --

2          MS. LONG:  Sorry, it is confusing, Request For

3   Production 18 and Interrogatory 18, which are actually

4   different things.

5          THE COURT:  Okay.

6          MS. LONG:  So we already talked about the putative

7   class members.

8          THE COURT:  Okay.

9          MS. LONG:  This is about Plaintiffs' staff members.

10          MR. SAMORE:  Okay.  What they -- and this production

11   motion is limited to two plaintiffs.

12          THE COURT:  Are we talking about production or

13   interrogatories?

14          MR. SAMORE:  This discovery request involves

15   Interrogatory No. 18, and it is with respect to two of the

16   responses.

17          THE COURT:  Okay.

18          MR. SAMORE:  With respect to Hatchet, Plaintiff

19   answered that Cynosure's agents informed Plaintiff's staff

20   members on multiple occasions that the PicoSure machine would

21   not remove or eliminate tattoos.  We asked for -- we want to

22   know, okay, if this happened, what staff members were told

23   this, what Cynosure agents were told this.

24          THE COURT:  Let me make sure I have the right one.

25   My Interrogatory 18 for the Defendants says:  "Identify any

1    and all bases for your allegations that Cynosure 'knew' or was

2    'aware' misrepresentations regarding PicoSure products were

3    false."  Is that the interrogatory we are talking about?

4              MR. SAMORE:  Yes, your Honor.

5              THE COURT:  Okay.  So now you lost me here.  So what

6    are we talking about?

7              MS. LONG:  In their response --

8              THE COURT:  Okay.

9              MS. LONG:  -- they say they object because it calls

10   for a narrative answer, and then they say that Cynosure's

11   agents and/or representatives informed Plaintiff's staff

12   members on multiple occasions.

13             THE COURT:  Okay.

14             MS. LONG:  Da, da, da.

15             They, after we pushed them, finally revealed the

16   Cynosure representatives that they have talked about or that

17   they are referencing in that response, but they still -- they

18   say that these Cynosure agents spoke to Plaintiff's staff, and

19   we have asked repeatedly for identification who on Plaintiff's

20   staff that was and have yet to get a response.

21             MR. BRUCE:  I have no idea what they are talking

22   about, Judge.

23             MS. LONG:  Okay.  So it is on Docket 105-5.  So it is

24   Page 7 of Exhibit E to our motion.

25             MR. BRUCE:  What plaintiff?

```
1              THE COURT:  Hold on.  Hold on.  Hold on.

2              MS. LONG:  This is Hatchet.

3              THE COURT:  Hold on.  Wait, wait, wait.

4              MS. LONG:  Sorry.

5              THE COURT:  All right.  105-5, tell me what page

6    number.

7              MS. LONG:  It is Page 10 of 69.

8              THE COURT:  All right.  Hold on.

9              All right.  I'm with you, Ms. Long.  Which number,

10   18?  Okay.  Give me a second.

11             Yes, okay.

12             Okay.  Mine says -- mine identifies the three

13   Cynosure representatives.

14             MS. LONG:  Yes.

15             THE COURT:  Brice, Carnie, and Kaufman.

16             MS. LONG:  But it doesn't identify the names of the

17   Plaintiff's staff members.

18             THE COURT:  Okay.  All right.  Do you know the

19   names -- do you see where we are, Mr. Bruce?

20             MR. BRUCE:  Now I find it.  They never told me that

21   that's what they wanted to know.  They complained, and I gave

22   them the name of the Cynosure class.  Now they are

23   asking -- first of all, I have no idea if my Plaintiffs -- who

24   said that to them, but that's not -- I mean, I wish Mr. -- I

25   really wish Mr. Samore had told me that's what he was after.
```

1  So I'm not going to represent to the court.  I understand.  He

2  is saying --

3          THE COURT:  How about three weeks to get an answer to

4  that, if they know, if they remember?

5          MR. BRUCE:  But I want to be clear so I don't do

6  anything wrong.  It is which of the -- it is

7  Plaintiff -- which one?

8          MR. SAMORE:  It is Hatchet and Ritacca.

9          MR. BRUCE:  We want to ask Dr. Ritacca --

10          MR. SAMORE:  And Dr. Hatchet.

11          THE COURT:  Who on their staff talked to Brice,

12  Carnie, and Kaufman.

13          MR. BRUCE:  Who on staff --

14          THE COURT:  And complained about those --

15          MR. BRUCE:  If they remember.  Fair enough.  Got it,

16  Judge.

17          THE COURT:  Okay.

18          MR. BRUCE:  I thought they were complaining about the

19  names of the Cynosure reps, which we gave them.

20          THE COURT:  You gave those three names.  They want to

21  know who the other part of this conversation was.  They want

22  foundation.

23          MR. BRUCE:  Got it.

24          MR. SAMORE:  I just want to say, for the record, if

25  you also look at Document 105-2, Page --

```
 1              THE COURT:  Hold on.  Hold on.

 2              Okay.  105-2.  What page?

 3              MS. LONG:  Page 5.

 4              MR. SAMORE:  Page 5.

 5              THE COURT:  Page 5 of 8?

 6              MR. SAMORE:  Okay.  Under Paragraph No. 9, we asked

 7    specifically for them to identify the members of Plaintiff's

 8    staff referred to.

 9              THE COURT:  Okay.  Well, now he is going to do it.

10              MR. SAMORE:  Okay.  Thank you.

11              THE COURT:  Problem solved.

12              MR. SAMORE:  Okay.

13              THE COURT:  Okay.  What's the next one?

14              MR. SAMORE:  Then we have our motion to compel, and I

15    think this will be very short, evidence relevant to direct

16    damages.

17              MR. BRUCE:  Oh, no, Judge, we are not done with my

18    motion to compel.

19              MR. SAMORE:  Well, we filed a motion to compel

20    evidence related to direct damages, that is evidence regarding

21    revenues obtained from the PicoSure machines.

22              THE COURT:  All right.  Before we get into that, I'm

23    going to turn back to Mr. Bruce, and we are going to go

24    through and see what other, if any, remaining issues exist.

25              MR. BRUCE:  And, Judge, if I cite something you ruled
```

1    on, just chastise me.

2              THE COURT:  Okay.

3              MR. BRUCE:  All right.  So I'm going to start.  I'm

4    just going to flip through my motion to compel, so you know

5    where I'm at, because when I did it, I cited both what I asked

6    for and what they responded.  Do you follow me?

7              THE COURT:  Okay.

8              MR. BRUCE:  So I'm on Page 5.  I didn't hear you talk

9    about --

10             THE COURT:  Just tell me the production request and

11   the number.

12             MR. BRUCE:  Third Request for Production, No. 2.

13             THE COURT:  Got you.

14             MR. BRUCE:  Studies, research, or data, and I cited

15   you both the BASF case and Matrixx case.

16             THE COURT:  Okay.

17             MR. BRUCE:  I say the machine doesn't work.  They say

18   the machine does work, despite what they told the FDA.  That's

19   their contention, at least currently.  I am entitled to know

20   anything in their possession, and they are all saying, "Well,

21   it is voluminous," whatever.

22             THE COURT:  I understand that, and I think the terms

23   "study, research, and data" are not vague or confusing.  It is

24   amazing how some of the smartest people in this country, who

25   spent at least seven years going to school, don't know what

1   study, research -- don't know what -- we know what those mean.

2          But my notes reflect and my recollection is they said

3   that they are not withholding any documents on that.

4          MS. LONG:  That's correct.

5          THE COURT:  Okay.  That was one of the ones that I

6   had under the resolved category.  And everybody is on notice,

7   right?  Everybody knows where we are going with this thing.

8          MR. BRUCE:  Okay.  Judge, interrogatory -- same Third

9   Request For Production, No. 3.

10         THE COURT:  Okay.

11         MR. BRUCE:  They not only asked, they re-asked, sent

12  me e-mails.  You said, to quote the esteemed Judge Johnston,

13  "What is good for the goose is good for the gander."  That's

14  citing Judge Johnston.  They have bugged me to death about the

15  names of all the other PicoSure -- or all the other

16  tattoo-lightening machines that my clients have purchased, and

17  they not only want the name, they want the model number, and

18  they have been bugging me about the price, which we gave them.

19  So that's what we want.

20         MS. LONG:  I'm sorry?

21         MR. BRUCE:  Interrogatory No. 3.

22         MS. LONG:  Interrogatory No. 3?

23         MR. BRUCE:  "What price did Defendant charge for the

24  Revlite product that was used in the FDA clinical test to

25  compare with the PicoSure?"

1      MS. LONG:  Price or price range.  We gave them a
2  price range.

3      MR. SAMORE:  I think we complied with that
4  interrogatory.

5      MR. BRUCE:  Okay.  The range they gave us was 50,000
6  to 175,000.  It is a broad range.  I will go back and ask for
7  the price.  That's fine.

8      THE COURT:  Yes, they gave the range.

9      MR. BRUCE:  It is on me to be more specific.

10      THE COURT:  They gave the range.  Okay.

11      MR. BRUCE:  I think you addressed -- I'm at the
12  Fourth Set of Production now, No. 2.

13      THE COURT:  Yes.  No. 2, okay.

14      MR. BRUCE:  We talked about they have got statements
15  of the Plaintiffs.  I mean, the website -- okay, Mr. Gravino
16  is whispering you granted that.

17      THE COURT:  Okay.

18      MR. BRUCE:  Now, what hasn't been discussed
19  is -- referred to, but not discussed -- is Fifth Set of
20  Request to Produce Documents.

21      THE COURT:  Fifth set?  Hold on one second.  Fifth
22  set, request to produce, go ahead.

23      MR. BRUCE:  Yes, No. 1.

24      THE COURT:  Which number?

25      MR. BRUCE:  No. 1.

1          THE COURT:  Okay.

2          MR. BRUCE:  Counsel has candidly admitted there is a

3  client file for each of these PicoSure people, and we want it.

4  We want the contracts.  You have already ordered.  We are

5  going to talk to them about the e-mails, unless it is just in

6  a file, which she said, I thought -- we can go back and read

7  the transcript -- electronic and written, I thought I heard,

8  which would be really easy to produce and just send it to a

9  copy service at my expense.  So I don't know that we have to

10  get into a whole e-mail search if they have got e-mails that

11  are in the customers files' and correspondence with each

12  purchase of the PicoSure product.

13          MS. LONG:  I would just like to say that my use of

14  the word "file," I think counsel is reading a lot into that

15  and assuming that he knows what's in the file, and I don't

16  even know what's in the file.  So I couldn't possibly have

17  been saying that.

18          THE COURT:  Okay.  Well, I was just going to ask you

19  what is a client file.  Do we know what a client file is?

20          MS. LONG:  I am fairly confident that it is not

21  comprehensive communication.  Every time a customer e-mails,

22  that e-mail does not go into the file.  I can't say that with

23  a hundred percent certainty, but based on my conversations.

24  That file would be huge because, again, after we sell a laser,

25  the relationship is ongoing with clinical, with regulatory,

1  with finance sometimes if there is questions about their

2  payments of the laser.

3          THE COURT:  And I agree it could be huge.  It could

4  be massive.

5          MS. LONG:  And I do not believe that they are all

6  stored in that file.

7          THE COURT:  But if it is a client file, then it will

8  be Client X, and it is a file.  It may be huge, but it is easy

9  to produce.

10         MS. LONG:  I'm almost positive that that's not true,

11 but I can confirm.

12         THE COURT:  I don't know.

13         MR. BRUCE:  They said they pulled the files.  That's

14 what she said several times.

15         MS. LONG:  That the contract was in.  I said that

16 there is a file that contains a contract.  I never said there

17 is a file that contains every single thing.

18         THE COURT:  Find out if there is something that we

19 are referring to as "client file."  If there is a file for

20 every customer that has the contract, the invoices,

21 communications back and forth, anything related to that

22 customer, if there is a client file or a file that has -- or

23 maybe it is a customer file that has all of that, it might be

24 massive.

25         MS. LONG:  I will confirm that, but I'm --

1      THE COURT:  But it would certainly be responsive to

2  all kinds of these requests and easy to produce.

3      MS. LONG:  Yes, I'm almost positive that that's not

4  the case, and I just want to make sure that I'm being clear,

5  because counsel has intimated a couple of times that I said

6  that, and I never said that.

7      THE COURT:  Find out.  And if we have an issue, we

8  can always have an evidentiary hearing.  We can have witnesses

9  testify about things.

10      MR. BRUCE:  Yes, Judge, and to put a finer point, I

11  may, depending on what their response is, be asking, you know,

12  before we get too much further, for the 206 witness with the

13  most knowledge of that record retention of the client files,

14  because I can't imagine that it is not what she said earlier,

15  that there is a client file to pull, and I would like to ask

16  somebody under oath who has the most knowledge about that, if

17  they come back and say, "We don't have it," that way.  I don't

18  want to play games.

19      THE COURT:  You can always take a 30(b)(6)

20  representative deposition on document retention.

21      MR. BRUCE:  Great.  Thanks, Judge.

22      THE COURT:  That's always within the scope.

23      MR. BRUCE:  Sixth Request For Production, No. 1.

24      THE COURT:  Yes.

25      MR. BRUCE:  The same thing, Judge.  It is their

1    client file.

2              THE COURT:  All right.  Hold on one second here.

3              This is about complaints, problems -- complaints,

4    problems, and concerns regarding maintenance issues.

5              MR. BRUCE:  And they say they are going to supplement

6    or amend at the bottom.

7              MS. LONG:  We say we reserve our right if anything

8    new comes up.  We are not withholding based on that.

9              THE COURT:  Okay.  And that's what I'm saying.  Is

10   there anything that is being withheld, or are you -- this is

11   an issue that you are saying you are producing the complaint

12   log and nothing else?

13             MS. LONG:  This is one where they are asking for

14   literally all communications with any customer about anything

15   ever.  So if a customer writes --

16             THE COURT:  No, it says about complaints, problems,

17   or concerns.

18             MS. LONG:  Including, but not limited to --

19             THE COURT:  E-mails or communications about the --

20             MS. LONG:  -- complaints, problems, or concerns.  I

21   think it is our position that those would all have been logged

22   in the complaint log that we produced.

23             MR. BRUCE:  Judge --

24             THE COURT:  If you think it might be your position

25   that -- I need something a little more definitive.

1          MR. BRUCE:  Can we get an affidavit from somebody at
2     Cynosure?  Or I will take that records dep that you talked
3     about.  Judge, we have to get to the bottom of it.  It doesn't
4     sound like they have done anything to look for this stuff.
5          THE COURT:  Okay.  We will find out.  We will find
6     out.  Okay.
7          So what's the next one, Mr. Bruce?
8          MR. BRUCE:  Sixth Request For Production, No. 2.
9          THE COURT:  Okay.  Hold on.  No. 2.
10         MR. BRUCE:  Yes, and can I flesh this out, Judge?
11         THE COURT:  Yes, go ahead.
12         MR. BRUCE:  So here I'm asking for documents from the
13    Defendant regarding other lawsuits or claims.  So it is not
14    simply a pleading in court, but if somebody is calling or
15    writing and saying, "I want my money back, this thing doesn't
16    work, I'm rejecting it, I'm rescinding it or suing, breach of
17    contract," whatever.  That is any of that.
18         They object, among other things, as attorney-client/
19    work product privileges.  Just so we are clear, I'm asking for
20    people who are adverse to Cynosure, asking them for any claims
21    or lawsuits, and I can't imagine how that's attorney-client or
22    attorney work product.
23         THE COURT:  Claims or lawsuits regarding the
24    products, involving the machine, okay.  So it is limited to
25    that.  But you don't need like in Title VII or an employment

1    or a slip-and-fall or anything like that.

2           You want if there is lawsuits -- again, we know what

3    a lawsuit is -- involving the PicoSure machine.  You want to

4    see those.

5           Do those even exist?

6           MR. SAMORE:  They don't.

7           MS. LONG:  And there are no other lawsuits in the

8    United States about the PicoSure machine.

9           THE COURT:  How about outside the United States?

10          MS. LONG:  I think -- it is our position that

11   litigation outside the United States is not relevant to this

12   issue of how we marketed the machine within the United States.

13   The basis of this claim is a false marketing.

14          THE COURT:  I disagree.  I disagree.  Are there other

15   lawsuits outside the United States?

16          MR. SAMORE:  I don't --

17          MS. LONG:  No, there is one, Melbourne.  There is

18   one.  We can produce the pleadings from that.  Obviously, this

19   is where it comes up with privilege.  There is one piece of

20   litigation.  So we will produce the pleadings.

21          THE COURT:  Produce the pleadings.

22          MS. LONG:  Okay.  The publicly available docket

23   information regarding it, We will produce that.

24          THE COURT:  Produce the pleadings.

25          MR. BRUCE:  And, Judge, what about --

1          THE COURT:  And then claim.

2          MR. BRUCE:  Right.

3          THE COURT:  So if you call up an insurance -- if you

4    get in a dispute with your neighbor or something, and you end

5    up calling an insurance rep, that's a claim under a policy or

6    something like that.  And it is more than just a complaint.

7    We have talked about complaints.  We have got that covered.

8          A claim, so if somebody hasn't filed a lawsuit, but

9    called and threatened and said, "I want my money back," do

10   those exist?

11         MS. LONG:  We produced the one -- I am aware of one

12   incident of that, and we produced the letter that we received.

13         THE COURT:  Okay.  All right.

14         MR. BRUCE:  Is that inside or outside the United

15   States?

16         MS. LONG:  That's inside the United States.  I don't

17   think -- I am not aware of claims outside the United States.

18   I think that that gets a bit farfetched.

19         THE COURT:  Well, if they exist, produce them.

20         MR. BRUCE:  Judge, Request to Produce No. 3, the same

21   set, in this one, we are asking -- I will give you the context

22   and maybe we can expedite this.

23         Because of the very, what we think, is damning

24   evidence for them when they told the FDA it doesn't do what

25   the photographs depicted that it does, which is clearly what

1    the FDA documents that they submitted said, then that got my

2    interest, and I'm asking for any documents, e-mails,

3    correspondence, communications with any governmental agency

4    regarding the PicoSure product.

5         What we are looking for there is if they told the FDA

6    that, what did they tell the Aussies, what did they tell the

7    Canadians, what did they tell the State of California, what

8    did they tell these other governmental agencies.  And instead

9    of giving all this boilerplate, if the answer is just "No,

10   that's it," then that's fine.  I mean, "None other than the

11   FDA ones previously produced," that's fine.  But they give me

12   this whole list thing, and now I'm thinking, well, they told

13   other governments, and maybe they told them the same thing or

14   maybe they told them something different.  I won't know until

15   they give it to me.

16        THE COURT:  Okay.  It seems a little broad, but go

17   ahead.  It seems like there is something that should be

18   provided, but they are asking for a lot.  So tell me what your

19   position is.

20        MS. LONG:  I think a lot of that is going to be

21   redundant.  I would have to discuss it with my client.  But to

22   the extent that we have talked to any governmental agency

23   about registering our business office so that we can sell the

24   PicoSure, you know, getting a business license, maintaining a

25   business license --

1        MR. SAMORE:  Yes, this is --

2        THE COURT:  Right.  And I agree.  That's why I think

3  it is broad.  But I understand if there is representations

4  that were made similar to the FDA, then it seems relevant.

5        MR. BRUCE:  I will limit it in any way, Judge, you

6  deem fit.  We know what we are after.  We are talking about

7  the efficacy, of the effectiveness of this product, which they

8  already -- you know, I mean, again, I think they cited a bunch

9  of studies, which we have never seen in the FDA documents.

10  But they have said they have given them, so I will go back and

11  look.  I'm sure I may have missed them.  But they might cite

12  other studies to the Aussies or the Canadians or whatever.  So

13  I would limit it to the effectiveness, efficacy of the

14  PicoSure product.  How is that, Judge?

15        MR. SAMORE:  Your Honor, this is -- the FDA

16  materials, this -- there was absolutely no misrepresentation.

17  This is really a -- the whole suit is really --

18        MS. LONG:  This is a death by a thousand paper cuts

19  at this point.

20        MR. SAMORE:  What they are trying to do is simply

21  kill us with the production requests and time to respond to

22  material.  It is like having the same witness during trial

23  come on and talk about the same topic.  We have produced the

24  information to the relevant, germane authority in the United

25  States.  That should be sufficient.

1          THE COURT:  Look, if you are selling the product in
2    Australia or the UK, and you tell those government bodies
3    "This product does exactly what we say it is going to do" or
4    "doesn't do what we say it is going to do," either way, that
5    seems highly relevant.  If they don't exist, they don't exist.
6    But if you are making a representation to a government body
7    that regulates your client's product in some way, and you say
8    that it does everything it is supposed to do, as we understand
9    the term, well, that's helpful for you, and I think you would
10   want to produce it.  If it says the contrary, well, then, it
11   is relevant, and it goes to them, and you have got to deal
12   with it.  Now, if they don't exist, they don't exist.  But if
13   there are studies, and they are limited to any studies cited
14   to any government agency regarding the efficacy of the
15   PicoSure, that's what I limit it to, and I limit it to 2011.
16         MR. BRUCE:  Thank you, your Honor.
17         MR. GRAVINO:  Limit it to?  What was that, your
18   Honor, to the year --
19         THE COURT:  2011.
20         MR. BRUCE:  You mean 2011 to the present?
21         THE COURT:  Correct, yes, 2011 going forward.
22         MR. BRUCE:  Did you -- I don't think so, but I could
23   be wrong.  Did you rule on Plaintiffs' Sixth Request For
24   Production, No. 7 and 8, Judge?  You ruled on 9 and 10.  Did
25   you rule on 7 and 8, and I just missed it?

```
1              THE COURT:  7 and 8, that's another one where the
2  Defendant said that they are not withholding any documents.
3              MR. BRUCE:  They formally made that representation.
4  That's fine.
5              THE COURT:  Correct.
6              MR. BRUCE:  14, Judge, did you rule on that one,
7  software update?  On that, you ruled?
8              THE COURT:  Yes, and that's another one where they
9  say they are not withholding any documents.
10             MR. BRUCE:  Okay.  15 and 16, Judge?
11             THE COURT:  Yes, also saying they are not withholding
12  any documents.
13             MR. BRUCE:  All right.  19?
14             THE COURT:  Not withholding any documents.
15             MR. BRUCE:  And I'm sorry, Judge, I should have taken
16  better notes.  I'm sorry.
17             THE COURT:  That's all right.
18             MR. BRUCE:  Did you rule on 22?
19             THE COURT:  Yes, not withholding any documents.
20             MR. BRUCE:  Oh, 26, did you get to that one, Judge?
21  That's important.
22             THE COURT:  I did not.  I did not.
23             MR. BRUCE:  Okay.  So let me give you some context,
24  Judge.
25             THE COURT:  I did not talk about 26, yes, because I
```

1    have a big "no" next to it.  So tell me why you need it.

2            MR. BRUCE:  Oh, okay.  Well, I think by the time I

3    finish --

4            THE COURT:  So give me a good pitch.

5            MR. BRUCE:  Well, I will.

6            Judge, look, so as we peel back the onion, as I

7    understand it, Cynosure was selling this $300,000 thing that

8    they photoshopped the tattoos about, and let's say, you know,

9    the other machines that were on the market at the time were,

10   let's just say, 50 grand, hypothetically.

11           Now, apparently what they did is that they worked

12   with a finance entity.  I don't know the relationship, which

13   is why we are asking for this.  And they set up these people

14   to buy this.  They said, "Oh, no, no, no.  You don't have the

15   money?  We will help you."  And they had these very complex

16   agreements with the -- between Cynosure -- and this is all

17   upon information and belief; I'm just learning about

18   this -- between Cynosure, the finance entity, and then the

19   prospective buyer because they can't pay the 300 grand.

20           So I want to peel back that onion, and as I'm

21   starting to learn more about this, Judge, you may see another

22   or they may see another round of discovery because I don't

23   know if they have been rather specific in their answers about

24   who the purchasers of this machine are.  There may be a whole

25   other bunch of people who got leaseback agreements, got lease

1    agreements, got loan-to-buy agreements, and if they have been

2    narrowly tailoring their answers to myself and this court, we

3    may be -- you know, there may be more people out there.  I

4    don't know.  I'm not saying that.  I'm not representing that.

5    But I do know that several people have, I believe -- I

6    believe, upon information and belief -- were directed to some

7    other financial entity which has a relationship with Cynosure.

8    So I want to get that information.

9         THE COURT:  How is it relevant to your claims?  It

10   certainly might be -- you might be able to -- I don't want to

11   use the word "spin."  You might be able to convey that, and

12   you might be able to make it sound nefarious and all of that

13   to a jury.  But as to the relevance of the claims, even under

14   the broad scope of relevance in discovery, how is it relevant?

15        MR. BRUCE:  Yes, so two ways.  First of all, there

16   might be a whole world of other class members that I don't

17   know about, that you don't know about today, number one, okay?

18   So number one.

19        Number two, which have knowledge about the

20   complaints, which they have gotten complaints from those other

21   people, which we would use, right, in the course of this case

22   to prove that the machine doesn't work.  I think that's

23   probably one of them.

24        And second of all, Judge --

25        THE COURT:  Well, you are getting the 450 contracts,

1    so you are going to know who they are.

2         MR. BRUCE:  No, that's the point, Judge.  That's the

3    point.  Do they have a whole different series of people that

4    they have some loosey-goosey lease arrangement, who got the

5    PicoSure machine?  That's what I'm trying to find out, Judge,

6    are there people -- maybe Mr. Samore would just tell us.  Are

7    there people, other than purchasers, that Cynosure has that,

8    through some financial arrangement, ultimately obtained the

9    PicoSure machines from them?  Because I want to know about

10   their complaints.  I want to know about what representations

11   they made to those people and so on.

12        But more to the point, Judge, in terms of once they

13   say -- if I'm correct -- and maybe they will come back and

14   say, "Devon, there is no third-party company," and the

15   discussion will end.  But let's just say there is Johnson

16   Financing Company.  Well, Judge, I will throw a subpoena on

17   Johnson Financing Company and ask for "any and all complaints

18   that you have received from your clients concerning the use,

19   efficacy of this machine," because if I'm some poor

20   dermatologist starting off in Oregon, and they fix me up with

21   some finance company that they have got a relationship, and

22   the thing doesn't work, and I'm losing my money, and I had to

23   pay 300 grand for this, I'm sure as hell going to complain to

24   these people and say, "This thing doesn't work that you guys

25   got me this money for," right?  And you say, "Well, it is not

1    there."  Well, I don't know, but we will find out as soon as

2    they tell me the name of the company.

3            THE COURT:  Well, when you get financing, it is just

4    somebody floating you a loan to buy the product.  You still

5    have a contract and agreement with the person selling it to

6    you.

7            MR. BRUCE:  It is unclear to me what this arrangement

8    is, and if you look at this thing, this recitation they have

9    shown from John Palastra at the eleventh hour, they spend a

10   lot of time telling me why they can't produce this financing

11   arrangement.  So I'm interested in this now, and that's why we

12   have asked for it, and they are stonewalling us.  Just what is

13   the harm of them telling us what is the name of the

14   third-party company?  Give us the contract they have with

15   them.  That's it.

16           THE COURT:  You asked for more than that.

17           MR. BRUCE:  Well, no, I will throw a subpoena on

18   them.  I will deal with them.  Just the contracts or

19   agreements with any third-party entity, any type of financial

20   relationship to sell the machine.  I will go deal with them

21   myself.

22           MS. LONG:  I don't think counsel can complain that we

23   don't give enough burden facts on the one hand, and then on

24   the one place where we were able to, in a week, able to get

25   together our burden facts, complain that we have provided too

1   many burden facts.  It is a bit confusing there.

2            But we don't, to my knowledge, have a single

3   party -- or, no, we don't, I will say that, have a single part

4   about finances.

5            As is laid out in the declaration from

6   Mr. Palastra --

7            THE COURT:  Where is the -- what's the -- give me the

8   declaration.

9            MS. LONG:  117-1.

10           THE COURT:  This stack.

11           MS. LONG:  It is on the bottom of Page 2 and at the

12   top of Page 3.  He makes clear in Paragraph 14 that "Each

13   customer who finances can use whatever financial institution

14   they choose."

15           MR. BRUCE:  And I don't dispute that, Judge.  They

16   have got a special arrangement with an entity, and if we have

17   to peel back, and I have to spend a lot of time and money

18   doing that, when they can just tell me who it is -- I'm not

19   saying that they can't finance it.  This is a nonanswer.  I

20   didn't ask that question.  I know that.  I know that.

21           The question I have is "Do you guys have an agreement

22   or contract with some entity that you have set up to help

23   finance your customers, that you would steer them to?"  That's

24   what I want to know.

25           Now I'm curious.  Why are they --

1          MS. LONG:  The request is much broader than "Do you

2     have a special company that you have some sort of special

3     relationship with?"

4          THE COURT:  Well, he is limiting it now.  Mr. Bruce

5     is a good guy.  He is a smart attorney.  So what he is doing

6     is he realizes he was going to lose on what he asked for, so

7     he is scaling it back.  He is trying to get something out of

8     it.

9          MS. LONG:  He asked for any third party --

10         THE COURT:  He has already dumped that.  He is not

11    asking for that.  Now he is peeling it back.  That's the whole

12    Rule 37 discussion.

13         MR. BRUCE:  Mr. Samore said he would not amend any

14    answer, so that ended it, and that is the truth.

15         THE COURT:  Let me read.  Let me read.

16         (Brief pause.)

17         THE COURT:  All right.  I will only require, if it

18    even exists, any contract with a third-party financing company

19    for customers that purchased the PicoSure product.

20         MR. BRUCE:  Thank you, Judge.

21         THE COURT:  That's it.

22         I think that's the end of my documents.  Anything

23    else?

24         MR. BRUCE:  No.

25         THE COURT:  Okay.  Mr. Samore, we were talking

1   about --

2         MR. SAMORE:  And I believe this should be short

3   because there was no response to this motion.

4         THE COURT:  All right.

5         MR. SAMORE:  It was our motion to compel evidence to

6   direct damages, namely the revenues from the PicoSure machines

7   that they -- the Plaintiffs purchased.  The Plaintiffs, you

8   may recall, agreed to limit their theory of damages to direct

9   damages.  Direct damages is the difference between the value

10  of the goods as represented versus the value as delivered.

11        One of the factors in determining the value of a good

12  as delivered is the revenue that it generated.  This is

13  recognized by the case precedent, by expert affidavit that we

14  have attached, and the professional literature, authoritative

15  literature, and by one putative class member who testified

16  with respect to the importance of the revenue data for

17  evaluating whether or not to purchase the PicoSure.

18        The Plaintiffs didn't respond.  This concerns

19  Interrogatories 11 and 12 and the Production Request No. 14.

20  We would ask that these interrogatories and this production

21  request be complied with.

22        THE COURT:  Go ahead.

23        MR. HOLEVAS:  Your Honor, Mr. Bruce and Mr. Gravino

24  have taken the laboring oar on the other discovery items, so I

25  was asked to review this.

1          First and foremost, Judge, it was my understanding

2     that this was noticed for presentment.  I don't think there

3     was ever contemplated that there was going to be any formal

4     response submitted as of today's date.  But notwithstanding

5     that, Judge, and we can respond to it if the court believes

6     that it is necessary, I reviewed your Document No. 81, the

7     minute order that you had entered on the 15th of August of

8     2016, where you already dealt with this issue.

9          THE COURT:  Yes.

10         MR. HOLEVAS:  So I didn't know if this was some type

11    of a motion for reconsideration that has now been filed about

12    eight months after you had previously ruled.  I note with

13    great interest that you --

14         THE COURT:  There was comments repeatedly about a

15    motion for clarification or something like that, and I know I

16    had ruled on it, and it sounded very familiar.

17         MR. HOLEVAS:  Right.  That's why we were --

18         THE COURT:  So when I read this, I didn't know what

19    we were doing on it.

20         MR. HOLEVAS:  We had the same confusion, your Honor,

21    because I think it has already been addressed by this court.

22    Nothing has changed, and I think the court very astutely

23    indicates in your order that "Defendant, despite having

24    several opportunities in the many briefs offered in the course

25    of cross motions, has provided no counter authority, and this

1    court's research disclosed none."

2        Judge, the two declarations that they attached to

3    their motion, one that counsel has already alluded to, and I

4    think his co-counsel has indicated that there was some e-mails

5    from that declarant that they are going to have to provide

6    within the next 14 days, obviously, we don't have any of that

7    information to review.

8        THE COURT:  Isn't this just a gussied-up motion to

9    reconsider?  Instead of taking me on, you are pointing the

10   finger at them and saying they didn't do something, instead of

11   saying, "Judge, you screwed up."

12       MR. SAMORE:  No.  Your Honor, I think that what

13   happened procedurally was that in their complaint, they sought

14   consequential damages, and we requested this information

15   because it was relevant to consequential damages.  Then at the

16   hearing, and very confusing, they went back and forth, but

17   they withdrew their claim for consequential damages.

18       THE COURT:  Mr. Bruce did it explicitly, multiple

19   times.

20       MR. SAMORE:  Well, they -- it was confusing in their

21   responses, and I think that that's a side point.  They

22   withdrew their claim for consequential damages for the first

23   time at that hearing.  That is not in the record anywhere

24   else.  Whether this is a motion to reconsider --

25       THE COURT:  Other than a transcript?

1        MR. SAMORE:  -- whether this is a motion that's up,

2   you know what you meant by the order, and if you believe this

3   was dealt with, then it is a motion to reconsider.

4        THE COURT:  Look, you are the one that put the

5   caption on it.  You tell me what you want me to do.  But you

6   can't ask for a motion to reconsider my ruling and point a

7   finger of blame at them for not responding to a discovery

8   request if I have already ruled on it saying it is not

9   relevant.  Just tell me if you think I'm wrong.  If you think

10  I'm wrong --

11       MR. SAMORE:  Well, I think that you are wrong, that

12  your order dealt with the issue of direct damages.

13       THE COURT:  All right.

14       MR. SAMORE:  And I defer to your Honor, but so far as

15  it dealt with direct damages, the order was erroneous.

16       THE COURT:  Because you didn't cite anything.  How

17  could I be wrong if you don't tell me any authority?  That

18  makes it really hard.

19       MR. SAMORE:  Because before the hearing, before the

20  hearing, there was a simple motion because they were seeking

21  consequential damages.

22       THE COURT:  Right.

23       MR. SAMORE:  Revenues clearly would be relevant to

24  consequential damages.  At the hearing, they announced that

25  they are not seeking consequential damages.

1          THE COURT:  Look, it is not set for presentment.  Do

2     you want to file a written response?

3          MR. HOLEVAS:  Your Honor --

4          THE COURT:  So that's why -- I remember I looked at

5     it, I read it, and I went, "Huh, there is no response," and I

6     looked at it, and I went "This smells like a motion to

7     reconsider, gussied up as a motion to compel."

8          MR. HOLEVAS:  Precisely, and that's why we did not

9     file a response because we needed to have some clarification.

10         THE COURT:  Well, there was no presentment.

11         MR. HOLEVAS:  Your Honor, with all due respect, I

12    think you have already dealt with this issue.  Counsel has

13    alluded to, and I think his co-colleague said, death by a

14    thousand cuts.  Why are we going back now and retreading

15    damage issues that you have already dealt with back in August?

16    There is a lot of work that both parties need to do here, and

17    I would submit to you that the transactional costs involved

18    and the court's time to readdress a motion that you have

19    already decided on is not in the best interest of anyone.

20         So if they want to withdraw it without prejudice, and

21    if it becomes an issue at some later date, perhaps.  But at

22    this stage right now, to go back and rework this issue that

23    you have already decided, without any additional new

24    authority, I just don't understand why we would be required to

25    do that.

1          THE COURT:  Okay.  Mr. Samore?

2          MR. SAMORE:  Yes.  Okay.  I think when a party amends

3    their pleading at the hearing, in which you base your ruling

4    on, to withdraw the claim, that they have changed the color.

5    We are responding to their claim now with respect to direct

6    damages.  Before we were responding to consequential damages.

7    This is directly relevant.  There is no dispute, I don't hear

8    anything from either your Honor or from Plaintiffs, that the

9    revenue that an asset produces is relevant to its value.

10          We have produced an affidavit, a detailed affidavit,

11    from a putative class member that talked about the importance

12    of this.  We have produced a CPA affidavit talking about an

13    asset cannot be viewed in a vacuum.  It has to be viewed by

14    the revenue that it produces.

15          We certainly -- if you believe it is a motion to

16    reconsider, we will style it as a motion to reconsider.  We

17    will file a motion to reconsider, but I would like this -- I

18    would like a ruling clearly and squarely on this issue.

19          THE COURT:  I have ruled clearly and squarely on this

20    issue a long time ago.  We have got a procedure.  Look, you

21    can file motions to reconsider.  I don't have any real hard

22    statistics, but motions to reconsider, generally not granted.

23    They can be.  I mean, we all make mistakes, and I have

24    reconsidered things, but they are generally not granted.

25          One of the great things about the system we have here

1    is if you don't like something I do, Judge Kapala loves

2    getting objections, and you can file an objection, and he can

3    tell me I'm wrong.

4         MR. SAMORE:  Okay.  We will be happy to do that,

5    then, your Honor.

6         THE COURT:  So you blew your 14 days on that, so I

7    don't know how happy you are.

8         MR. SAMORE:  This has changed the case complexion.

9    Your Honor has allowed them --

10         THE COURT:  If you want to file a motion to

11    reconsider, file a motion to reconsider, but this is a motion

12    to compel the Plaintiffs to do something that they are under

13    no burden to do.

14         MR. SAMORE:  I will be happy to do that.  I will be

15    happy to do that.

16         THE COURT:  We have got different standards.  We have

17    got -- okay, a motion to reconsider has a different standard

18    and Rule 37 has a different standard.  It needs to be

19    presented, and it needs to be put forward to the court in the

20    proper procedural light, because where you start often

21    determines where you end, okay?

22         MR. SAMORE:  Okay.

23         THE COURT:  So I will deny it without prejudice.

24         MR. SAMORE:  Okay.  And what we will do is we will

25    file this the way it is or in the alternative for a motion to

1    reconsider.  I don't think the issue is the same.

2         THE COURT:  No, here is what I'm going to do:  I'm

3    denying this without prejudice.  You can do whatever you want

4    to do, okay?

5         MR. HOLEVAS:  Thank you, your Honor.

6         MR. BRUCE:  Thank you.

7         MR. GRAVINO:  Thank you, Judge.

8              (Which were all the proceedings heard.)

9                        CERTIFICATE

10     I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12   */s/ Heather M. Perkins-Reiva*          *April 17, 2017*

13   _____        _____
     Heather M. Perkins-Reiva                    Date
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25