# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| RITACCA COSMETIC SURGERY AND MED SPA, Ltd. an Illinois LLC, BLACK ALSATIANS, LLC d/b/a PIGMENT DEMOGRAPHICS AND LASER REMOVAL, a Texas LLC, SAXON HATCHETT, DR. THOMAS BURKE, BURKE DERMATOLOGY, P.A., DR. ISABEL BANUCHI, BANUCCI INSTITUTE, SYNERGY MEDICAL SPECIALISTS, P.C., DR. STEPHEN SNYDER, DERMATOLOGY LASER CENTER & MEDISPA, THE FACIAL SURGERY CENTER and ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CYNOSURE, Inc., a Delaware Corporation, | ) ) |
| Defendants. | ) |

Case No. 3:15-cv-50148

## SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Ritacca Cosmetic Surgery and Med Spa, Ltd., Black Alsatians, LLC d/b/a

Pigment Demographics and Laser Removal, Saxon Hatchett, Dr. Thomas Burke, Burke

Dermatology, P.A., Dr. Isabel Banuchi, Banucci Institute, Synergy Medical Specialists, P.C., Dr.

Stephen Snyder, Dermatology Laser Center & MediSpa and The Facial Surgery Center bring this

Class Action Complaint against Defendant Cynosure, Inc. based upon false and misleading

representations and omissions of material fact made to Plaintiffs and similarly situated others

regarding the PicoSure Picosecond Aesthetic Workstation. Plaintiffs, for their Third Amended

Class Action Complaint, allege, hypothetically and in the alternative, the following based upon

personal knowledge as to what occurred to the Plaintiffs and their own acts and experiences, and

as to all other matters upon information and belief, including investigation conducted by its

attorneys.

## Index of Counts

Count I-        Negligent Misrepresentation
Count II-       Fraudulent/Intentional Misrepresentation
Count III-      Fraud by Omission
Count IV-       Breach of Contract/ Breach of Express Warranties Under the UCC
Count V-        Violation of the Illinois Consumer Fraud Act 815 ICLS 5/512
Count VI-       Violation of Delaware Consumer Fraud Act
Count VII-      Violation of California False Advertising Laws Cal. Business and Professions
                Code § 17500, *et. seq*.
Count VIII-     Violation of the California Unfair Competition Act Cal. Business & Professions
                Code § 17200, *et. seq*.
Count IX-       Deceit Under California Civil Code § 1710
Count X-        Deceit Under the Pennsylvania Unfair Trade Practices and Consumer Protection
                Law

### Nature of the Case

1.      On and prior to November 2013 and thereafter, Cynosure, Inc. (hereinafter
"Cynosure") advertised and sold the PicoSure Picosecond Aesthetic Workstation (hereinafter the
"PicoSure product") worldwide. The advertised purpose of the PicoSure product was to
eliminate tattoos of all colors through the use of new laser technology.

2.      In the fourth quarter of 2012, the PicoSure product received FDA "clearance" for
the removal of tattoos which was set forth in Cynosure's 10-27-14 News Release re: Expanded
FDA Clearance to Market PicoSure for Acne.

3.      On and after the fourth quarter of 2012, Cynosure made numerous representations
to dermatology practices, including Plaintiffs, and to the public regarding the ability of the
PicoSure product to remove and eliminate recalcitrant tattoos of all colors.  Those
representations were disseminated through a variety of means including web-based marketing,
color brochures with pictures, flyers, press releases, the operator's manual and the clinical
reference guide for the PicoSure product.

2

4.      At no time did Cynosure inform the public, potential customers, customers and/or users of the PicoSure product of the fact that the PicoSure product *did not eliminate* tattoos as it represented; Cynosure instead affirmatively concealed the fact that the product did not eliminate tattoos as represented.

**Parties**

5.      Ritacca Cosmetic Surgery and Med Spa, Ltd. is a Cosmetic Surgery Practice located at 230 Center Drive, Vernon Hills, Illinois.  Ritacca Cosmetic Surgery and Med Spa, Ltd. is a licensed Illinois corporation.

6.      Black Alsatians, LLC d/b/a Pigment Demographics and Laser Removal is located at 12233 Rand Road, 620 N#111, Austin, TX hereinafter "Pigment Removal".  Black Alsatians, LLC is a licensed LLC in the State of Texas.  Pigment Removal was a for-profit business which sold services for tattoo treatment.  Saxon Hatchett entered into the contract with Cynosure to purchase the PicoSure machine.

7.      Dr. Thomas Burke and Burke Dermatology, P.A. has several locations in Delaware including 18947 John J. Williams Highway, Suite 306, Rehobath, Delaware, 19971, hereinafter "Burke Dermatology."  Burke Dermatology, PA is a professional association licensed in the State of Delaware.

8.      Dr. Isabel Banuchi and the Banucci Institute is located at 302 Domeneh Street, San Juan, Puerto Rico.  The Banucci Institute is a licensed LLC in Puerto Rico.  The Banucci Institute was a for-profit business which sold services for tattoo treatment.

9.      Synergy Medical Specialists, P.C. is located at 3142 Vista Way #207, Oceanside, CA 92056.  Synergy Pain Specialists is a licensed LLC in the State of California.  Synergy Medical Specialists was a for-profit business which sold services for tattoo treatment.

10.     Dr. Stephen Snyder and Dermatology Laser Center & MediSpa is located at 10220 South Dolfield Route, Suite #110, Owings Mills, MD. Dermatology Laser Center & MediSpa is a licensed LLC in the State of Maryland. Dermatology Laser Center & MediSpa was a for-profit business which sold services for tattoo treatment.

11.     The Facial Surgery Center is located at 6545 Route 819, Mt. Pleasant, PA. The Facial Surgery Center is a licensed LLC in the State of Pennsylvania. The Facial Surgery Center was a for-profit business which sold services for tattoo treatment.

12.     Defendant Cynosure is a corporation incorporated and existing under the law of Delaware with its principal place of business located at 5 Carlisle Road, Westfield Massachusetts. Defendant Cynosure does significant business in the Northern District of Illinois, including in the Western Division, as wells as nationwide and worldwide.

**Jurisdiction and Venue**

13.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. Section 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, (c) over 100 Pisosecond Workstations were sold nationwide and (d) none of the exceptions under that subsection apply to this action.

14.     The court has personal jurisdiction over this action and venue is proper in the Northern District, under 28 U.S.C. Section 1391 because one plaintiff, Dr. Daniel Ritacca, resides and is located in the Northern District of Illinois.

**Facts Common To All Counts**

A. **Cynosure's deceptive and fraudulent practices to sell its tattoo "removal" machine which does not remove tattoos**

15.     Cynosure is a corporation which specializes, in part, in the marketing and sale of medical devices including in the field of dermatology.

16.     On and after January 1, 2013, Cynosure engaged in an aggressive marketing campaign to sell Cynosure's PicoSure product.  Cynosure advertised its tattoo removal machine as new technology that would remove or eliminate tattoos of all colors.  This product was priced substantially higher than existing machines in the market.  To effectuate this campaign and its ability to obtain a substantially higher price for this product compared to existing machines in the market, Cynosure made representations that its product would remove and eliminate tattoos of all colors in written advertisements, flyers, brochures, product inserts, press releases and public statements.

17.     On and after January 1, 2013, Cynosure utilized numerous advertisements including brochures which depicted multi-colored tattoos which were completely "removed".  Many of these tattoos depicted by Cynosure were not tattoos at all, but were pictures of tattoos that were *photoshopped* on to pictures of models.  The tattoos in the advertisements never existed.

18.     At no time did the PicoSure product have the ability to remove or eliminate tattoos as represented.  What Cynosure represented about its PicoSure product in its advertisements and marketing was untrue and misleading.

19.     On and after January 1, 2013, Cynosure made a number of express written statements of fact and/or promises to potential buyers that the PicoSure Product would remove

5

or eliminate tattoos of all colors.

20.     On and after January 1, 2013, Cynosure made the following representations, affirmations of fact, and/or promises regarding what the Cynosure PicoSure product would do. Those representations by Cynosure were material for Plaintiffs and class members in deciding to purchase or lease the PicoSure product and Plaintiffs and class members relied upon those representations in purchasing or leasing the PicoSure product. The following representations by Cynosure regarding the PicoSure product formed part of the basis of the bargain for Plaintiffs and class members to purchase or lease the PicoSure product:

a.      Cynosure distributed the advertisement attached as Exhibit A in written form and on the web which represents the complete removal of a multicolored tattoo;

b.      Cynosure distributed the flyer attached as Exhibit B which stated in pertinent part, in reference to the "PicoSure Picosecond workstation", "Removing tattoos just got faster", "multi-colored tattoos", "black tattoos", "previously treated tattoos";

c.      Cynosure stated in written flyers, brochures and on the web that the PicoSure product "removes recalcitrant tattoos and difficult colors including blue and green inks"; (Exhibit B)

d.      Cynosure distributed the flyer attached as Exhibit C in written form and on the web which stated, "Breakthrough Tattoo Removal with PicoSure,", *"Erase unwanted tattoos* with PicoSure the most advanced laser treatment available for safe and effective *tattoo removal.* PicoSure targets unwanted ink more effectively than ever before, *successfully removing* difficult ink colors such as blues and greens, as well as previously treated tattoos. Fewer treatments, faster recovery time and greater results are achievable with PicoSure's groundbreaking Picosecond technology"; (emphasis added)

e.      In the PicoSure Product Operator's Manual Chapter 8, p. 49 Cynosure stated: "The PicoSure workstation is indicated for tattoo and benign pigmented  lesion  *removal*"; (emphasis added)

f.      In the PicoSure Product Operator's Manual Chapter 8, p. 49 stated: "532- mm wavelength- The PicoSure 532 mm delivery system for *tattoo*

6

*removal* in skin Types I-II"; (emphasis added)

g.    Cynosure stated in the Clinical Reference Guide at page 4 of 30, "PicoSure technology combines a dual approach when treating a photothermal process and a photomechanical impact based on ultra-short pulse duration. This combination of photothermolysis and intense photomechanical impact known as Press Wave *breaks up the target*, e.g. ink or targeted pigment, into particles that are *easily eliminated from the body*";

h.    Cynosure stated in the Clinical Reference Guide at page 5 of 30, "Targeting Tattoos: The basis of laser treatment for the *removal of tattoos* is the destruction of ink particles by absorption of laser energy without damaging surrounding tissue", "Wavelength: The PicoSure, however, will *effectively treat* both epidermal and dermal lesions."

I.    Cynosure stated on its website that the Picosure product provides "all color tattoo removal". (Exhibit G)

21.    Cynosure did not provide any information or make any disclosure in any of the aforementioned express representations that would dispel the consumers' beliefs about Cynosure's deception that the Picosure would eliminate all tattoo colors.

22.    Cynosure did not qualify or limit any of the aforementioned express affirmative statements of fact.

23.    In those circumstances in which Cynosure utilized photoshopped tattoos to advertise the PicoSure product, Cynosure did not disclose to the purchaser or prospective purchaser that the picture was not a real tattoo.

24.    Each of the above representations were promises or guarantees by Cynosure to prospective buyers that the PicoSure Product would remove and eliminate tattoos of all colors. They are specific and pointed representations of what the PicoSure Product was capable of.

25.    None of the aforementioned express representations contained *any* disclaimer that the PicoSure Product would not remove or eliminate tattoos of all colors.

26.    Cynosure used photographs and YouTube video clips in its marketing materials to demonstrate the purported efficacy and purported results of the PicoSure product in removing tattoos.

27.    Cynosure directly markets and advertises its products, including the PicoSure product, through websites, YouTube video clips, marketing materials, brochures and representations made by Cynosure sales representatives that call on dermatology clinics and other clinics across the United States.  These prospective consumers relied on and purchased the PicoSure product based upon these false representations.  Substantial evidence exists that Cynosure employed a policy to intentionally misrepresent to consumers that the PicoSure product would remove tattoos.

28.    Cynosure intended for its false representations regarding the ability of the PicoSure product to remove and eliminate tattoos to induce Plaintiffs and the class members to purchase the PicoSure product.

29.    Cynosure knew that its representations regarding the ability of the PicoSure product to remove and eliminate tattoos were false.

30.    Cynosure's representations regarding the ability of the PicoSure product to remove and eliminate tattoos were likely to induce a reasonable purchaser to purchase the PicoSure product.

31.    Cynosure knew that its representations regarding the ability of the PicoSure product to remove and eliminate tattoos were likely to induce Plaintiffs and the class members to purchase the PicoSure product.

32.    Cynosure's representations regarding the ability of the PicoSure product to

8

remove and eliminate tattoos induced the Plaintiffs and the class members to purchase or lease the PicoSure product.

33. At the time of and after the sales or lease of the PicoSure product to the Plaintiffs and the class members, Cynosure was aware of the fact that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.

34. After the sales of the PicoSure product to the Plaintiffs and the class members, Plaintiffs and class members notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.

35. By selling the PicoSure Product under the premise that it would eliminate and remove tattoos when it would not, the conduct of Cynosure offended public policy, was unscrupulous and substantially injurious to consumers who purchased or operated the product on patients.

36. Each of the aforementioned express representations and others by Cynosure that the PicoSure Product would remove or eliminate tattoos was a statement of fact as the present capability of the product.

37. The deceptive conduct of Cynosure was not only exceptionally egregious, but it was designed to entice dermatology clinics and tattoo parlors to purchase Cynosure's product at a cost substantially higher than existing tattoo machines in the market.

**B.**     **Cynosure sales of the PicoSure Product**

38.     As to each PicoSure product that was sold or leased to the customer, Cynosure presented the customer with a Customer Purchase Agreement.  An example of the Customer Purchase Agreement is attached as Exhibit D.  Under the heading "PRODUCT DESCRIPTION", The Customer Purchase Agreement referred to and contained the following as being provided to the customer with the "PicoSure Picosecond Aesthetic Workstation" "Marketing Package: Business Marketing Package including a manual, DVD, patient brochures and table tent.  Electronic support for posters, ad slicks, postcards, before and after photos, web graphics and customizable materials online".

39.     The marketing materials referred to and contained in the "PRODUCT DESCRIPTION" were expressly made a part of the Customer Purchase Agreement between Cynosure and its customer, and were sold to the customer by Cynosure as part of the purchase of the PicoSure product.

40.     The marketing materials referred to and contained in the "PRODUCT DESCRIPTION" and  sold to the customer by Cynosure as part of the purchase of the PicoSure product contained representations and promises that the PicoSure product would *inter alia* "remove" and "eliminate" tattoos.

41.     Cynosure made no disclaimers to the prospective customers or customers that its PicoSure product would not eliminate or remove tattoos as Cynosure had falsely represented or that results may vary from those portrayed in advertising materials, flyers or pictorials.

42.     The Customer Service Agreement, including the written documents referred to and contained in the "PRODUCT DESCRIPTION" and sold to the customer by Cynosure as

part of the purchase of the PicoSure product, does not contain any disclosure to the customer that the PicoSure product would not remove or eliminate tattoos as represented by Cynosure. To the contrary, the brochures and other materials referred to and contained in the "PRODUCT DESCRIPTION" and sold to the customer by Cynosure as part of the purchase of the PicoSure product contained material false representations about the product which went to the heart of the reason why the consumers bought this particular machine.

**C.     The PicoSure Product does not and has never been able to perform as represented by Cynosure**

43.     The PicoSure Product does not, nor has it ever been able to, remove or eliminate tattoos of all colors.

44.     The PicoSure product does not, nor has it ever been able to remove or eliminate recalcitrant tattoos of all colors.

45.     The PicoSure Product does not, and has never been able to, "successfully remove difficult ink colors."

46.     The PicoSure Product does not, and has never been able to, remove multi-colored tattoos, and does not, and has never been able to provide "all color tattoo removal".

47.     Individuals, clinics and tattoo treatment facilities who purchased or leased the PicoSure Product and utilized the PicoSure product as recommended by Cynosure have been unable to remove or eliminate tattoos of its customers and patients.

**D.     Cynosure was in the business of supplying information**

48.     Cynosure was in the business of supplying information regarding the application and effectiveness of its PicoSure Product to dermatology and other tattoo clinics.

11

49.     The information Cynosure supplied to the clinics was intended by Cynosure to be used for guidance by the clinics in their business dealings with their patients and customers.

50.     Cynosure provided detailed, written information and photographs in the form of marketing materials to clinics stating that the PicoSure product would eliminate and remove tattoos.  The clinics would in turn provide that information to its patients and customers in the course of their business dealings.  Specifically, the clinics would pass along the glossy brochures that Cynosure gave them concerning the PicoSure Product.  In fact, it was the specific intent of Cynosure that these clinics would promote the PicoSure product and distribute the Cynosure flyers in the clinics to increase the sales and use of the PicoSure product.

51.     The information supplied by Cynosure to the clinics regarding the PicoSure product was used as guidance by the clinics to discuss the PicoSure product with its patients and customers.

52.     The information supplied by Cynosure to the clinics which the clinics passed along to their patients and customers was false and untrue and was intended by Cynosure to increase the profits of Cynosure.

**Class Representatives**

**A.     Facts relating to Plaintiff Ritacca Cosmetic Surgery and Med Spa**

53.     Prior to purchasing the PicoSure Product, Ritacca Cosmetic Surgery and Med Spa saw, heard, read and relied upon the express representations and promises from Cynosure that the PicoSure Product would eliminate and remove tattoos in making the decision to purchase the PicoSure Product.

12

54.     The belief that the PicoSure Product would in fact remove and eliminate tattoos was a material aspect of why Ritacca Cosmetic Surgery and Med Spa bought the machine and formed a part of the basis of the bargain.

55.     Plaintiff, Ritacca Cosmetic Surgery and Med Spa, purchased the PicoSure Product on May 18, 2013 pursuant to a written contract with Cynosure, Inc. (Attached as Exhibit E is the contract plaintiff Ritacca entered into with Cynosure.)

56.     Pursuant to the express contract terms referred to and contained in the "PRODUCT DESCRIPTION" and as part of the PicoSure product sold to Plaintiff, Cynosure provided Plaintiff a number of items as a part of the Customer Purchase Agreement describing the product including, but not limited to: manuals, DVD, patient brochures and table tents, electronic support for posters, ad slicks, postcards, "before and after" photos (of purported patients), web graphics, and customizable materials on-line.  As stated earlier, these promotional materials were replete with simple factual assertions that the machine would remove and eliminate tattoos.

57.     Plaintiff Ritacca Cosmetic Surgery and Med Spa purchased and continued to use the PicoSure product because of the false representations and inducement which it received from Cynosure about the PicoSure product, before purchasing the product. Specifically, Plaintiff purchased the product because of Cynosure's false representation that the PicoSure product removes and eliminates tattoos. At all times relevant, the Plaintiff relied upon the deceptive advertising practices to purchase and use the PicoSure product, and to market the PicoSure product to its customers.  Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

13

58.    The contract signed by the Plaintiff concerning the purchase of the PicoSure product specifically states: "Cynosure grants no right of return".  As such, according to the contract, the Plaintiff had no right at any time to return the product.

59.    At the time it purchased the PicoSure product, Ritacca Cosmetic Surgery and Med Spa entered into a business to consumer relationship with Cynosure.

60.    After Plaintiff purchased the product and administered the treatment as directed to numerous patients, none of the patient's tattoos were removed or eliminated, contrary to Cynosure's representations and promises.  The fact that the tattoos were not removed or eliminated is an objective fact and not subjective.

61.    The PicoSure Product did not work as the plaintiff expected or as Cynsoure had represented and promised.

62.    After purchasing the PicoSure product, plaintiff had numerous questions and eventual concerns about the efficacy and safety of the product.  As a result, plaintiff and its staff raised these questions and concerns on numerous occasions with representatives of Cynosure over the telephone and in person.  Specifically, plaintiff notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.  Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

63.    Before, during and after the purchase of the PicoSure product, Cynosure representatives made numerous false representations and promises to plaintiff regarding the PicoSure product's ability to eliminate and remove tattoos in the form of webpages, flyers, brochures, pamphlets, owner's manual and clinical reference guide.

14

64.     The PicoSure product which the plaintiff purchased does not, nor has it ever, removed or eliminated tattoos.

65.     Had the Plaintiff known that the PicoSure product does not remove or eliminate tattoos at represented and promised by Cynosure, the plaintiff would have purchased a much cheaper tattoo lightening machine.

66.     The value of the PicoSure Product which Plaintiff purchased is worth dramatically less than what the plaintiff paid for it and from the machine as represented and promised by Cynosure.

67.     The PicoSure product purchased by the Plaintiff has diminished in value because of Cynosure's intentional misrepresentation.

68.     Plaintiff was injured and lost money in the following respects:

        a.      the fee paid to purchase the PicoSure product;

        b.      by paying more for the product than plaintiff would have paid, had it known that the PicoSure product did not remove tattoos; and

        c.      by paying for a purported tattoo removal machine that did not remove tattoos.

**B.      Facts Relating to Plaintiff Pigment Demographics and Laser Removal**

69.     Prior to purchasing the PicoSure Product, Pigment Demographics and Laser Removal saw, heard, read and relied upon the express representations and promises from Cynosure that the PicoSure Product would eliminate and remove tattoos in making its decision to purchase the product.

70.     The belief that the PicoSure product would in fact remove and eliminate tattoos was a material aspect of why Pigment Demographics and Laser Removal bought the machine and formed a part of the basis of the bargain.

15

71.     Plaintiffs, Saxon Hatchett on behalf of his business, Pigment Demographics and Laser Removal, purchased a PicoSure Product on October 22, 2014 pursuant to a written contract with Cynosure, Inc. (Attached as Exhibit F is the contract plaintiff Pigment Dermatology entered into with Cynosure.)

72.     Pursuant to the express contract terms referred to and contained in the "PRODUCT DESCRIPTION" and as part of the PicoSure product sold to Plaintiffs, Cynosure provided Plaintiffs a number of items as a part of the Customer Purchase Agreement describing the product including, but not limited to: manuals, DVD, patient brochures and table tents, electronic support for posters, ad slicks, postcards, "before and after" photos (of purported patients), web graphics, and customizable materials on-line.  As stated earlier, these promotional materials were replete with simple factual assertions that the machine would remove and eliminate tattoos.

73.     Plaintiff Pigment Tattoo Removal purchased and continued to use the PicoSure product because of the false representations and inducement which it received from Cynosure about the PicoSure product, before purchasing the product.  Specifically, Plaintiff purchased the product because of Cynosure's false representation that the PicoSure product removes and eliminates tattoos. At all times relevant, the Plaintiff relied upon the deceptive advertising practices to purchase and use the PicoSure product, and to market the PicoSure product to its customers.

74.     The contract signed by the plaintiff concerning the purchase of the PicoSure product specifically states: "Cynosure grants no right of return".  As such, according to the contract, the plaintiff had no right at any time to return the product.

75.     At the time Plaintiff purchased the PicoSure product, Pigment Removal entered into a business to consumer relationship with Cynosure.

76.     After Plaintiff purchased the product and administered the treatment as Cynosure recommended to numerous patients, none of the patient's tattoos were removed or eliminated, contrary to Cynosure's representations and promises.  The fact that the tattoos were not removed or eliminated is an objective fact and not subjective.

77.     The PicoSure Product did not work as the plaintiff expected or Cynosure had represented and promised.

78.     After purchasing the PicoSure product, plaintiff had numerous questions and eventual concerns about the efficacy and safety of the product.  As a result, plaintiff and its staff raised these questions and concerns on numerous occasions with representatives of Cynosure over the telephone and in person.  Specifically, plaintiff notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.  Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

79.     Before, during and after the purchase of the PicoSure product, Cynosure representatives made numerous false representations and promises to plaintiff regarding the PicoSure product's ability to remove and eliminate tattoos.

80.     The PicoSure product which the Plaintiff bought does not, nor has it ever, removed or eliminated tattoos.

81.     Had the Plaintiff known that the PicoSure product does not remove or eliminate tattoos as represented and promised by Cynosure, the plaintiff would have purchased a much cheaper tattoo lightening machine.

82.     The value of the PicoSure Product which Plaintiff purchased is worth dramatically less than what the plaintiff paid for it and from the machine as represented and promised by Cynosure.

17

83.     The PicoSure product purchased by the plaintiff has diminished in value because it does not remove or eliminate tattoos as represented and promised by Cynosure.

84.     Plaintiff was injured and lost money in the following respects:

    a.     the fee paid to purchase the PicoSure product;

    b.     by paying more for the product than plaintiff would have paid, had it known that the PicoSure product did not remove tattoos; and

    c.     by paying for a purported tattoo removal machine that did not remove tattoos.

**C.     Facts Relating to Plaintiffs Dr. Thomas Burke and Burke Dermatology, P.A.**

85.     Prior to entering into a purchase for the PicoSure Product, Dr. Thomas Burke and Burke Dermatology, P.A. saw, heard, read and relied upon the express representations and promises from Cynosure that the PicoSure Product would eliminate and remove tattoos.

86.     The belief that the PicoSure Product would in fact remove and eliminate tattoos was a material aspect of why Dr. Thomas Burke and Burke Dermatology, P.A. purchased the PicoSure Product and formed a part of the basis of the bargain.  (Attached as Exhibit H is the contract entered into between plaintiff and Cynosure)

87.     Pursuant to the express contract terms referred to and contained in the "PRODUCT DESCRIPTION" and as part of the PicoSure product to Plaintiffs Dr. Thomas Burke and Burke Dermatology, P.A., Cynosure provided Plaintiffs a number of items as a part of the Customer Lease Agreement describing the product including, but not limited to: manuals, DVD, patient brochures and table tents, electronic support for posters, ad slicks, postcards, "before and after" photos (of purported patients), web graphics, and customizable materials on-line.  As stated earlier, these promotional materials were replete with simple factual assertions that the machine would remove and eliminate tattoos.

88.     Plaintiffs, Dr. Thomas Burke and Burke Dermatology, P.A. purchased and continued to use the PicoSure product because of the false representations and inducement which it received by Cynosure about the PicoSure product, before and after leasing the product. Specifically, Plaintiffs purchased the product because of Cynosure's false representation that the PicoSure product removes and eliminates tattoos. At all times relevant, the Plaintiffs relied upon the deceptive advertising practices to lease and use the PicoSure product, and to market the PicoSure product to its customers.

89.     After purchasing the PicoSure product, Dr. Thomas Burke and Burke Dermatology, P.A. entered into a business to consumer relationship with Cynosure.

90.     After Plaintiffs purchased the PicoSure product and administered the treatment as Cynosure recommended to numerous patients, none of the patient's tattoos were removed or eliminated, contrary to Cynosure's representations and promises.  The fact that the tattoos were not removed or eliminated is objective and not subjective.

91.     The PicoSure Product did not work as the plaintiffs expected or as Cynosure represented and promised.

92.     After purchasing the PicoSure product, plaintiffs had numerous questions and eventual concerns about the efficacy and safety of the product.  As a result, plaintiffs and its staff raised these questions and concerns on numerous occasions with representatives of Cynosure over the telephone and in person.  Specifically, plaintiffs notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.  Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

93.     Before, during and after purchasing of the PicoSure product, Cynosure made numerous false representations and promises to plaintiffs regarding the PicoSure product's

ability to eliminate and remove tattoos in the form of webpages, flyers, brochures, owner's manual and clinical reference guide.

94. The PicoSure product which the Plaintiffs purchased does not, nor has it ever, removed or eliminated tattoos.

95. Had the Plaintiffs known that the PicoSure product does not remove or eliminate tattoos as represented and promised by CynoSure, the Plaintiffs would have purchased a cheaper machine.

96. The value of the PicoSure Product which the Plaintiffs leased is worth dramatically less than what the plaintiff purchased it for and from the machine as represented and promised by Cynosure.

97. The PicoSure product purchased by the Plaintiffs has diminished in value because it does not remove or eliminate tattoos as represented and promised by Cynosure.

98. Plaintiff was injured and lost money in the following respects:

    a.    the fee paid to purchase the PicoSure product;

    b.    by paying more for the purchase of the product than plaintiff would have paid, had it known that the PicoSure product did not remove tattoos; and

    c.    by purchasing a purported tattoo removal machine that did not remove tattoos as represented.

**D.    Facts Relating to Dr. Isabel Banuchi and the Banucci Institute**

99. Prior to entering into a purchase for the PicoSure Product, Dr. Isabel Banuchi and the Banucci Institute saw, heard, read and relied upon the express representations and promises from Cynosure that the PicoSure Product would eliminate and remove tattoos.

100. The belief that the PicoSure Product would in fact remove and eliminate tattoos was a material aspect of why Dr. Isabel Banuchi and the Banucci Institute purchased

the PicoSure Product and formed a part of the basis of the bargain.  (Attached as Exhibit I is the contract entered into between plaintiff and Cynosure)

101.    Pursuant to the express contract terms referred to and contained in the "PRODUCT DESCRIPTION" and as part of the PicoSure product to Plaintiffs Dr. Isabel Banuchi and the Banucci Institute, Cynosure provided Plaintiffs a number of items as a part of the Customer Lease Agreement describing the product including, but not limited to: manuals, DVD, patient brochures and table tents, electronic support for posters, ad slicks, postcards, "before and after" photos (of purported patients), web graphics, and customizable materials on-line.  As stated earlier, these promotional materials were replete with simple factual assertions that the machine would remove and eliminate tattoos.

102.    Plaintiffs, Dr. Isabel Banuchi and the Banucci Institute, purchased and continued to use the PicoSure product because of the false representations and inducement which it received by Cynosure about the PicoSure product, before and after leasing the product. Specifically, Plaintiffs purchased the product because of Cynosure's false representation that the PicoSure product removes and eliminates tattoos. At all times relevant, the Plaintiffs relied upon the deceptive advertising practices to lease and use the PicoSure product, and to market the PicoSure product to its customers.

103.    After purchasing the PicoSure product, Dr. Isabel Banuchi and the Banucci Institute entered into a business to consumer relationship with Cynosure.

104.    After Plaintiffs purchased the PicoSure product and administered the treatment as Cynosure recommended to numerous patients, none of the patient's tattoos were removed or eliminated, contrary to Cynosure's representations and promises.  The fact that the tattoos were not removed or eliminated is objective and not subjective.

105. The PicoSure Product did not work as the plaintiffs expected or as Cynosure represented and promised.

106. After purchasing the PicoSure product, plaintiffs had numerous questions and eventual concerns about the efficacy and safety of the product. As a result, plaintiffs and its staff raised these questions and concerns on numerous occasions with representatives of Cynosure over the telephone and in person. Specifically, plaintiffs notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos. Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

107. Before, during and after purchasing of the PicoSure product, Cynosure made numerous false representations and promises to plaintiffs regarding the PicoSure product's ability to eliminate and remove tattoos in the form of webpages, flyers, brochures, owner's manual and clinical reference guide.

108. The PicoSure product which the Plaintiffs purchased does not, nor has it ever, removed or eliminated tattoos.

109. Had the Plaintiffs known that the PicoSure product does not remove or eliminate tattoos as represented and promised by CynoSure, the Plaintiffs would have purchased a cheaper machine.

110. The value of the PicoSure Product which the Plaintiffs leased is worth dramatically less than what the plaintiff purchased it for and from the machine as represented and promised by Cynosure.

111. The PicoSure product purchased by the Plaintiffs has diminished in value because it does not remove or eliminate tattoos as represented and promised by Cynosure.

112. Plaintiff was injured and lost money in the following respects:

a. the fee paid to purchase the PicoSure product;

b. by paying more for the purchase of the product than plaintiff would have paid, had it known that the PicoSure product did not remove tattoos; and

c. by purchasing a purported tattoo removal machine that did not remove tattoos as represented.

**E. Facts Relating to Medical Synergy Specialists, PC**

113. Prior to entering into a purchase for the PicoSure Product, Medical Synergy Specialists, PC saw, heard, read and relied upon the express representations and promises from Cynosure that the PicoSure Product would eliminate and remove tattoos.

114. The belief that the PicoSure Product would in fact remove and eliminate tattoos was a material aspect of why Medical Synergy Specialists, PC purchased the PicoSure Product and formed a part of the basis of the bargain.  Upon information and belief,  Medical Synergy Specialists, PC entered into the same form contract as the other Plaintiffs. At this time, plaintiff is unable to locate the document.

115. Pursuant to the express contract terms referred to and contained in the "PRODUCT DESCRIPTION" and as part of the PicoSure product to  Medical Synergy Specialists, P.C., Cynosure provided Plaintiff a number of items as a part of the Customer Lease Agreement describing the product including, but not limited to: manuals, DVD, patient brochures and table tents, electronic support for posters, ad slicks, postcards, "before and after" photos (of purported patients), web graphics, and customizable materials on-line.  As stated earlier, these promotional materials were replete with simple factual assertions that the machine would remove and eliminate tattoos.

116. Plaintiff,  Medical Synergy Specialists, PC purchased and continued to use the PicoSure product because of the false representations and inducement which it received by Cynosure about the PicoSure product, before and after leasing the product.  Specifically,

Plaintiff purchased the product because of Cynosure's false representation that the PicoSure product removes and eliminates tattoos. At all times relevant, the Plaintiff relied upon the deceptive advertising practices to lease and use the PicoSure product, and to market the PicoSure product to its customers.

117.    After purchasing the PicoSure product,  Medical Synergy Specialists, PC entered into a business to consumer relationship with Cynosure.

118.    After Plaintiff purchased the PicoSure product and administered the treatment as Cynosure recommended to numerous patients, none of the patient's tattoos were removed or eliminated, contrary to Cynosure's representations and promises.  The fact that the tattoos were not removed or eliminated is objective and not subjective.

119.    The PicoSure Product did not work as the plaintiff expected or as Cynosure represented and promised.

120.    After purchasing the PicoSure product, plaintiff had numerous questions and eventual concerns about the efficacy and safety of the product.  As a result, plaintiff and its staff raised these questions and concerns on numerous occasions with representatives of Cynosure over the telephone and in person.  Specifically, plaintiff notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.  Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

121.    Before, during and after purchasing of the PicoSure product, Cynosure made numerous false representations and promises to plaintiff regarding the PicoSure product's ability to eliminate and remove tattoos in the form of webpages, flyers, brochures, owner's manual and clinical reference guide.

122.    The PicoSure product which the Plaintiff purchased does not, nor has it ever, removed or eliminated tattoos.

123.    Had the Plaintiff known that the PicoSure product does not remove or eliminate tattoos as represented and promised by CynoSure, the Plaintiff would have purchased a cheaper machine.

124.    The value of the PicoSure Product which the Plaintiff leased is worth dramatically less than what the plaintiff purchased it for and from the machine as represented and promised by Cynosure.

125.    The PicoSure product purchased by the Plaintiff has diminished in value because it does not remove or eliminate tattoos as represented and promised by Cynosure.

126.    Plaintiff was injured and lost money in the following respects:

   a.    the fee paid to purchase the PicoSure product;

   b.    by paying more for the purchase of the product than plaintiff would have paid, had it known that the PicoSure product did not remove tattoos; and

   c.    by purchasing a purported tattoo removal machine that did not remove tattoos as represented.

**F.    Facts Relating to Dr. Stephen Snyder and Dermatology Laser Center &MediSpa**

127.    Prior to entering into a purchase for the PicoSure Product, Dr. Stephen Snyder and Dermatology Laser Center & MediSpa saw, heard, read and relied upon the express representations and promises from Cynosure that the PicoSure Product would eliminate and remove tattoos.

128.    The belief that the PicoSure Product would in fact remove and eliminate tattoos was a material aspect of why Dr. Stephen Snyder and Dermatology Laser Center & MediSpa purchased the PicoSure Product and formed a part of the basis of the bargain.  Upon information and belief, Dermatology Laser Center & MediSpa entered into the same form

contract as the other Plaintiffs. (Attached as Exhibit J is the contract entered into between plaintiffs and Cynosure)

129.    Pursuant to the express contract terms referred to and contained in the "PRODUCT DESCRIPTION" and as part of the PicoSure product to Dr. Stephen Snyder and Dermatology Laser and MediSpa, Cynosure provided Plaintiffs a number of items as a part of the Customer Lease Agreement describing the product including, but not limited to: manuals, DVD, patient brochures and table tents, electronic support for posters, ad slicks, postcards, "before and after" photos (of purported patients), web graphics, and customizable materials on-line.  As stated earlier, these promotional materials were replete with simple factual assertions that themachine would remove and eliminate tattoos.

130.    Plaintiffs, Dr. Stephen Snyder and Dermatology Laser and MediSpa, purchased and continued to use the PicoSure product because of the false representations and inducement which it received by Cynosure about the PicoSure product, before and after leasing the product. Specifically, Plaintiffs purchased the product because of Cynosure's false representation that the PicoSure product removes and eliminates tattoos. At all times relevant, the Plaintiffs relied upon the deceptive advertising practices to lease and use the PicoSure product, and to market the PicoSure product to its customers.

131.    After purchasing the PicoSure product, Dr. Stephen Snyder and Dermatology Laser and MediSpa entered into a business to consumer relationship with Cynosure.

132.    After Plaintiffs purchased the PicoSure product and administered the treatment as Cynosure recommended to numerous patients, none of the patient's tattoos were removed or eliminated, contrary to Cynosure's representations and promises.  The fact that the tattoos were not removed or eliminated is objective and not subjective.

26

133.    The PicoSure Product did not work as the plaintiffs expected or as Cynosure represented and promised.

134.    After purchasing the PicoSure product, plaintiffs had numerous questions and eventual concerns about the efficacy and safety of the product.  As a result, plaintiffs and its staff raised these questions and concerns on numerous occasions with representatives of Cynosure over the telephone and in person.  Specifically, plaintiffs notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.  Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

135.    Before, during and after purchasing of the PicoSure product, Cynosure made numerous false representations and promises to plaintiffs regarding the PicoSure product's ability to eliminate and remove tattoos in the form of webpages, flyers, brochures, owner's manual and clinical reference guide.

136.    The PicoSure product which the Plaintiffs purchased does not, nor has it ever, removed or eliminated tattoos.

137.    Had the Plaintiffs known that the PicoSure product does not remove or eliminate tattoos as represented and promised by CynoSure, the Plaintiffs would have purchased a cheaper machine.

138.    The value of the PicoSure Product which the Plaintiffs leased is worth dramatically less than what the plaintiff purchased it for and from the machine as represented and promised by Cynosure.

139.    The PicoSure product purchased by the Plaintiffs has diminished in value because it does not remove or eliminate tattoos as represented and promised by Cynosure.

140.    Plaintiff was injured and lost money in the following respects:

27

a.    the fee paid to purchase the PicoSure product;

b.    by paying more for the purchase of the product than plaintiff would have paid, had it known that the PicoSure product did not remove tattoos; and

c.    by purchasing a purported tattoo removal machine that did not remove tattoos as represented.

**G.    Facts Relating to The Facial Surgery Center**

141.    Prior to entering into a purchase for the PicoSure Product, The Facial Surgery Center saw, heard, read and relied upon the express representations and promises from Cynosure that the PicoSure Product would eliminate and remove tattoos.

142.    The belief that the PicoSure Product would in fact remove and eliminate tattoos was a material aspect of why The Facial Surgery Center purchased the PicoSure Product and formed a part of the basis of the bargain.  Upon information and belief,  The Facial Surgery Center entered into the same form contract as the other Plaintiffs. (Attached as Exhibit K is the contract entered into between plaintiff and Cynosure)

143.    Pursuant to the express contract terms referred to and contained in the "PRODUCT DESCRIPTION" and as part of the PicoSure product to The Facial Surgery Center, Cynosure provided Plaintiff a number of items as a part of the Customer Lease Agreement describing the product including, but not limited to: manuals, DVD, patient brochures and table tents, electronic support for posters, ad slicks, postcards, "before and after" photos (of purported patients), web graphics, and customizable materials on-line.  As stated earlier, these promotional materials were replete with simple factual assertions that the machine would remove and eliminate tattoos.

144.    Plaintiff,  The Facial Surgery Center, purchased and continued to use the PicoSure product because of the false representations and inducement which it received by Cynosure about the PicoSure product, before and after leasing the product.  Specifically,

Plaintiff purchased the product because of Cynosure's false representation that the PicoSure product removes and eliminates tattoos. At all times relevant, the Plaintiff relied upon the deceptive advertising practices to lease and use the PicoSure product, and to market the PicoSure product to its customers.

145.    After purchasing the PicoSure product, The Facial Surgery Center entered into a business to consumer relationship with Cynosure.

146.    After Plaintiff purchased the PicoSure product and administered the treatment as Cynosure recommended to numerous patients, none of the patient's tattoos were removed or eliminated, contrary to Cynosure's representations and promises. The fact that the tattoos were not removed or eliminated is objective and not subjective.

147.    The PicoSure Product did not work as the plaintiff expected or as Cynosure represented and promised.

148.    After purchasing the PicoSure product, plaintiff had numerous questions and eventual concerns about the efficacy and safety of the product. As a result, plaintiff and its staff raised these questions and concerns on numerous occasions with representatives of Cynosure over the telephone and in person. Specifically, plaintiff notified Cynosure that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos. Following this notification, Cynosure did not provide a machine to the plaintiff that eliminated and removed tattoos.

149.    Before, during and after purchasing of the PicoSure product, Cynosure made numerous false representations and promises to plaintiff regarding the PicoSure product's ability to eliminate and remove tattoos in the form of webpages, flyers, brochures, owner's manual and clinical reference guide.

150.    The PicoSure product which the Plaintiff purchased does not, nor has it ever, removed or eliminated tattoos.

151.    Had the Plaintiff known that the PicoSure product does not remove or eliminate tattoos as represented and promised by CynoSure, the Plaintiff would have purchased a cheaper machine.

152.    The value of the PicoSure Product which the Plaintiff leased is worth dramatically less than what the plaintiff purchased it for and from the machine as represented and promised by Cynosure.

153.    The PicoSure product purchased by the Plaintiff has diminished in value because it does not remove or eliminate tattoos as represented and promised by Cynosure.

154.    Plaintiff was injured and lost money in the following respects:

      a.     the fee paid to purchase the PicoSure product;

      b.     by paying more for the purchase of the product than plaintiff would have paid, had it known that the PicoSure product did not remove tattoos; and

      c.     by purchasing a purported tattoo removal machine that did not remove tattoos as represented.

### III. Class Allegations

155.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of itself and a class of similarly situated individuals (the "Class") defined as follows:

      a.     All individuals and entities in the United States and the Territory of Puerto Rico, except those within the State of Louisiana, who purchased a PicoSure Picosecond Aesthestic Workstation.

Excluded from the Class are: (1) Defendant, its legal representatives, assigns, and successors, and any entity in which Defendant has a controlling interest, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3)

persons who execute and file a timely request for exclusion, (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, and (5) the legal representatives, successors, or assigns of any such excluded person.

156.    Plaintiff reserves the right to amend or modify the class definition with greater specificity or division into sub-classes after they have had an opportunity to conduct discovery.

157.    **Numerosity**: The exact number of Class members is unknown and not available to Plaintiff, but based upon the representations of Cynosure's counsel, over 450 class members throughout the country, making joinder of each individual member impracticable.  On information and belief, defendant has sold or leased over 50 units in Illinois. Ultimately, Class members can be identified through Defendant's records.

158.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Class, as the Plaintiffs and the other members sustained damages arising from Defendant's uniform wrongful conduct, based upon the same types of transactions that were made repeatedly with Plaintiffs and the members of the Class; and because Defendant sold or leased the PicoSure product to each member of the class for the same price, more or less.  Each member of the class suffered the same injury by purchasing or leasing the PicoSure product. The misrepresentations that Cynosure made to all customers are the same, namely that the PicoSure product would remove and eliminate tattoos, when in fact it would not.

159.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation, including class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

160.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class. All of the claims made by the class

arise out of the same act of the purchase or lease of the same product and same course of conduct, namely the misrepresentations that the PicoSure product would remove or eliminate tattoos.

161. Those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a. Whether Defendant intentionally or negligently misrepresented and/or concealed the fact that the PicoSure product does not remove or eliminate tattoos;

b. Whether Defendant's advertisement of the PicoSure product intentionally misled, or tended to mislead, consumers into believing that the PicoSure product removed and/or eliminated tattoos;

c. Whether Defendant's conduct in misrepresenting the capabilities of the PicoSure product constituted certain express warranties from Cynosure to the purchaser or lessor of the product

d. Whether the PicoSure product removes and eliminates tattoos as represented and promised by Defendant; and

e. Whether Defendant breached the contract it entered into with and the express warranties made to the purchasers of the PicoSure product.

162. **Superiority**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Cynosure's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to independently obtain effective relief from Cynosure's misconduct. Even if members of the Class could sustain such piece meal litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and

factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

163.    **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Cynosure has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Cynosure's fraudulent representations challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these misrepresentations hinges on Cynosure's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Cynosure has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class.

164.    Plaintiff reserves the right to revise the foregoing "Class Allegations" based on facts learned in discovery.[1]

---

[1]Plaintiff acknowledges the District Court Order dated August 17, 2016 dismissing Count I. Plaintiffs only include Counts I in the Second Amended Complaint to preserve the matter for appeal.

## Count I

## Negligent Misrepresentation

165.    Plaintiff incorporates by reference paragraphs 1-181 as if fully set forth

herein.

166.    Cynosure was in the business of supplying information to its purchasers of the

PicoSure product.

167.    Cynosure as a pattern and practice supplied information which were

misrepresentations to its purchaser of the PicoSure product for the express purpose that this

information would be used in the business dealings of the purchasers which they had with their

patients and customers.

168.    Cynosure, supplied web information, brochures, pamphlets directly and indirectly

to the purchasers of the PicoSure Product which advertised the PicoSure product and claimed

that it eliminated and removed tattoos.

169.    The information which Cynosure provided to the purchasers was intended to:

a.    guide its purchaser in dealing with patients, customers and potential patients and
customers;

b.    allow the purchasers of the PicoSure product to disseminate information about
how the PicoSure product purportedly worked and its alleged effectiveness; and

c.    increase the use and name recognition of the PicoSure product to drive up profits
for Cynosure.

170.    Providing the owner's manual and especially the marketing materials and

brochures to be displayed and distributed to clinics' prospective customers was central to the

business of the sale and use of the PicoSure Product.

171.    The representations made by Cynosure to the purchasers that the PicoSure

product would remove and eliminate tattoos were false statements of material facts.  Defendant

made further false statements of material facts that the PicoSure product would have the characteristic and benefit of being able to remove or eliminate tattoos with less treatments and less expense to the patients.

172. The representations were known to be false by Cynosure at the time that they were made. Specifically, the representations made by Cynosure that the PicoSure product would remove or eliminate tattoos was known at all times by Cynosure to be false.

173. Cynosure made the aforementioned representations with the intent that consumers would rely upon them to induce them to purchase the PicoSure product.

174. Cynosure's misrepresentations were such that reasonable consumers considered them in deciding whether to purchase Cynosure's PicoSure product. At all relevant times, Plaintiffs and the Class relied on these statements in purchasing the PicoSure product. Had Plaintiffs and the Class known of the PicoSure product's inability to remove or eliminate tattoos, they would not have purchased the PicoSure product or would have paid substantially less for it.

175. The PicoSure product provided by Cynosure, cannot eliminate or remove tattoos as represented, Cynosure's representations were false and misleading, and constitute negligent misrepresentations.

176. As a direct and proximate result of the aforesaid negligent misrepresentations, Plaintiffs and each class member have suffered actual harm in the form of economic damages.

177. As a direct and proximate result of Defendant's misconduct, Plaintiffs and the Class have suffered actual damages in the form of monies paid to purchase the PicoSure product, as well as the difference in value between a PicoSure product that Plaintiffs and the class received and one that truly eliminated tattoos.

## Count II

### Fraudulent/Intentional Misrepresentation

178.     Plaintiff incorporates by reference paragraph 1 through 181 as if fully set forth herein.

179.     Defendant made the aforementioned representations that the PicoSure product would eliminate and remove tattoos.

180.     Cynsoure knew that its statements regarding the PicoSure product were false and misleading on each and every instance that it made them.

181.     Cynosure made the aforesaid representations with the specific intent to induce consumers to purchase the PicoSure product.

182.     Plaintiffs and the class relied upon these false representations and as a result were induced to purchase a PicoSure product which did not function as Cynosure said

183.     Cynosure engaged in advertising and marketing to the public, and offered for sale the PicoSure product on a nationwide basis. Cynosure publicly represented and advertised that the PicoSure product would remove and/or eliminate tattoos. Defendant did so with the intent to induce Plaintiffs and the Class to purchase or lease the product and continue using the PicoSure product.

184.     Cynosure's advertising and marketing statements were and are untrue and misleading and likely to deceive members of the public in that they portrayed the existence of a technical ability to eliminate tattoos and benefit the patient, which Cynosure knew or should have known it was unwilling or unable to deliver.

185.     Cynosure's representations that the PicoSure product would eliminate patients' tattoos, when in fact it would not, is deceptive conduct that created confusion and misunderstanding for Plaintiffs and the Class.

36

186.     As a direct and proximate result of Cynosure's intentional misrepresentations, Plaintiff and each Class member have suffered harm in the form of monies paid to Defendant. Plaintiff, on behalf of itself and the Class, seeks an order (1) requiring Defendant to cease the unfair practices described herein; (2) awarding damages, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable; and/or (3) requiring Defendant to restore to Plaintiff and each Class member any money acquired by means of unfair competition/ deceptive conduct (restitution).

## Count III

## Fraud by Omission

187.    Plaintiff incorporates by reference paragraphs 1 through 181 as if fully set forth

herein.

188.    Based on Cynosure's misrepresentations and omissions, Plaintiffs and the Class

reasonably expected the PicoSure product to eliminate tattoos. This is a reasonable and

objective consumer expectation for Cynosure's tattoo removal product, the PicoSure product.

189.    Cynosure knew that the PicoSure product was unable to remove or eliminate

tattoos.

190.    Cynosure concealed from and failed to disclose to Plaintiffs and the Class

the inability of the PicoSure product to remove or eliminate tattoos.

191.    Cynosure was under a duty to Plaintiffs and the Class to disclose that the

PicoSure product did not eliminate tattoos as it represented, because:

a)    Cynosure was in a superior position to know the true state of facts about
      the inability of the PicoSure product to eliminate tattoos;

b)    Plaintiffs and the Class could not reasonably have been expected to learn or
      discover that Defendant PicoSure's product was unable to eliminate tattoos;

c)    Cynosure knew that Plaintiffs and the Class could not reasonably have been
      expected to learn or discover the inability of the PicoSure product to
      function as defendant represented;

d)    Cynosure directly marketed and communicated with Plaintiffs and the Class
      through its websites, and specifically engaged Plaintiffs and the Class for the
      purpose of inducing prospective customers to purchase the PicoSure product;
      and

e)    Cynosure's omissions made through its websites, emails and sales
      representations were meant to result in the sale of the PicoSure product.

192.    The facts concealed or not disclosed by Cynosure to Plaintiffs and the Class

are material in that a reasonable consumer would have considered them to be important in

deciding whether to purchase or lease the PicoSure product, whether to attempt return an already purchased PicoSure product for a refund (although not allowed), or whether to pay or lease a lesser price for it.

193.    Had Plaintiffs and the Class known of the PicoSure product's inability to eliminate tattoos, they would not have purchased the PicoSure product or would have paid substantially less for it.

194.    Plaintiffs and the Class justifiably relied on Cynosure's misrepresentations and omissions to their detriment by purchasing the PicoSure product and/or not paying a lesser price for it.

195.    As a direct and proximate result of Cynosure's misconduct, Plaintiffs and the Class have suffered actual damages in the form of monies paid to purchase the PicoSure product, as well as the difference in value between a PicoSure product and one that truly eliminated tattoos.

**Count IV**

**Breach of Contract- Breach of Express Warranties Under the Uniform Commercial Code**

196.    Plaintiff hereby incorporates paragraph 1 through 181 as if fully set forth herein.

197.    At all relevant times, every state in the United States and the Territory of Puerto Rico, except Louisiana, has adopted Article 2 of the Uniform Commercial Code concerning the sale of goods.

198.    Section 2-313 of the Uniform Commercial Code entitled, "Express Warranties by Affirmation, Promise, Description, Sample, states in relevant part, (a) "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of he bargain creates an express warranty that the good shall conform to the affirmation or

promise"; (b) any description of the goods which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description".

199.     Official Comments to Section 2-313 of the Uniform Commercial Code states in relevant part,

> "In actual practice, affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement".

> See Section 2-313 of the UCC, Official Comment 3

200.     At all relevant times, Official Comment 5 to Section 2-313 of the Uniform Commercial Code states in relevant part,

> "A description need not be by words.  Technical specifications, blueprints and the like can attach more exact description then mere language and if made part of the basis of the bargain goods must conform with them".

> See Section 2-313 of the UCC, Official Comment 5

201.     At all relevant times, the brochures and web page pictures which Cynosure aggressively market depicted complete removal of a tattoo and were "a part of the basis of the bargain" by which consumers purchased the PicoSure product.

202.     Cynosure made the following representations, affirmations of fact and/or promises to the Plaintiffs and class members that constituted express warranties pursuant to Section 2-313:

    a.     Cynosure distributed the advertisement attached as Exhibit A in written form and on the web which represents a total removal of a multicolored tattoo;

    b.     Cynosure distributed the flyer attached as Exhibit A which stated in pertinent part, in reference to the "PicoSure Picosecond workstation", "Removing tattoos just got faster", "multi-colored tattoos", "black tattoos", "previously treated tattoos";

c.     Cynosure stated in written flyers, brochures and on the web, that the PicoSure product "removes recalcitrant tattoos and difficult colors including blue and green inks"; (Exhibit B)

d.     Cynosure distributed the flyer attached as Exhibit C in written form and on the web which stated, "Breakthrough Tattoo Removal with PicoSure,", *"Erase unwanted tattoos* with PicoSure the most advanced laser treatment available for safe and effective *tattoo removal*. PicoSure targets unwanted ink more effectively than ever before *successfully removing* difficult ink colors such as blues and greens, successfully removing difficult ink colors, such as blues and greens, as well as previously treated tattoos. Fewer treatments, faster recovery time and greater results are achievable with PicoSure's groundbreaking Picosecond technology"; (emphasis added)

e.     In the PicoSure Product Operator's Manual Chapter 8, p. 49 Cynosure stated: "The PicoSure workstation is indicted for tattoo and benign pigmented lesion *removal*"; (emphasis added)

f.     In the PicoSure Product Operator's Manual Chapter 8, p. 49 stated: "532- mm wavelength- The PicoSure 532 mm delivery system for *tattoo removal* in skin Types I-II"; (emphasis added)

g.     Cynosure stated in the Clinical Reference Guide at page 4 of 30, "PicoSure technology combines a dual approach when treating a photothermal process and a photomechanical impact based on ultra-short pulse duration. This combination of photothermolysis and intense photomechanical impact known as Press Wave *breaks up the target*, e.g. ink or targeted pigment, into particles that are *easily eliminated from the body*";

h.     Cynosure stated in the Clinical Reference Guide at page 5 of 30, "Targeting Tattoos: The basis of laser treatment for the *removal of tattoos* is the destruction of ink particles by absorption of laser energy without damaging surrounding tissue", "Wavelength: The PicoSure, however, will *effectively treat* both epidermal and dermal lesions."

I.     Cynosure stated on its website that the Picosure product provides "all color tattoo removal".

203.     Cynosure breached each and every one of these express warranties. The PicoSure product did not remove or eliminate tattoos as represented and promised by Cynosure.

204.     Pursuant to the express contract terms referred to and contained on the face of the contracts Cynosure entered into with Plaintiffs and class members and as part of the PicoSure products sold to Plaintiffs and class members, Cynosure made express

warranties that the PicoSure product would remove and eliminate tattoos.

No disclaimer provided by Cynosure stated in any way that the PicoSure product would *not* remove and eliminate tattoos as represented and promised by Cynosure.

205.    Plaintiff's and the other Class members' PicoSure Picosecond Aesthetic Workstations did not perform as Cynosure represented and promised.

206.    Defendant breached the terms of the contract with Plaintiffs and other Class members by not providing PicoSure Picosecond Aesthetic Workstation with capabilities and functionality as represented and promised by Defendant.

207.    Each of the express warranties made by Cynosure were made to the lessees of the PicoSure Product just as they were made to the purchasers of the product.

208.    Cynosure's express warranties that the PicoSure product would remove and eliminate tattoos were material to Plaintiffs' and class members' decisions to purchase the PicoSure product.

209.    Plaintiffs and class members relied upon Cynosure's express warranties that the PicoSure product would remove and eliminate tattoos in purchasing the PicoSure product

210.    Cynosure's express warranties that the PicoSure product would remove and eliminate tattoos were a part of the basis of the bargain by which Plaintiffs and class members purchased the PicoSure product.

211.    At the time of and after the sales of the PicoSure product to the Plaintiffs and the class members, Cynosure was aware of the fact that the PicoSure product did not conform to Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.

212.    After the sales of the PicoSure product to the Plaintiffs and the class members, Plaintiffs and class members notified Cynosure that the PicoSure product did not conform to

Cynosure's representations and promises that the PicoSure product would remove and eliminate tattoos.

213. As the foreseeable and actual result of Cynosure's breach of contract and breach of express warranties, Plaintiffs and the other Class members suffered actual damage in an amount that they paid to purchase the PicoSure product, as well as the difference in value between a PicoSure product and a product that truly eliminated and removed tattoos.

**Count V**

**Violation of the Illinois Consumer Fraud Act 815 ILCS 505 *et. seq.***

214. Plaintiff hereby incorporates paragraph 1 through 181 as if fully set forth herein.

215. This cause of action is brought by Plaintiffs, Hartsough Dermatology and Ritacca Med Spa, pursuant to the Illinois Consumer Fraud Act, 815 ILCS 505/2 *et. seq* on behalf of all of the Illinois purchasers of the PicoSure Product.

216. Plaintiffs are "persons" able to avail themselves of the Illinois Consumer Fraud Act pursuant to 815 ILCS 505/1 ( c).

217. The PicoSure product is "merchandise" subject to the Illinois Consumer Fraud Act pursuant to 815 ICLS 505/1(b).

218. At all relevant times, Section 2 of the Illinois Consumer Fraud Act states in relevant part,

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade

Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act."

219.     At all relevant times, Cynosure violated and continues to violate the Illinois Consumer Fraud Act in transactions within the State of Illinois which were intended and did result in the sale of the PicoSure product by: representing that the PicoSure product would eliminate and remove tattoos which it does not and cannot do.

220.     As a direct and proximate result of the false and misleading misrepresentations, Plaintiffs and the class suffered actual damages in the amount they paid for or leased the PicoSure product.

Wherefore, Plaintiffs seek recovery under the Illinois Consumer Fraud Act.

## Count VI

## Delaware Consumer Fraud Act

221.     Plaintiff hereby incorporates paragraphs 1 - 181 as if fully set forth herein.

222.     This cause of action is brought by plaintiff, Burke Dermatology, P.A. pursuant to the Delaware Consumer Fraud Act, Del. Code Ann. Title 6, Chapter 25 on behalf of all Delaware purchasers.

223.     At all relevant times, plaintiff, Burke Dermatology, P.A. was a consumer for purpose of its purchase of the Cynosure PicoSure product.

224.     At all relevant times that Cynosure made false representations and false promises to Plaintiff and the class about PicoSure Product.

225.     At all relevant times, Cynosure intended Plaintiff and the class members to rely on the false misrepresentations and false promises.

226.     That plaintiff and the class members suffered actual damages due the false

representations made by Cynosure.

Wherefore, plaintiff seeks recovery under the Delaware Consumer Fraud Act.

**Count VII**

**Violation of the California False Advertising Law, Cal. Bus. & Prof.**

**Code §§ 17500 *et. seq.***

227.     Plaintiff hereby incorporates paragraphs 1 - 181 as if fully set forth

herein.

228.     This cause of action is brought by plaintiff, Synergy Medical Specialists, P.C.,

pursuant to the California False Advertising Law (hereinafter the "FAL"), on behalf of all

California purchasers.

229.     California's False Advertising Law (Bus. & Prof. Code §§ 17500 *et. seq.*),

states in relevant part that:

> It is unlawful * * * to make or disseminate or cause to be made or
> disseminated from this state before the public in any state, in * * * any
> advertising device, * * * or in any other manner or means whatever,
> including over the Internet, any statement, concerning that real or
> personal property or those services, professional or otherwise, or
> concerning any circumstance or matter of fact connected with the
> proposed performance or disposition thereof, which is untrue or
> misleading, and which is known, or which by the exercise of
> reasonable care should be known, to be untrue or misleading * * *.

230.     Defendant Cynosure committed acts of false advertising, in violation of and as

defined by the FAL, by using false and misleading statements, and material omissions, to

promote the sale of the Cynosure PicoSure product, as described above, and including but not

limited to, representing that the Cynosure PicoSure product would remove and eliminate

tattoos.

231.    Defendant Cynosure knew or should have known, through the exercise of reasonable care, that its statements were false, untrue, and misleading.

232.    At all relevant times Cynosures acts and omissions in violation of the FAL were false and misleading such that the general public is and was likely to be deceived.

233.    At all relevant times, Cynosure intended Plaintiff and the class members to rely on the false misrepresentations and false promises. Synergy Medical Specialists, P.C., did in fact rely on the aforesaid statements and was injured as a result.

234.    As a direct and proximate result of these acts and omissions, consumers have been and are being harmed. Plaintiff and the class members suffered actual damages due the false and misleading representations made by Cynosure.

Wherefore, plaintiff seeks recovery under the California False Advertising Law.

### Count VIII

### Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq.*

235.    Plaintiff hereby incorporates paragraphs 1 - 181 as if fully set forth herein.

236.    This cause of action is brought by plaintiff, Synergy Medical Specialists, P.C., pursuant to the California Unfair Competition Law (hereinafter the "UCL"), on behalf of all California purchasers.

237.    California's Unfair Competition Law (Bus. & Prof. Code §§ 17200 *et. seq.*),

> [D]oes not proscribe specific practices. Rather, as relevant here it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' Its coverage is 'sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.' By proscribing 'any unlawful' business practice, 'section 17200 borrows violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. *Cel-Tech Communications,*

46

*Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citations and internal quotation marks omitted).

238.     Virtually any law or regulation - federal, state, statutory, or common law - can serve as the basis for an independent violation of the UCL. *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1283 (2012).

239.     Defendant Cynosure violated the "unlawful prong" of the UCL by violating the FAL, state, and federal law as discussed herein. Cynosure's acts and omissions regarding its representations of the PicoSure product were done as an independent violation of the "unfair prong" of the UCL.

240.     Defendant Cynosure's acts and practices constitute "unfair" business acts and practices in that the harm caused by Cynosure's wrongful conduct outweighs any utility of such conduct, and that Defendant's conduct: (1) offends public policy; (2) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, and/or (3) has caused, and will continue to cause substantial injury to consumers, including Plaintiffs and the class.

241.     There were reasonable alternatives available to further Cynosure's legitimate business interest, including but not limited to, accurately representing the capabilities of the Cynosure PicoSure product, other than Cynosure's wrongful conduct and omissions described herein.

242.     The UCL also prohibits "fraudulent business act or practice." Cynosure's above described claims, nondisclosures, concealments, and misleading statements were false, misleading, and likely to deceive the consuming public, including Plaintiffs and the class, in violation of the UCL.

243.     As a direct and proximate result of Cynosure's above described wrongful actions, inactions, and violation of the UCL, Plaintiff and the class members suffered injury and actual damages due the false representations made by Cynosure because: (1) Plaintiffs and class members would not have purchased the PicoSure product or would not have paid as much had they known the true facts; (2) Plaintiffs and class members purchased the PicoSure product due to Cynosure's misrepresentations and omissions; and (3) the PicoSure product did not have the capabilities or value as promised and advertised.

Wherefore, plaintiff seeks recovery under the California Unfair Competition Law.

## Count IX

### Deceit Under California Civil Code § 1710

244.     Plaintiff hereby incorporates paragraphs 1 - 181 as if fully set forth herein.

245.     This cause of action is brought by plaintiff, Synergy Medical Specialists, P.C., pursuant to California Civil Code § 1710, on behalf of all California purchasers.

246.     Based on Defendant Cynosure's conduct as discussed above, Defendant has engaged in fraud and deceit as set forth in California Civil Code § 1710.

247.     At all relevant times, Defendant Cynosure made suggestions, assertions, and/or promises to plaintiff and the class, knowing them to be untrue, with no reasonable grounds to believe their truth, and with no intention for Cynosure or the PicoSure product to perform as promised.

248.     At all relevant times, Defendant Cynosure knowingly concealed the material

fact that the PicoSure product did not perform in the manner as it was advertised, suggested,

asserted, represented, and/or promised to Plaintiffs and the class members.

249.     Plaintiffs and the class members have reasonably relied on the material

misrepresentations and omissions made by Defendant Cynosure and have been injured as a

result.

250.     Plaintiffs and the class members suffered actual damages due the aforesaid

material misrepresentations and omissions made by Cynosure.

Wherefore, plaintiff seeks recovery under California Civil Code § 1710.

## Count X

### Deceit Under Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 P.S. §201-1-201.93

251.     Plaintiff hereby incorporates paragraphs 1-181 as fully set forth herein.

252.     This cause of action is brought on behalf of The Facial Surgery Center

pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law

(hereinafter UTPCPL) 73 P.S. §201-1-201.93 on behalf of all Pennsylvania purchasers of the

Picosure product.

253.      Plaintiff is a "person" pursuant to Section 201-2(2) of the Act.

254.     The Picosure product is a personal property and/or thing of value pursuant to

201-2(3) of the Act.

255.     At all relevant times the UTPCPL defines deceptive act or practice in Section 201-2(4) including:

> (v)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
>
> (ix)    Advertising goods or services with intent not to sell them as advertised;
>
> (xiv)   Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made.
>
> (xxi)   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

256.     At all relevant times, Cynosure violated and continues to violate the UTPCPL in transactions within the State of Pennsylvania which were intended and did result in the sale of the Picosure product, representing that the Picosure product would eliminate and remove tattoos which it does not and cannot do.

257.     As a direct and proximate result of the false and misleading misrepresentations, plaintiffs and the class suffered damages in the amount they paid for the Picosure product.

Wherefore, plaintiffs seek recovery under the UTPCPL including, but not limited to, treble damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Ritacca Cosmetic Surgery and Med Spa, Ltd., Black

Alsations, LLC d/b/a Pigment Demographics and Laser Removal, Saxon Hatchett, Burke

Dermatology, PA, Banucci Institute, Synergy Medical Specialists, PC, Dermatology Laser

Center & MediSpa and The Facial Surgery Center on behalf of itself and the Class,

respectfully requests that this Court issue an order:

A) Certifying this case as a class action on behalf of the Class defined above, appointing plaintiffs as class representatives, and appointing their counsel as class counsel;

B) Declaring that Cynosure's actions, as set out above, negligently and intentionally misrepresented the PicoSure product; that Cynosure breached the express warranties it made about this product and violated multiple State's Consumer Fraud statutes;

C) Awarding Plaintiffs and the Class all appropriate damages;

D) Awarding the injunctive relief necessary to ensure that Defendant's conduct alleged herein does not continue into the future;

E) Awarding Plaintiffs and the Class restitution in the form of complete disgorgement of all revenue derived from sales or leasing of the PicoSure product

F) Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

G) Entering such other injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class; and

H) Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully Submitted,


s/Devon C. Bruce
Counsel for Plaintiff

Devon C. Bruce
Jonathan M. Thomas
Power, Rogers & Smith
70 West Madison, #5500
Chicago, IL 60602
Tel: 321/236-9381

Marc Gravino
John Holevas
Joel Huotari
WilliamsMcCarthy, LLP
120 W. State Street, 4th Floor
P.O. Box 219
Rockford, IL 61105-0219
Telephone: (815) 987-8900